UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,

        Plaintiff,

    vs.                5:20-CV-539-D

$115,413.00 IN U.S. CURRENCY,

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

FEBRUARY 8, 2023
MOTION HEARING
BEFORE THE HONORABLE JAMES C. DEVER III
UNITED STATES DISTRICT JUDGE

APPEARANCES:

On Behalf of the Plaintiff:

MATTHEW FESAK, ASSISTANT U.S. ATTORNEY
MICHAEL ANDERSON, ASSISTANT U.S. ATTORNEY
United States Attorney's Office
150 Fayetteville Street, Suite 2100
Raleigh, North Carolina  27601

On Behalf of the Claimant:

WILLIAM PRUDEN, ESQ.
Pruden Law, PLLC
421 Fayetteville Street, Suite 1100
Raleigh, North Carolina  27601

CHAD AXFORD, ESQ.
Axford Law, PLLC
5171 Glenwood Avenue, Suite 206
Raleigh, North Carolina  27612

AMY M. CONDON, CRR, RPR, CSR
Official Court Reporter
United States District Court
Raleigh, North Carolina
Stenotype with computer-aided transcription

I N D E X

### PLAINTIFF'S WITNESSES

RENU SINGH

     Direct Examination by Mr. Fesak      9
     Cross-Examination by Mr. Pruden     17
     Redirect Examination by Mr. Fesak    22

CARLOS BALLESTEROS

     Direct Examination by Mr. Fesak     23
     Cross-Examination by Mr. Pruden    30
     Redirect Examination by Mr. Fesak   38
     Recross-Examination by Mr. Pruden   40

JOHN PEGRAM

     Direct Examination by Mr. Fesak     41
     Cross-Examination by Mr. Axford    53
     Redirect Examination by Mr. Fesak   63

RODNEY ALWANG

     Direct Examination by Mr. Fesak     65
     Cross-Examination by Mr. Axford    75

RAMON LYON

     Direct Examination by Mr. Anderson   87
     Cross-Examination by Mr. Pruden    117


### PLAINTIFF'S EXHIBITS

1 through 44         64


### CLAIMANT'S EXHIBITS

1 through 3        122

```
 1        (Wednesday, February 8th, 2023, commencing at 9:00 a.m.)

 2                       P R O C E E D I N G S

 3             THE COURT:  Good morning, and welcome to the United

 4    States District Court for the Eastern District of North

 5    Carolina.

 6             We're here today on a hearing for the motion to

 7    suppress in United States of America versus $115,413 in

 8    Currency.  Case number 5:20-CV-539-D.

 9             Hello, Mr. Fesak and Mr. Anderson.

10             MR. FESAK:  Good morning.

11             THE COURT:  Is it Mr. Pruden?

12             MR. PRUDEN:  Good morning, Your Honor.

13             THE COURT:  Mr. Axford.

14             MR. AXFORD:  Good morning, Judge.  I apologize for

15    being late.

16             THE COURT:  I have read all the papers.  How many

17    witnesses does the Government anticipate calling?

18             MR. FESAK:  At this time, potentially four.  Maybe

19    more, but four right now.

20             THE COURT:  How about for the claimant?

21             MR. PRUDEN:  Potentially two.  Most likely one, Your

22    Honor.

23             THE COURT:  Any preliminary matters before I hear

24    from the witnesses?

25             MR. FESAK:  Yes, Your Honor.  I filed late yesterday
```

1  a motion in limine that Transportation Security Administration

2  asked that it be filed and basically to protect its witnesses

3  from having to testify about secure, sensitive information.

4         THE COURT:  Do you have a copy of it?  I was

5  teaching last night and I did not check CM/ECF when I got back

6  from Duke.  Do you have a copy of it?

7         MR. ANDERSON:  I believe so, Your Honor.  Your

8  Honor, the only copy I have on hand is the one I marked up.

9         THE COURT:  That's fine.  We'll have it printed

10 right now.

11         Tell me about it.  Just tell me about it.

12         MR. FESAK:  Yes, Your Honor.

13         Essentially, we are asking that the TSA witnesses,

14 we have three here with us, two expected to testify at least,

15 essentially to limit their testimony to what they observed,

16 what happened on the morning of June 3rd, 2020.

17         Obviously, depending on the scope of

18 cross-examination, they could get into the methods, the means

19 of how security checks are conducted, you know, kind of

20 broader policies that if made public could expose potential,

21 you know, sensitivities and vulnerabilities in the

22 transportation security system.

23         And so, you know, the witnesses themselves are

24 pretty attuned I think to what they can and cannot answer, but

25 we just wanted to highlight the issue for the Court in

1  advance.

2          THE COURT:  Mr. Pruden?

3          MR. PRUDEN:  Thank you, Your Honor.

4          We would oppose this motion.  We received it last

5  night and this case has been going on for two-and-a-half

6  years.  Both Mr. Fesak and I have security clearances and I'm

7  sure the Court could fashion a way to protect any information

8  from being released.  However, I don't believe that that was

9  the true motive of this.

10         THE COURT:  You don't believe what?

11         MR. PRUDEN:  I don't believe that the late filing --

12  the true motive in our view, Your Honor, is because it would

13  foreclose their case as a matter of law, because the

14  administrative search did not end, the bag was not cleared

15  until after Mr. Ramon Lyon was in the interrogation room with

16  the TSA and with the airport police.  And because it ended

17  afterwards, there's something called a Code 5 where it would

18  be a security breach.  And because the TSA does not have the

19  arrest authority or the ability to detain Mr. Lyon, they would

20  have had to call the exact same police that he was being

21  interrogated by.  So he, in fact, was -- it was essentially

22  enveloped by both the -- by TSA and TSA policies and also

23  being interrogated by the police at the same time.

24         We do not have a copy of that, but we believe that

25  is their policy.  The TSA's policy would be if somebody enters

into the security line and then passes through security, the
sterile area, and then decides to leave, they would be -- they
would then be -- the APD would be contacted, a Code 5 would be
called and then they would be at the very least re-arrested or
questioned.

THE COURT:  Mr. Fesak.

MR. FESAK:  Your Honor, that is not anything that's
part of our evidence or case today.  I'm not familiar with
those procedures at all.

To the extent that they're arguing the
administrative search was never concluded, I think the
Government is willing to stipulate to that fact.  The bag was
not cleared at the time RDU police became involved.  And I
think that's really the crux of our position, which is there
is no Rodriguez-type extension of an administrative search
because the bag hadn't been cleared by the time the police got
there and took over the matter as a criminal matter.

THE COURT:  I'll rule question by question.

MR. FESAK:  Thank you.

THE COURT:  Anything else preliminarily from the
Government?

MR. FESAK:  No, Your Honor.

THE COURT:  Anything preliminarily from claimant?

MR. PRUDEN:  Yes, Your Honor.

Pursuant to Rule 615, we would like to sequester the

1  witnesses.

2          THE COURT:  Okay.  The Government gets a case agent

3  that can stay in.  You can designate one agent to be with you;

4  but otherwise, I'll invoke Rule 615 for anybody -- and it

5  applies obviously to each side.

6          Who are the -- you have three TSA people.  And then

7  what do you have, somebody from RPD?

8          MR. FESAK:  Yes.  RDU Police Department.  Our case

9  agent, Your Honor, is Tony Bell with Homeland Security.

10          THE COURT:  And who are the claimant's witnesses?

11          MR. AXFORD:  Ms. Denise Williamson sitting in the

12  back, Judge, on your left.

13          THE COURT:  What is her connection to the money?

14          MR. AXFORD:  I'll let you handle that one.

15          MR. PRUDEN:  She's the fiancee of Mr. Lyon and was

16  on the phone with him while he was in --

17          THE COURT:  So Mr. Lyon is not here?

18          MR. PRUDEN:  Not at the moment, Your Honor.

19          THE COURT:  Do you expect him?

20          MR. PRUDEN:  I can get him here.

21          THE COURT:  That's not my question.  Do you expect

22  him?  You said you thought you'd have two witnesses.  Is he

23  going to be one of your witnesses?

24          MR. PRUDEN:  No, Your Honor.

25          THE COURT:  He's not?

1          MR. PRUDEN:  No.

2          THE COURT:  Okay.  That's fine.  All right.

3          The Government may call its first witness.

4          MR. FESAK:  Your Honor, the United States calls Renu

5   Singh.

6                          RENU SINGH,

7          having been duly sworn, testified as follows:

8          THE COURT:  You may examine the witness.

9                        DIRECT EXAMINATION

10  BY MR. FESAK:

11  Q.    Good morning, Ms. Singh.  How are you?

12  A.    Good.  Good morning, sir.

13  Q.    Ms. Singh, who do you work for?

14  A.    I work for TSA, sir.

15  Q.    TSA stands for what?

16  A.    Transportation Security Agency.

17  Q.    And what is your position with TSA?

18  A.    I am a transportation security officer, a TSO.

19  Q.    TSO?

20  A.    Yes.

21  Q.    And how long have you been employed with TSA as a TSO?

22  A.    So more than 10 years.

23  Q.    Okay.  Were you on duty at approximately 5:30 in the

24  morning, on June 3rd, 2020?

25  A.    Yes, sir.

R. Singh - Direct Examination

1   Q.   Where were you assigned that morning?

2   A.   I was at the PSO position, which is a Property Search

3   Officer, like a bag check position, sir.

4   Q.   What terminal?

5   A.   At terminal two.

6   Q.   And you say you were a bag check officer position?

7   A.   Yes, sir.

8   Q.   Were you at the time fully trained on all the various

9   positions as a TSO?

10   A.   Yes, sir.

11   Q.   Would that include checking IDs?

12   A.   Yes, sir.

13   Q.   Would that include operating an x-ray machine?

14   A.   Yes, sir.

15   Q.   Around the time that we're discussing, which is 5:30 in

16   the morning June 3rd, 2020, were you called to do a bag search

17   of a bag that was later identified as belonging to a Mr. Ramon

18   Lyon?

19   A.   Yes, sir.

20   Q.   Who summoned you to do that bag check?

21   A.   Officer James Adams was on the x-ray and he called me

22   over and he showed me what he was looking at because he had

23   annotated the bag, and then he told me what he wanted to be

24   checked.  So I pulled the bag from the tunnel and moved it out

25   of sight.

R. Singh - Direct Examination

1  Q.   So you say you saw the x-ray image?

2  A.   I saw the x-ray image.

3  Q.   Can you describe what you saw on the x-ray?

4  A.   It looked like a duffle bag.  And towards the bottom of

5  the bag, it looked like an organic mass, a large organic mass

6  sitting, so that is what needed to be checked and that's the

7  reason we pulled it out.

8  Q.   All right.  Why did that large organic mass require a

9  physical hand search?

10  A.   Because organic mass, when you see something like that on

11  the x-ray, sir, it can mimic many things; some of them could

12  be -- like it could be an explosive.  So anything that is not,

13  meaning safe for people to have on the plane, so it needs

14  personal intervention and checking so...

15  Q.   So at that point in time --

16         THE COURT:  I remind counsel that I do not know

17  witnesses by sight.  Rule 615 is invoked.  If anybody is a

18  witness that has walked in they need to leave, except the one

19  person can be here for the claimant.

20  BY MR. FESAK:

21  Q.   So you took possession of the bag from the x-ray machine?

22  A.   Yes, sir.

23  Q.   Did you have an interaction with Mr. Lyon before

24  searching his bag?

25  A.   As a standard procedure, when we pull the bag to the

1  side, we were supposed to ask like whose bag it is.  So once

2  the passengers start coming in, we start to identify who the

3  bag belongs to.  And, apparently, he said, "It's my bag."  And

4  I told him that I'm going to take the bag to the table and he

5  can follow.  And then, of course, we go from there.  So that's

6  the first time.

7        And then once I reached the table, as a standard

8  procedure I have to ask is there anything sharp or dangerous

9  in the bag that could harm or injure me and if the person says

10 nothing is there, then I go from there.  That's the only

11 conversation that we have with the passenger.

12 Q.   Okay.  So describe, then, when you started your search,

13 how you went about searching the bag and what you saw.

14 A.   So once I opened the bag, I saw some bundle of currency

15 toward the top, and then -- but that is not what I was looking

16 for.  So I focused my search to the -- towards the bottom

17 where I could see.  And when I reached there, underneath the

18 lining, meaning there was lining, there was nothing there,

19 sitting there to what I was looking for in the image, so I had

20 to unzip the lining there.  And then inside I see a large --

21 there was something was sitting wrapped around in papers and I

22 couldn't see what it was.  So it was so artfully concealed

23 that as a standard procedure I'm supposed to call my

24 supervisor, and that's what I did.

25 Q.   How long do you think it took you to find that object on

1 the bottom?

2 A.   Couple of minutes, sir.  It doesn't take long to look in

3 the bag.

4 Q.   Were there a lot of clothes or other personal items in

5 the bag that you had to move aside?

6 A.   Just the usual.  Not too many, sir.

7 Q.   In your estimation, was the amount of personal items or

8 clothing consistent with a long or short duration trip?

9 A.   Assumption could be a short trip, because -- meaning

10 coming from working for 10 years, when people have their bags

11 tightly packed and a lot of stuff, this was not compared to

12 that, so -- but, you know, this is a general view because

13 people can use one T-shirt for 10 days.  I don't know.

14 Q.   Okay.  Was it possible for you to discern what was inside

15 the wrapped object in the bottom of Mr. Lyon's bag?

16 A.   No, sir, not at all.  We couldn't see it.  It was wrapped

17 in paper and something else, so no.

18 Q.   So it could have been anything?

19 A.   It could be anything.

20 Q.   It could be money?

21 A.   That is not where my assumption was.  We are looking for

22 something that is more harmful for the transportation, so

23 that's the reason I involved my supervisor.

24 Q.   It could be something potentially dangerous?

25 A.   Yes, sir.

1  Q.   Like what?

2  A.   Meaning explosive, what about that?  So that is our first

3  and major concern.

4  Q.   Okay.  You say you worked over 10 years in TSA.  Is it

5  common to experience items that are wrapped up when you're

6  checking bags going through --

7  A.   During Christmastime, sir, people bring gifts which are

8  wrapped around and all that.  But usually people, like,

9  volunteer that information that that's a book or that's a

10  candle that I'm taking for my mother and it can be

11  giftwrapped, but that is totally different.  It's a giftwrap

12  and, you know, the season, it's seasonal.  We know these kinds

13  of things are going to happen, but this is something ordinary.

14      This is out of the ordinary, I would say that, the way it

15  was wrapped, where it was sitting underneath the lining.  It

16  was like concealed.  Giftwraps are not usually concealed.  You

17  know, people are get carrying gifts all the time, so that's

18  different.

19  Q.   Had you ever seen anything like this?

20  A.   No, sir.

21  Q.   And you mentioned that passengers will often volunteer if

22  they do have a giftwrapped item, you know, this is what it is.

23  Did Mr. Lyon volunteer any information to you?

24  A.   Nothing.  No, sir.  I did not have any of the -- like he

25  did not volunteer any information.  He did not interact with

1  me at all.

2  Q.   Was that unusual?

3  A.   It depends on some people, yeah.

4  Q.   When you do encounter a giftwrapped item or wrapped-up

5  item, how do you go about clearing such an item?

6  A.   Like, sir, we ask them, like, this is a giftwrap, we need

7  to open and see it and the passengers -- usually some people

8  are happy; some people are not, but they say, okay, go about,

9  you can open it.  So we open the gift, check whatever it is

10  that we needed to check, and they can go if it's safe, yeah,

11  you can take it; if it's not, then we confiscate it.

12  Q.   But if it's alarmed on the x-ray, you need to open that

13  wrapping?

14  A.   Yes, sir.  Definitely.

15  Q.   Okay.  After you found the wrapped items at the bottom of

16  the suitcase, what did you do?

17  A.   Sir, I called for my supervisor.

18  Q.   And who was that?

19  A.   Supervisor Carlos.  He is the one who answered and came

20  over.

21  Q.   And why did you call your supervisor?

22  A.   Because the way it was concealed, sir.  Anything that is

23  concealed could be potentially linked to any activity that is

24  not safe for the transportation system, so that's the reason

25  we call.

```
 1      The artful concealment of the item, that's the reason I
 2 called.  If something was right there for me to see, I would
 3 have just checked it and it was good to go.
 4 Q.   How long did it take Carlos to respond to your call?
 5 A.   I think within a minute or so.
 6 Q.   At the time that you turned this matter over to Carlos,
 7 had the bag been cleared from a security standpoint?
 8 A.   No, not at all, sir.  It was not.
 9 Q.   Did you ask for to see Mr. Lyon's driver's license or
10 boarding pass at any point?
11 A.   No, sir.  No, sir, I did not.
12 Q.   Did you ever at any point tell Mr. Lyon that he was not
13 free to leave?
14 A.   No, sir, not at all.
15 Q.   Did you ever hear anyone else tell Mr. Lyon he was not
16 free to leave?
17 A.   No, sir.
18 Q.   Did Mr. Lyon ever indicate to you that he wanted to
19 leave?
20 A.   No, sir.
21          MR. FESAK:  No further questions, Your Honor.
22          THE COURT:  Thank you.
23          Cross-examination.
24                    CROSS-EXAMINATION
25 BY MR. PRUDEN:
```

1  Q.   Good morning, Ms. Singh.

2  A.   Good morning.

3  Q.   I have a few questions for you.

4  A.   Sure.

5  Q.   You took Mr. Lyon's bag after it ran through the x-ray

6  because he mentioned that the organic mass could conceal sheet

7  explosives; is that correct?

8  A.   No, sir.

9  Q.   Unlike Mr. Adams, in your affidavit you stated that you

10  called your supervisor because an unidentified organic mass

11  could be indicative of criminal activity, correct?

12  A.   It could be anything, sir.  Because I had not seen what

13  was inside that mass.

14  Q.   Did you conduct a bomb explosive residue test?

15  A.   No, sir.  To that time, no.

16  Q.   There was other money in the bag, correct?

17  A.   I saw a bundle lying kind of on top, yeah, when I opened

18  the bag, yes, sir.

19  Q.   And you say it was artfully concealed?

20  A.   The mass sitting at the bottom of the bag underneath the

21  lining, the way it was wrapped around and all that, yes, sir.

22  It was concealed, yes.

23  Q.   The money was concealed?

24  A.   I have no idea what it was, sir.

25  Q.   Or the way it was in the bag was con --

1  A.    Whatever was in the bag, the way it was sitting, whatever

2  item it was, it was artfully concealed.  So that's the reason

3  I called my supervisor.

4  Q.    But you did not try -- you did not try to rule out any

5  threat, that it was a threat item, correct?

6  A.    That's what we are looking for.  So meaning -- what did

7  you say?  I'm sorry.  Repeat that question.

8  Q.    If you called your supervisor because you were concerned

9  about it being involved in potential criminal activity, you

10 were -- so your testimony is that you were not -- strike that.

11        You were not taking active steps to ensure that that item

12 was not a threat item?

13 A.    So here's the thing, sir.  When I see something that is

14 concealed like that, my active first step is to involve the

15 supervisor because I have no idea what's inside it.  I need my

16 back-up team, my team there, my supervisor to be standing and

17 whatever they say, that's the next step we take from there.

18 Q.    But, Ms. Singh, in your declaration you state that -- you

19 don't mention anything about security or it being -- this item

20 being a threat item; you say it may be indicative of criminal

21 activity; is that right?

22 A.    Sir, meaning -- I don't understand the distinction, sir.

23 Q.    Between a threat item and criminal investigation.

24 A.    So the thing is this:  When something is marked annotated

25 by the x-ray operator, I'm checking it.  What it is going to

1 be, I have no -- I'm not going to assume what it might be.

2 There is no assumption there. Until and unless I check it or

3 clear it, I do not know what it is.

4     The way it was concealed, that's where I stopped. I did

5 not take any further action on it because that's where I

6 stopped, and I backed away because my supervisor took over.

7 Q. Do you know if a bomb swab was ever conducted on this

8 item?

9 A. I have no clue, sir.

10 Q. What about calling in an explosive dog?

11 A. I don't know.

12 Q. So you didn't really think this was an explosive?

13 A. So the thing is this, sir, my role in that bag was done

14 once I called the supervisor, then I stepped away. What was

15 done to it, that's not under what I did. I can only tell you

16 the steps I took.

17 Q. And you're not law enforcement, correct?

18 A. No, sir, I'm not.

19 Q. But you wear a badge?

20 A. Sir, I wear a badge. I work for TSA. I'm not a LEO,

21 though.

22 Q. And you dress similar to a police officer; correct?

23 A. Excuse me?

24 Q. Your uniform is similar to a police officer; is that

25 correct?

1  A.   Not at the RDU.  They have different color uniforms.

2  Q.   If somebody who entered the screening area then decided

3  to leave, what would happen?

4  A.   Meaning once their property had started the process of

5  screening?

6  Q.   Yes.

7  A.   If they leave the bag and they just walk away?

8  Q.   Yes.

9  A.   Then I'll be calling my supervisor definitely.  We don't

10 know what's inside the bag, the person just walked out of the

11 building.

12 Q.   Is the police eventually contacted by --

13 A.   Sir, again, you're asking me a question -- once I call my

14 supervisor, then my job is done.  That falls under the

15 supervisor what they -- steps they take.  I will not be here

16 to answer for them.

17 Q.   Did you ask Mr. Lyon any questions?

18 A.   No, sir.

19 Q.   How many times have you been involved with incidents

20 where someone's bag is determined that it needed further

21 inspection?

22 A.   Every day, sir?  As many bags can come.  Every day we

23 have like hundreds of bags coming in.

24 Q.   So you could say it's happened thousands of times?

25 A.   For me to go inside the bag and check for whatever?

1  Q.   Uhm-uhm.

2  A.   Yes, sir.

3  Q.   How many times have you detected an organic mass

4  warranting further instruction [sic] that turned out to be

5  currency?

6  A.   Many times, sir.

7  Q.   Many times?

8  A.   Many, yeah, because -- yes.

9  Q.   Many like 20?

10  A.   Meaning during the 10 years that I worked here and with

11  the older rapid-scan machines -- but we have changed to the

12  x-rays.  Now we can identify it, but those were the times when

13  we had the older x-rays, and any organic matter, if it was

14  really thick, it could be food.  Food can mimic explosives

15  too.  So, yes, it needed checking, yeah, we are checking it.

16  Q.   So it can detect cash now, the machines; is that correct?

17  Is that what your testimony was?

18  A.   We are -- a little bit these machines are better

19  detecting what it is and we can clear certain items, but those

20  were older technology and we have to check, we are checking.

21  Food can mimic that, we are checking it.  Books can do it, we

22  are checking it.

23  Q.   And organic mass is any organic material, correct?

24  A.   Organic, yes.  Books, food.  Anything.  Paper is organic.

25  Q.   How many times in your career have you detected

R. Singh - Redirect Examination

1  an organic mass warranting further inspections that turned out

2  to be sheet explosives?

3  A.   The real -- really acetone sheet explosives, sir?

4  Q.   Yes.

5  A.   I haven't found sheet explosives.  Meaning in a

6  traveler's bag, a passenger carrying it, I have not.

7          MR. PRUDEN:  No more questions.

8          THE COURT:  Thank you.  Anything else?

9                  REDIRECT EXAMINATION

10  BY MR. FESAK:

11  Q.   Ms. Singh, is it a crime to carry an explosive on an

12  airplane?

13  A.   It is a crime, sir.

14  Q.   So if you're unable to rule out whether something is or

15  is not explosive, is that indicative to you of potential

16  criminal activity?

17  A.   Yes, sir.

18          MR. FESAK:  No other questions, Your Honor.

19          THE COURT:  Thank you.

20          Anything else?

21          MR. PRUDEN:  No, Your Honor.

22          THE COURT:  Thank you, ma'am.  Please watch your

23  step.

24          The United States may call its next witness.

25          MR. FESAK:  The United States calls Carlos

1  Ballesteros.

2                          CARLOS BALLESTEROS,

3           having been duly sworn, testified as follows:

4              THE COURT:  You may examine the witness.

5                          DIRECT EXAMINATION

6  BY MR. FESAK:

7  Q.    Good morning, Mr. Ballesteros.

8  A.    Good morning.

9  Q.    Who do you work for?

10  A.    TSA.

11  Q.    That's the Transportation Security Administration?

12  A.    Yes, sir.

13  Q.    What is your position with TSA?

14  A.    I'm a supervisor right now.

15  Q.    And were you a supervisor back in June of 2020?

16  A.    Yes, sir.

17  Q.    When did you become a supervisor?

18  A.    December 8th, 2019.

19  Q.    And how long have you been with TSA altogether?

20  A.    Seven years.

21  Q.    So you started off as a regular TSO?

22  A.    TSO, yes.

23  Q.    Were you on duty around 5:30 in the morning on June 3rd,

24  2020?

25  A.    Yes, sir.

C. Ballesteros - Direct Examination

1   Q.   And where were you assigned that morning?

2   A.   Terminal two checkpoint.

3   Q.   How far away is the supervisor's station from the actual

4   checkpoint?

5   A.   Probably 25 feet.  I'm sorry.  Can you repeat the

6   question?

7   Q.   Where you were located, how far away is that from the

8   x-ray machine and the property search table?

9   A.   So, yeah, probably about 20, 25 feet.

10  Q.   Okay.  On June 3rd, 2020, at around 5:30 in the morning,

11  do you recall being summoned by TSO Renu Singh in reference to

12  a bag search of a bag belonging to Mr. Ramon Lyon?

13  A.   Yes, sir.

14  Q.   When you arrived in response to Ms. Singh's summoning,

15  what did she tell you about the reason for calling her

16  supervisor?

17  A.   So she showed me a bag on the screen, the screening

18  table, she showed me a bag and she was concerned with what was

19  in the bag.

20  Q.   Did you see the x-ray image also?

21  A.   Yes, sir.

22  Q.   And you saw the bag?

23  A.   Yes, sir.

24  Q.   Did you search the bag itself when you arrived?

25  A.   Yes, sir.

C. Ballesteros - Direct Examination

1  Q.   What did you see inside it?

2  A.   First I look at the image and looks like there's some

3  masses inside of the bag.  And when we opened the bag, I

4  saw -- under the liner on the bag was some -- something

5  wrapped in newspaper and vacuum sealed under the liner of the

6  bag.

7  Q.   Could you tell what it was that had been wrapped in

8  newspaper and vacuum sealed?

9  A.   No, sir.

10  Q.   Did you ask Mr. Lyon what was inside the packaging?

11  A.   I believe I did, yes, sir.

12  Q.   And would that have been consistent with your routine

13  practice, to ask a passenger what's inside something?

14  A.   Yes, sir.

15  Q.   And what did he tell you?

16  A.   I think he said cash.

17  Q.   The fact that Mr. Lyon told you that it had been cash

18  that was wrapped in newspaper and vacuum sealed, was that

19  sufficient, that information sufficient by itself for you to

20  clear that bag through security?

21  A.   No, sir.

22  Q.   Why not?

23  A.   I don't know what's in there.

24  Q.   Did you open it to find out?

25  A.   No, sir.

1  Q.   Did you remove it from where it was located --

2  A.   No, sir.

3  Q.   -- in the bottom of the bag under the liner?

4  A.   No, sir.

5  Q.   Why not?

6  A.   Because I didn't know what it was.

7  Q.   And so what does your training and TSA policy tell you to

8  do in that situation?

9  A.   So because it looks like criminal activity, I have to

10  call the LEO immediately.

11  Q.   When you say "LEO," can you --

12  A.   Law enforcement officer.  Sorry.

13  Q.   And just some background information I think that will be

14  helpful.  You as a supervisory TSO, do you have law

15  enforcement authority yourself?  Are you a sworn law

16  enforcement officer?

17  A.   No, sir.

18  Q.   Can you make arrests?

19  A.   No, sir.

20  Q.   How about Ms. Singh?

21  A.   No, no, sir.

22  Q.   She's not a law enforcement officer either?

23  A.   (The witness nodded negatively.)

24  Q.   What agency at RDU Airport has primary law enforcement

25  jurisdiction?

1  A.   The RDU police.

2  Q.   So if you encounter a passenger in the course of a

3  security screening who you suspect may be involved in criminal

4  activity or may be committing a crime, what is it that you do?

5  A.   We call for a law enforcement officer.

6  Q.   Is bringing an explosive material into a terminal a

7  criminal offense?

8  A.   Yes, sir, it is.

9  Q.   So if there's a possibility that some object is

10  explosive, is that something you handle or do you call RDU

11  police?

12  A.   Yeah.  We call the RDU police and we call the PSSE, the

13  explosive experts.

14  Q.   What if it isn't an explosive?  What if it's a large bulk

15  bundle of currency that is packaged and hidden in such a way

16  that it might look like it's involved in criminal activity, is

17  that something you handle or do you call the police?

18  A.   I call the police, sir.

19  Q.   I mean, is there any -- strike that.

20       So is it accurate to say regardless of what was wrapped

21  up in the bottom of Mr. Lyon's suitcase, that the appropriate

22  response in your mind was to call a LEO?

23  A.   Yes, sir.

24            MR. FESAK:  One moment, Your Honor.

25  BY MR. FESAK:

1  Q.   Again, why wouldn't you cut open, you know, or remove

2  that packaging and cut it open just to see for yourself what

3  it is?  Is that a safety risk for you?

4  A.   Yes, it is.  We can't -- I mean, I don't want to do that

5  because I didn't know what it was.  But once he said it was

6  cash, it looks like criminal activity, my go-to is call the

7  law enforcement and they will take care of it.

8  Q.   In this case, did you call a LEO?

9  A.   Yes, sir.

10 Q.   How close was that LEO stationed to your checkpoint?

11 A.   Probably like 10 feet away, 10 feet.

12 Q.   How long did it take them to respond?

13 A.   Less than a minute.

14 Q.   And at the time that the LEO responded to the situation,

15 had Mr. Lyon's bag been cleared from an aviation security

16 standpoint?

17 A.   No, sir.

18 Q.   Is there a requirement for you to make a report any time

19 you call a law enforcement officer?

20 A.   Yes, sir.

21 Q.   And is that requirement in a written policy of TSA?

22 A.   Yes, sir.

23 Q.   In order to facilitate you preparing such a report, do

24 you typically request documentation from a passenger?

25 A.   Yes, sir.  We ask the passenger if they can provide a

C. Ballesteros - Direct Examination

1 driver's license and a boarding pass.

2 Q.   Do you recall whether you requested Mr. Lyon to do that?

3 A.   I do not, no, sir.

4 Q.   Assuming a passenger complies, what do you do with the ID

5 and the boarding pass?

6 A.   We make a copy for the documentation.

7 Q.   And then what do you do after you make a copy?

8 A.   I'll hand the boarding pass and the driver's license back

9 to the passenger or the law enforcement officer.

10 Q.   Okay.  What happens if a passenger refuses to give you

11 his boarding pass and ID?

12 A.   I'll wait for the LEO to provide that information to me.

13 Q.   Do you recall whether Mr. Lyon voluntarily gave you his

14 license or not?

15 A.   I do not, no, sir.

16 Q.   And at any time during your interaction with Mr. Lyon,

17 did you ever tell him he was not free to leave?

18 A.   No, sir.

19 Q.   Did you ever hear anyone else tell Mr. Lyon that he was

20 not free to leave?

21 A.   No, sir.

22 Q.   Did you ever hear Mr. Lyon say that he wanted to leave?

23 A.   No, sir.

24          MR. FESAK:  No other questions, Your Honor.

25          THE COURT:  Thank you.

1          Cross-examination.

2                          CROSS-EXAMINATION

3     BY MR. PRUDEN:

4     Q.    Good morning.  I have a few questions for you.

5           First, you didn't ask for Mr. Lyon's ID, did you?

6     A.    I don't remember if I did, but I don't think so, no, sir.

7     Q.    And you said -- your testimony is that it looked like

8     cash.

9     A.    No.  I did not say that, no.

10    Q.    You did not know what the item was, correct?

11    A.    Correct.

12    Q.    How many explosive swabs have you done -- do you do a day

13    typically while you're on your shift?

14    A.    Can you repeat the question?

15    Q.    How many of those swabs do you conduct on a daily basis

16    at your shift?

17    A.    A lot.

18    Q.    Can you define "a lot"?

19    A.    Maybe 30, 40, 50.

20    Q.    And that's a day, correct?

21    A.    Yes, sir.

22    Q.    And that wasn't done on this item that you believed to be

23    a threat item?

24    A.    No, sir.

25    Q.    Was it ever done?

1   A.   I don't believe so, no.

2   Q.   Did you call a bomb dog?

3   A.   No, sir.

4   Q.   So you really didn't think it was an explosive, right?

5   A.   Well, once he said it was cash, my go-to -- you know, my

6   next step is to call the LEOs.

7   Q.   Who said it was cash?

8   A.   I don't know his name, but the person -- the owner of the

9   bag.

10  Q.   And you were present when the law enforcement officer

11  originally took Mr. Lyon's license, correct?

12  A.   I don't remember that, no.

13  Q.   Going to the questions.  By what authority did you have

14  to ask him questions about his bag or what -- any questions at

15  all, what authority gave you -- what authority did you have to

16  do that as a member of the TSA without law enforcement, as not

17  a sworn law enforcement officer?

18  A.   Do I ask what's in the bag?

19  Q.   Uhm-uhm.

20  A.   I don't understand the question.

21  Q.   By what authority were you allowed to ask -- to question

22  Mr. Lyon about the items in his bag?

23  A.   I don't know the answer to that, sir.

24  Q.   Did you tell him that he did not have to answer any

25  questions?

1  A.   Can you repeat that, please?

2  Q.   Did you tell Mr. Lyon that he did not have to answer any

3  questions?

4  A.   I did not.

5  Q.   Did you know he had the right not to answer any of your

6  questions?

7           MR. FESAK:  Objection.

8           THE COURT:  Sustained.

9           Next question.

10 BY MR. PRUDEN:

11 Q.   Do you remember when Officer Pegram arrived?

12 A.   Yes, sir.

13          MR. PRUDEN:  Your Honor, if I may, I'll show a

14 video.

15          THE COURT:  Okay.

16     (Video played in open court.)

17 BY MR. PRUDEN:

18 Q.   Mr. Ballesteros, is this an accurate portrayal of that

19 morning when you approached Mr. Lyon?

20 A.   I can't -- it's not on.

21 Q.   How about now?

22 A.   Yes.

23     (Video played in open court.)

24 BY MR. PRUDEN:

25 Q.   Is that you talking to Mr. Lyon?

1  A.   I can't see myself in that video.

2       (Video played in open court.)

3  BY MR. PRUDEN:

4  Q.   It's at the very bottom of the screen.  I believe you can

5  see your head.

6       (Video played in open court.)

7  BY MR. PRUDEN:

8  Q.   I'm going to fast forward to where you and Officer Pegram

9  begin engaging with Mr. Lyon.

10      (Video played in open court.)

11 BY MR. PRUDEN:

12 Q.   Now, at that point had the bag been cleared by the TSA?

13 A.   No, sir.

14 Q.   Do you remember this conversation?

15 A.   No, sir.

16      (Video played in open court.)

17 BY MR. PRUDEN:

18 Q.   A few minutes later -- this is you, correct?

19 A.   Yes, sir.

20 Q.   So now it's you and the law enforcement officer both

21 engaging with Mr. Lyon?

22 A.   Yes, sir, that's what it looks like.

23      (Video played in open court.)

24 BY MR. PRUDEN:

25 Q.   Right there, why were you looking at his phone?

1  A.    I couldn't tell you, sir.

2       (Video played in open court.)

3  BY MR. PRUDEN:

4  Q.    At this point it appears he was making a phone call; is

5  that correct?

6  A.    Yes, sir.

7  Q.    And it's been seven minutes, almost eight minutes since

8  he's passed through security.

9       What's the typical time -- once you put your luggage on

10 the rack to go through, what's the average time that it takes

11 somebody to clear security?

12 A.    I'll say three minutes.

13 Q.    Two minutes?

14 A.    Yeah.  Two, three minutes, yeah.

15 Q.    In your experience, how common is it for somebody to make

16 a phone call in that area between -- not answer a phone call,

17 but to make a phone call while they're waiting to get their

18 items back?

19 A.    While we're doing a property search or...?

20 Q.    It is not common for people to make a phone call,

21 correct, while they're waiting to have their items --

22 A.    It depends, yes.

23 Q.    Were you trained to engage in casual conversation and

24 make observations about passengers?

25 A.    Yes, sir.

1          MR. PRUDEN:  One moment, Your Honor.

2      (Pause in the proceeding.)

3  BY MR. PRUDEN:

4  Q.   And you wear a TSA uniform that indicates to all air

5  travelers you are in a position of authority, don't you?

6  A.   Yes, sir.

7  Q.   And in common practice, air travelers are expected to

8  obey the direction of TSA officers pretty much from the time

9  they walk into RDU; is that correct?

10 A.   Yes, sir.

11 Q.   At this point what would happen if Mr. Lyon tried to exit

12 and go back out the airport?

13 A.   There's nothing I can do.

14 Q.   Would you call anybody?

15 A.   Probably the LEOs.

16 Q.   Is it a security breach?

17 A.   It depends.

18 Q.   With this situation right now with Ramon Lyon, if he just

19 turned around and walked -- tried to walk back out.

20 A.   It could happen, yes.

21 Q.   It could happen or would happen?

22 A.   It could have been a security breach, yes.

23 Q.   What's the name of that security breach?

24 A.   It's just a breach.

25 Q.   You don't have any code signs?

C. Ballesteros - Cross-Examination

```
 1  A.    We do have a code.
 2              MR. FESAK:  Objection to the extent it calls for
 3  SSI.
 4  BY MR. PRUDEN:
 5  Q.    So if he left at this moment, you would -- you would call
 6  the airport police directly?
 7  A.    No.  Since the LEO was already there, I don't think I
 8  have to do anything about that.
 9  Q.    But if they weren't, you would call law enforcement,
10  correct?
11  A.    Yes.
12  Q.    And would they be arrested?  They would be arrested?
13              MR. FESAK:  Objection.
14              THE COURT:  Sustained.  He's not a law enforcement
15  officer.
16  BY MR. PRUDEN:
17  Q.    And did you -- let me rephrase that.
18        You were involved in this seizure and you assisted
19  carrying Mr. Lyon's luggage into the police security room, the
20  interrogation room; is that correct?
21  A.    No, sir.
22        (Video played in open court.)
23  BY MR. PRUDEN:
24  Q.    I'm going to show you another video.
25        (Pause in the proceeding.)
```

1        (Video played in open court.)

2   BY MR. PRUDEN:

3   Q.   Can you identify this room?

4   A.   No, sir.

5   Q.   You've never been in this room?

6   A.   I don't recall being in there, no, sir.

7        (Video played in open court.)

8   BY MR. PRUDEN:

9   Q.   Is that not you, sir?

10  A.   No, sir.

11  Q.   Do you know who that is?

12  A.   I can't see the face, sir.

13       (Video played in open court.)

14  BY MR. PRUDEN:

15  Q.   Now, at this point had the bag been cleared by TSA?

16  A.   I don't believe so, no, sir.

17       (Video played in open court.)

18  BY MR. PRUDEN:

19  Q.   Have you determined if that was you?

20  A.   That's not me.

21  Q.   Do you know who it is?

22  A.   Yes, sir.

23  Q.   Can you tell us, please?

24  A.   It's -- his name is Chris John, another supervisor.

25  Q.   Is he in the courthouse today?

1  A.   No, sir.

2  Q.   Okay.  Thank you.

3         MR. PRUDEN:  One moment, Your Honor.

4      (Pause in the proceeding.)

5  BY MR. PRUDEN:

6  Q.   So it's your testimony that you've never been in this

7  room and you were not involved?

8  A.   No.  No, sir.  I don't remember being in there.

9         MR. PRUDEN:  No more questions, Your Honor.

10        THE COURT:  Anything else?

11                    REDIRECT EXAMINATION

12  BY MR. FESAK:

13  Q.   Mr. Ballesteros, why wasn't an ETD swab down on

14  Mr. Lyon's bag?

15  A.   The moment he said it was cash, there was no need to do a

16  swab, we call the LEOs.  The moment he say it was cash, we

17  called the LEOs immediately.

18  Q.   What if it -- did you know for certain that it was cash?

19  A.   No, sir.

20  Q.   So are you going to take his word for it?

21  A.   No, sir.

22  Q.   Then I'll re-ask the question.  Why didn't you do an ETD

23  swab if you're not going to take his word for it?

24  A.   I call the LEO and the LEO will take over that matter.  I

25  would have to remove the item of the bag to do the swab, and I

 1  didn't know what it was, so the LEO will take care of that

 2  part of it and so we call the LEOs.

 3  Q.   Are you familiar with TSA Management Directive 100.4?

 4  A.   Maybe.

 5  Q.   Let me publish Exhibit 8 to Claimant's motion to

 6  suppress.  Can you see what's on the screen in front of you?

 7  A.   Yes, sir.

 8  Q.   Does that refresh your recollection?  Have you seen that

 9  document before?

10  A.   Yes, sir.

11  Q.   And can we please skip forward to page 9.  I want to

12  direct your attention to paragraph number 2 at the top of the

13  page, the third sentence where it says -- I'm quoting here --

14  "As a general matter, there should be no reason to ask

15  questions of the passenger about currency, although there may

16  be times when questions are warranted by security needs."

17       Do you see that?  Third sentence down.  We're going to

18  try and highlight it for you.

19       Anyway, let me ask you this while we're waiting:  Did you

20  ask Mr. Lyon how much cash he was carrying?

21  A.   No, sir.

22  Q.   Did you ask him why he was carrying cash?

23  A.   No, sir.

24  Q.   Did you ask him where he got the cash from?

25  A.   No, sir.

1   Q.   Did you ask him questions about the currency?

2   A.   No, sir.

3   Q.   All you asked was what he had concealed inside of

4   newspaper and shrinkwrap; is that right?

5   A.   Yes, sir.

6        MR. FESAK:  No other questions, Your Honor.

7        THE COURT:  Thank you.

8        Anything else?

9        MR. PRUDEN:  Yes, Your Honor.

10                   RECROSS-EXAMINATION

11  BY MR. PRUDEN:

12  Q.   As a TSA officer, your duty is to protect airports, the

13  passengers inside the airports, and the planes and the

14  passengers inside the planes; is that correct?

15  A.   Yes, sir.

16  Q.   Is it your job to detect threat items?

17  A.   Yes, sir.

18  Q.   Such as -- so your job would be to determine whether or

19  not an item is a threat item, correct?

20  A.   Yes, sir.

21  Q.   Not law enforcement; is that correct?

22  A.   Yes, sir.

23  Q.   And you didn't know -- your testimony is you did not know

24  for sure whether this was currency; is that right?

25  A.   Yes, sir.

1  Q.   But you turned this potentially dangerous item over to

2  law enforcement?

3  A.   Yes, sir.

4  Q.   That could have been a bomb?

5  A.   Could have been, yes, sir.

6            MR. PRUDEN:  No further questions.

7            THE COURT:  Thank you.

8            Thank you.  Please watch your step stepping down.

9            The United States may call its next witness.

10           MR. FESAK:  United States calls John Pegram.

11                        JOHN PEGRAM,

12             having affirmed, testified as follows:

13           THE COURT:  You may examine the witness.

14           MR. FESAK:  Thank you, Your Honor.

15                      DIRECT EXAMINATION

16 BY MR. FESAK:

17 Q.   Mr. Pegram, what is your occupation currently?

18 A.   Currently I am retired.

19 Q.   Retired from what?

20 A.   Retired law enforcement officer from the Raleigh-Durham

21 International Airport Police Department.

22 Q.   Can you summarize for the Court your law enforcement

23 career?

24 A.   I came to Raleigh-Durham Airport as a law enforcement

25 officer in July of 1983, and I served as a duty supervisor for

1  most of that term up until I had my first retirement, which
2  came in December of 2011.  I came back to Raleigh-Durham about
3  two-and-a-half months later in 2012, around the beginning of
4  March in 2012, and I've stayed there as a part-time law
5  enforcement officer, as a security checkpoint intervention
6  officer, armed law enforcement for the airport, but for the
7  TSA under the canopy of TSA Federal Government.  And I stayed
8  there from that time until -- I think last March, and I turned
9  everything in and said I was done.  I'm through now.
10  Q.   So I want to unpack a little bit what this part-time
11  officer does.  You're a full, sworn law enforcement officer?
12  A.   Yes, sir, I was at the time.
13  Q.   You can carry a firearm?
14  A.   Absolutely.
15  Q.   And badge?
16  A.   Yes, sir.
17  Q.   Can make arrests?
18  A.   Yes, sir.
19  Q.   All right.  So what is it that you do as a part-time
20  officer that is different than a full-time officer?
21  A.   So at the time when I was there at security checkpoint --
22  well, for the RDU Airport Law Enforcement Department, as a
23  checkpoint officer -- we call them part-time officers.  Our
24  responsibility was to be the first responder for law
25  enforcement, any law enforcement intervention that was needed

1  at the security checkpoint that you were assigned to.  So
2  anything where a police officer or law enforcement needed to
3  get involved, needed to handle, needed to facilitate, call for
4  assistance or backup or have the first line of intervention,
5  we did that, whether it's, you know, helping someone that
6  needed help otherwise, whether it is intervening in a
7  situation, airport security, any type of, you know, security
8  checkpoint.  Screening issues that would come up, we were the
9  first intervention officer that would come there and respond
10 to that.
11 Q.   What if TSA finds in a bag a potential threat item, they
12 can't determine exactly what it is, is that their duty to
13 figure it out or is that something they call you for?
14 A.   That's when they are going to call one of the assigned
15 checkpoint officers or whomever from the law enforcement
16 sector to come and respond.
17      There's a requirement that we have to respond and be
18 available as law enforcement to any type calls like that, and
19 so that's what we would do.  I would be there, a line of
20 defense there to respond to anything they had going on.
21 Q.   Were you on duty at approximately 5:30 a.m. on June 3rd,
22 2020?
23 A.   Yes, I was.
24 Q.   Where were working that morning?
25 A.   I was at what we call terminal two, which was at the

1    security checkpoint, that's where I was.  Which is an area

2    that is -- it's toward the back of the checkpoint, past the

3    screening mechanisms where the passengers going to come

4    through each queue line and they are going to work their way

5    through x-ray and whatever other intervention needs to happen.

6    And then after that, that's the regroup area where they going

7    to get all their stuff together and head toward the gate.

8        My position at that time was at the back area, what we

9    call the law enforcement podium, which is a desk, and we

10   respond directly to whatever needs to happen at the back part

11   of the checkpoint.

12   Q.   And that podium, is that -- do you have kind of equal

13   access to both the checkpoint coming in as well as the exit of

14   people going out?

15   A.   Yes.

16   Q.   So how far away would you say you were from the security

17   checkpoint?

18   A.   I'm right in the middle of it, right there in the middle

19   of it at the back quadrant of the checkpoint.

20   Q.   How long would it take you to respond when you got

21   called?

22   A.   Immediately.  Seconds, seconds.

23   Q.   And on June 3rd, 2020, around 5:30, do you recall being

24   summoned by TSA in reference to the search of a bag belonging

25   to a Mr. Ramon Lyon?

J. Pegram - Direct Examination

1  A.   I do.  I'm not quite certain how the call came in, but I

2  was summoned to respond to a call to one of the lanes.

3  Q.   And when you responded, do you recall what you were told

4  by the TSA personnel who called you?

5  A.   I was told that they had what they call bulk cash in a

6  bag and it was at one the lanes.  So I had to respond over

7  there to that lane.

8  Q.   Did you take any steps to verify for yourself what was in

9  the bag?

10  A.   I did.  When I got over to the bag search area, the bag

11  was there.  TSA agents are usually going to identify with us

12  what they have going on.  So I'm going to ask them what do you

13  have.  They going to say we got bulk cash and at whatever

14  point they are in their screening, you know, where they have

15  called us, I'm going to observe from that point to see and

16  confirm what it is that they have going on, what they think

17  they may have going on.

18      So what I recall, when I got over there, we have a bag on

19  the table and the TSA agent says, well, cash and stuff.  So

20  when I go to look in the bag, you know, I see what appeared to

21  be some bulk cash inside of the bag.

22  Q.   So when you say it appeared to be bulk cash, there was

23  money, bills you can physically see laying on top; is that

24  right?

25  A.   Yes.

1  Q.   Were you alerted by TSA to anything that had been

2  concealed inside the bottom of the bag?

3  A.   Not -- okay.  Let me say it like this.  They -- I believe

4  how it happened is that when I looked in the bag, I see a -- I

5  see a wad of bulk cash that is wrapped, appears to be wrapped

6  and packaged some kind of way, but I can see it's cash money.

7  And I see, I believe what it is, it's like -- in every bag you

8  have a panel.  You have a bottom of the bag.  You have side

9  sleeve sometimes.  And what I -- from what I recall, because

10  we're talking about almost three years ago, I saw bulk cash,

11  but then I also saw what I believe was possibly something else

12  up under the bottom panel of the bag that looked to be

13  wrapped.

14  Q.   Did you know what that something else was?

15  A.   Today I do.

16  Q.   At the time.

17  A.   At the time I really honestly don't think I did.  But

18  that was --

19  Q.   Do you remember what it looked like?

20  A.   It looked like -- honestly, it looked like more money or

21  something that was wrapped.  There was one loose wad wrapped,

22  but then there was plastic and some taping or something under

23  the panel that appeared to be wrapped also.

24  Q.   All right.  So that's really kind of -- I should have

25  rephrased the question.  So how was it -- what was visible to

1  you?

2  A.    I think it was maybe still some clothing items in the bag

3  still, but it was at the point where TSA stopped their process

4  of screening once they, I guess, saw that there was bulk cash

5  in there.  So it stops right there.  And then that's what I

6  need to see, and then I make my call for the -- after that for

7  whatever we need to do.

8  Q.    Did you -- did you ask Mr. Lyon how much money he was

9  carrying at any point in time?

10  A.    Yes, I did.  I recall asking.

11  Q.    And what was his answer?

12  A.    $6,000.

13  Q.    $6,000?

14  A.    Yes.

15  Q.    Did you have reason to believe that that was an

16  inaccurate statement?

17  A.    At that time I kind of -- it wasn't, you know, either

18  way, I'm going on what he said, and I did see bulk cash there.

19      I would say that I know of that wad that I saw was $6,000

20  in there, but looking at it I thought that, okay, if that's

21  6,000, it's got to be all ones, but I don't know if that's

22  6,000 in all ones, $6,000 in all one-dollar bills.

23  Q.    Just to clarify.  What you saw, that wad of money, you

24  didn't think was -- you thought it didn't quite jive with it

25  being $6,000?

1  A.    That's correct, sir.  That's correct.

2  Q.    Okay.  And in terms of the other item that was wrapped in

3  plastic and tucked in the bottom of the bag, you say today you

4  know what that was.  You didn't know what it was at the time,

5  correct?

6  A.    That's correct.

7  Q.    Have you seen -- have you ever seen money packaged that

8  way before?

9  A.    Not really.  Not like that.  Not usually, no.  Only in,

10  you know, cases where, you know, an intervention is taking

11  place and that's just how it was packaged, but I've never

12  really come across it like that myself.

13  Q.    So that was pretty unusual to see something like that?

14  A.    Unusual, yes.

15  Q.    Have you ever seen drugs packaged in vacuum-sealed bags?

16  A.    Yes.

17  Q.    Did that item look suspicious to you?

18  A.    It did.

19  Q.    So when you get there and based on everything you've

20  seen, is this a matter that you can resolve yourself as a

21  part-time officer or do you have to elevate it up to the

22  chain?

23  A.    I have to elevate it.

24  Q.    And so what steps do you take next?

25  A.    I have to call for a full-time law enforcement officer

1  and they're going to respond because my position is pretty

2  much a status-above position.  I'm there for first respondent

3  at the checkpoint.  There are other things that has to take

4  place in order to facilitate getting the bag issue resolved

5  and cleared completely.  And once I call the full-timers, they

6  come, they are going to take over from that point from me and

7  they will take the next necessary steps that they need to take

8  to deal with the bulk cash issue.

9  Q.   So aside from calling the full-time officer to take

10 responsibility, like, in your experience, is the -- when

11 there's a potential threat item or a weapon or bulk cash or

12 whatever it is that requires LEO involvement, is that

13 something they just start pulling out evidence right there at

14 the checkpoint or do they move the bag?

15 A.   No.  Once I get there, once the law enforcement officer

16 gets there to respond to check-in, we're going to inquire to

17 the TSA personnel, what do you have.  They going to tell us.

18      We're going to -- and for this specific situation -- look

19 to see what it is that they think that they see or that they

20 don't see based on this specific bag.  And from that point,

21 I'm going to look and see and I'm going to assess it, and then

22 I'm going to make a determination that this is something that

23 does need to be advanced, you know, up line, to the level of

24 calling in the full-time officer, that element.  And this was

25 me seeing that bulk wad of cash there and then whatever that

1  additional was under the panel in the bag that could not be

2  explained because I was not going to be able to go in-depth to

3  investigate that any further.  My stop was right there.  So

4  that's -- and that's when I called them, called the full-time

5  officers.

6  Q.   And are the full-time officers stationed right there at

7  the checkpoint just like you are?

8  A.   Not stationed directly there.  There is someone usually

9  assigned to that terminal building, so they're within, you

10 know, a quick response time most of the times.

11 Q.   And do you recall in this case whether -- how long the

12 response time was?

13 A.   It was not -- from what I recall, it was not a long time.

14 When I say "not a long time," it wasn't any longer than

15 maybe -- any longer than maybe 10 minutes, a response time to

16 get there.

17 Q.   So you maybe had to wait a few minutes for the full-timer

18 to get there?

19 A.   Yes.

20 Q.   Did you take any investigative steps of your own while

21 you were waiting in terms of like reviewing, you know,

22 documentation, boarding pass, ID?  Can you explain that?

23 A.   Yes.  For that specific case, I don't remember exactly

24 what my line of intervention was with that, but I'm normally

25 going to have a boarding pass, you have to have a boarding

J. Pegram - Direct Examination

1  pass to come through the checkpoint usually if you're going to

2  leave on the flight.  So get a copy of the boarding pass, run

3  the person's driver's license or identification to check for

4  warrants or, you know, anything else, and also to get a copy

5  of that from the TSA personnel just to have that and check

6  with communications, whatever response they come back with on

7  that and get a -- start a case number.  Sometimes I start it.

8  Sometimes the officer that responds will start the case

9  number.

10 Q.  So to your recollection, you did obtain or request a

11 driver's license from Mr. Lyon?

12 A.  From what I remember, I believe I did.

13 Q.  And what do you do with that once the full-time officer

14 arrives?

15 A.  Turn that over to the full-time officer.

16 Q.  At any time during your interaction with Mr. Lyon, did

17 you tell him he was not free to leave?

18 A.  Oh, no.  No, sir.

19 Q.  That he was being detained?

20 A.  No, no.

21 Q.  Arrested?

22 A.  No.

23 Q.  Did you ever hear anyone else tell Mr. Lyon he was not

24 free to leave?

25 A.  No, sir.

1  Q.   Do you ever hear Mr. Lyon indicate that he wanted to

2  leave?

3  A.   No, sir.

4  Q.   Have you ever encountered passengers who would say, you

5  know, I'm in a hurry, I'm worried about missing my flight, you

6  know --

7  A.   Yes.

8  Q.   How do you respond in that kind of a situation?

9  A.   It can vary depending on whatever the situation is, but

10 they -- I would inform them that, well, you do have some

11 options.  The airline is not necessarily going to wait for you

12 irregardless of what's happening here.  Whatever the process

13 is that needs to be engaged.

14      But this specific case, it's going to have to finish out.

15 You -- as a passenger, you have a right to leave under most

16 circumstances unless there's an arrestable offense, you know,

17 right there.  But unless -- without that, you're free to

18 leave.  But this -- or this property that has not been fully

19 cleared or whatever, it has to remain and the investigation

20 has to finish out for that.

21 Q.   And do you know if a passenger chooses to stay to

22 participate in the investigation, whether they have the option

23 of getting rebooked on a later flight?  Is that something

24 that --

25 A.   Usually they do.  And a lot of times the law enforcement

1 will assist them, you know, if an arrest has not taken place.

2 Even if it has. A lot of times they'll try to help them to

3 get -- find some means of getting where they need to get to,

4 if they have to.

5 Q. And finally, you testified earlier about asking Mr. Lyon

6 how much currency he was carrying. Is that -- did you repeat

7 that question at any point in time?

8 A. I did. I did. Because I saw the bulk piece of cash

9 there and whatever there was under the panel that appeared to

10 be -- it looked like cash to me, he said that he had $6,000

11 and I said okay. And I confirmed, after checking for the

12 driver's license and the boarding pass and all of that again,

13 how much do you have, and it was $6,000. He said $6,000. I

14 said okay.

15           MR. FESAK: That's all the questions I have, Your

16 Honor.

17           THE COURT: Cross-examination.

18                     CROSS-EXAMINATION

19 BY MR. AXFORD:

20 Q. Officer Pegram --

21 A. Yes.

22 Q. -- as a part-time officer, you testified that you don't

23 have the ability to inform TSA that the bag is -- it's fine,

24 you can clear it, you do not have that authority?

25 A. No, no. Say that again.

J. Pegram - Cross-Examination

1  Q.   You testified that as a part-time officer, if further

2  investigation were to be needed, you would then have to call

3  in a full-time officer?

4  A.   Uhm-uhm, yes.

5  Q.   Do you have the ability to tell TSA that bag is fine, you

6  can now clear it?

7  A.   I would have to answer that question to say no,

8  because -- I would have to say no.

9  Q.   Okay.  But you do have the ability to obtain somebody's

10 driver's license and boarding pass?

11 A.   Yes.

12 Q.   And in this case, in fact, you obtained Mr. Lyon's

13 driver's license at around 5:36.  I know obviously this has

14 been a long time ago.

15      Have you reviewed the TSA video before your testimony

16 here today?

17 A.   Only one part that had me in it I think I saw and that

18 was it.

19 Q.   Okay.

20 A.   When I initially got there.

21 Q.   And do you remember that the main TSA agent that you were

22 having a conversation with was a Mr. Ballesteros, first name

23 Carlos?

24 A.   I recall it, you know, now.  But he wasn't in the part of

25 the video that I saw.  It was just --

1  Q.    Okay.

2  A.    -- me and Mr. Lyon.

3  Q.    And in June of 2020, that's pretty much right at the

4  beginning of the pandemic, wasn't it?

5  A.    Yeah, I believe so, yeah.

6  Q.    And do you remember that Mr. Lyon was wearing a K9 -- or

7  KN90 mask?  Do you remember him wearing a mask?

8  A.    I can't say for sure if he was, in fact, wearing a mask

9  or not.

10  Q.    If I showed you a video of that interaction, would that

11  refresh your memory?

12  A.    Sure.  Sure.

13          MR. AXFORD:  With Your Honor's permission, I'll just

14  play a snippet of that video.

15          THE COURT:  That's fine.

16          MR. AXFORD:  Mr. Pegram, do you see anything on your

17  monitor yet?

18          THE WITNESS:  There's a microphone on the corner,

19  but that's it.  It's coming up now.

20      (Video played in open court.)

21  BY MR. AXFORD:

22  Q.    The figure there with the white hat, black shirt, and

23  white mask, does it appear to be Mr. Lyon, as you remember?

24  A.    It appears to be him from here.

25  Q.    My indication that he was wearing a mask that day, would

1  you now agree he was wearing a mask?

2  A.    Yes.   Uhm-uhm.

3  Q.    So if he told you $6,000, is there a chance you might

4  have misunderstood him?

5  A.    No.

6  Q.    There's no chance?

7  A.    No.

8  Q.    Do you remember the TSA agent telling you that they had

9  bulk cash in a bag?

10  A.    Yes.

11  Q.    And when you described the back panel of this duffle bag

12  that we're talking about, isn't it true that it was actually

13  just a nylon zipper lining?

14  A.    I want to correct -- I didn't -- I don't recall saying a

15  back panel, but I said sometimes in bags there's panels around

16  the sides and whatever, but the bottom, there's a bottom panel

17  on the bottom of the bag, they have panels in those types of

18  bags and that's how I was referring to, was that there was a

19  panel in the bottom of that bag.

20  Q.    Okay.  But the -- covering this other piece of organic

21  material that's wrapped in plastic, that was already unzipped,

22  was it not?

23  A.    Yes.

24  Q.    And one of the --

25  A.    I couldn't tell if it was a zipper or what.  All I saw

1    was a portion of what that was there of that -- the TSA had

2    identified as an anomaly in the bag, and they had stopped

3    right there at that point.

4    Q.    And you also testified that you said whatever was under

5    the panel looked like cash to me.

6    A.    Yes.

7    Q.    All right.  So in your experience as a law enforcement

8    officer since 1983, you know what cash looks like, right?

9    A.    Yes.

10   Q.    And whether it's wrapped or not wrapped?

11   A.    Uhm-uhm.

12   Q.    I mean, it's pretty easy to distinguish, is it not?

13   A.    Yes.

14   Q.    Now, at the point where you obtained Mr. Lyon's driver's

15   license, is that when you called in the full-time RDU officer

16   or shortly thereafter?

17   A.    I don't recall.  A lot of times things can happen, you

18   know, at the same time, so I don't recall whether or not I had

19   already gotten that from him or if I already was calling for

20   the full-time officer to get there, you know.  So for this

21   specific case, I don't recall whether I gotten his license

22   first and then called officers or called officers and then,

23   you know, secured his license.

24   Q.    Okay.  Either way, there's no denying that you're the one

25   who got his license?

1  A.   I would say that I did, yes.  At least have possession of

2  it for a point of time.

3  Q.   Do you remember which full-time officer you called?

4  A.   I believe it was Officer Alwang who was the responding

5  officer.

6  Q.   Do you remember how long it took him to respond?

7  A.   I don't.  Like I said, I don't recall it being a long

8  period of time.  Sometimes it could be because if the officer

9  that is assigned to the terminal is not in the terminal or if

10  it's at shift change, sometimes that person has to respond

11  from -- in a vehicle to get to the terminal or a secondary

12  officer may have to come and get there, but I don't recall

13  waiting a long period of time for someone to get there.

14  Q.   Okay.  And, in fact, you were one of the law enforcement

15  officers who escorted Mr. Lyon into the security room, were

16  you not?

17  A.   I believe I may have been.  I believe that is true.  I

18  may have been one of the ones.

19           MR. AXFORD:  With Your Honor's permission to play

20  another snippet.

21           THE COURT:  That's fine.

22      (Video played in open court.)

23  BY MR. AXFORD:

24  Q.   Do you see that picture on your screen?

25  A.   Okay.  Yes, there's a picture.

1  Q.   That's the security office, correct?

2  A.   It went away again.  It came up, but then it went away.

3  No signal detected.

4       It's up now.

5  Q.   So this is the security office where Mr. Lyon was

6  escorted into?

7       (Video played in open court.)

8          THE WITNESS:  Yes.  That's the security office.

9  BY MR. AXFORD:

10 Q.   That's you, correct?

11 A.   Yes.

12 Q.   So you actually brought his bag into the room; he didn't

13 bring it himself?

14 A.   That's correct.

15 Q.   Okay.  And --

16 A.   That's the way it looks like right here.  Yeah, he didn't

17 have access to it.

18 Q.   And do you see just beyond his bag on the table, that's

19 his ID, doesn't that look like his ID sitting on the table?

20 A.   Yes, uhm-uhm.

21 Q.   Okay.  Now, at this point you actually kind of hang out

22 right in the doorway of that office, don't you?

23 A.   I really don't recall what my timeline was.  I don't.

24      (Video played in open court.)

25 BY MR. AXFORD:

1  Q.   Can you see yourself right there in the doorway?

2  A.   Yes, uhm-uhm.

3  Q.   So now at this point in that security office you have a

4  TSA officer?

5  A.   Uhm-uhm.

6  Q.   Two law enforcement officers?

7  A.   Uhm-uhm.

8  Q.   And Mr. Lyon sitting in the corner?

9  A.   Okay.

10  Q.   Is that correct?

11  A.   It's kind of like not a corner, but he's right there, you

12  know, at the door, you know, where the desk is and stuff so...

13  Q.   Okay.  And as whether you're part time or full time as an

14  RDU police officer, you have a gun on your side?

15  A.   Absolutely.

16  Q.   You have a taser on the other side?

17  A.   I do not have a taser.

18  Q.   You do not have a taser?

19  A.   No.

20  Q.   Do you wear a badge?

21  A.   Absolutely, yes.

22  Q.   Do you also have like all the radio communications and --

23  A.   Yes.

24  Q.   Do you have body armor on?

25  A.   Yes.

1  Q.   And a nametag with your last name on it?

2  A.   Yes.

3  Q.   So, in other words, there's no mistaking that you're a

4  law enforcement officer?

5  A.   That's correct.

6  Q.   Are you aware at the time in this particular video, do

7  you know if that bag had been cleared by TSA yet?

8  A.   No, I do not know.

9  Q.   You don't -- you do not know?

10  A.   I don't know, as far as -- is concerned -- as far as

11  their terms are concerned with that.

12  Q.   Did you ask Mr. Lyon to accompany you back into that

13  security office?

14  A.   I don't recall.  That would normally not be my place

15  because the full-time officer is the one that has charge over

16  that call.  Once I give them the license and boarding pass for

17  them to take with them, usually they're going to escort back

18  in the office.

19       The reason why I had to go in this case right here is for

20  our officer's safety.  Someone has to go back with the

21  full-time officer, and so that's the only -- that was the real

22  reason why I had to leave my post for measures of security to

23  be there with him until a secondary officer could come, and so

24  that's how that ended up being the way it did.

25  Q.   And in this particular case also, as you saw in the

J. Pegram - Cross-Examination

1  beginning of the video, Mr. Lyon actually walks in that office
2  first?
3  A.   Uhm-uhm.
4  Q.   And yourself, the other RDU officer, and TSA officer are
5  following behind him; is that right?
6  A.   Yes.  Uhm-uhm.
7  Q.   I'm sorry.  Is that a yes?
8  A.   Yes.  However it played out on this video, yes, if that's
9  how it happened.  If he came in first, you know, that's how it
10 happened.
11 Q.   Okay.  And going back to -- just backing up to when you
12 originally went to the screening table --
13 A.   Uhm-uhm.
14 Q.   -- is the responsibility if TSA believes there's some
15 type of bomb or bomb residue or any type of threat item like
16 that, you do not order them to do any type of the bomb swab
17 stuff, right, that's completely TSA?
18 A.   That's correct.  That's their responsibility.
19 Q.   And did you ever see that done on this bag?
20 A.   Not to my knowledge, no.
21 Q.   Okay.
22         MR. AXFORD:  That's all the question I have at this
23 point, Judge.
24         THE COURT:  Thank you.
25         Anything else?

1    MR. FESAK:  Very briefly.

2                    REDIRECT EXAMINATION

3    BY MR. FESAK:

4    Q.    Mr. Pegram, why do you take the bag and Mr. Lyon out of

5    the public terminal and back into a more private area in this

6    type of a situation?

7    A.    Well, it's for a matter of discretion.  For this

8    particular type of call, bulk cash call and some other types

9    of calls, you don't -- a loaded weapon, you don't want to be

10   pulling stuff out of the bags out in the general public.  It's

11   for discretion, so that someone who has bulk cash or something

12   like that, or jewelry or something, you don't want that to be

13   all exposed for other passengers to see what this person has.

14   It could be a security threat for them.

15        So it's for discretionary purposes to get them out of the

16   open view of the public and to finish, you know, the line of,

17   you know, intervention that you need at that point.

18   Q.    And if you see an object that you think might be bulk

19   cash that has been wrapped up in newspaper, it's been vacuum

20   sealed in a bag, it's been artfully concealed underneath a

21   liner of a suitcase, is that something you treat as a

22   potential criminal matter?

23   A.    Yes.  Yes, sir.  Yes.

24   Q.    And if the statements made by someone that it's a certain

25   amount of money don't jive with what you're seeing, that's an

 1  additional factor that would arouse your suspicions, correct?

 2  A.   Yes, it is.

 3  Q.   And you don't know, in fact, what is inside those

 4  bundles?

 5  A.   No.

 6          MR. FESAK:  That's all.

 7          THE COURT:  Anything else?

 8          MR. AXFORD:  Just one second, Your Honor.

 9      (Pause in the proceeding.)

10          MR. AXFORD:  We don't have any questions, Judge.

11          THE COURT:  Thank you.  Please watch your step

12  stepping down, sir.  There's a step up as you come off the

13  witness stand and a step down through the gate.

14          The United States may call its next witness.

15          MR. FESAK:  Your Honor, the United States calls

16  Rodney Alwang.

17          As a housekeeping matter, Your Honor, the Court has

18  an exhibit binder with 43 -- 44, I'm sorry, Government

19  Exhibits, the last two of which are SSI designated by TSA and

20  need to be sealed.  Will you handle that when we get to them?

21          MR. ANDERSON:  Yes.

22          MR. FESAK:  Just for the Court's edification, we did

23  want to move the admission of the remaining 42 at this time.

24          THE COURT:  They'll be received.

25      (Plaintiff's Exhibit Nos. 1 through 44 were admitted into

1  evidence.)

2                      RODNEY ALWANG,

3          having been duly sworn, testified as follows:

4              THE COURT:  You may examine the witness.

5              MR. FESAK:  Thank you, Your Honor.

6                      DIRECT EXAMINATION

7  BY MR. FESAK:

8  Q.    Mr. Alwang, how are you employed?

9  A.    I am a police officer with the RDU Airport Authority.

10 Q.    Are you a full-time officer?

11 A.    Full time.

12 Q.    And how long have you been doing that?

13 A.    I've been there since September of 2017.

14 Q.    Were you on duty at approximately 5:30 in the morning

15 June 3rd, 2020?

16 A.    Yes.

17 Q.    And do you recall responding to terminal two, the

18 security checkpoint there, in reference to a bag search

19 belonging to Ramon Lyon?

20 A.    Yes.

21 Q.    As a police officer full time, were you required to

22 prepare a report related to this incident?

23 A.    Yes.

24 Q.    And did you, in fact, prepare such a report?

25 A.    I did.

R. Alwang - Direct Examination

1  Q.   Did you prepare it at or near the time of the incident

2  when the facts were still fresh in your recollection?

3  A.   I did.

4  Q.   And can you pull up, please, Government's Exhibit 8.  I'm

5  showing you the first page, sir.  Can you see that on your

6  screen?

7  A.   Yes.

8  Q.   Can you verify whether this is a true and accurate copy

9  of the report from this incident?

10 A.   It is a true and accurate copy.

11 Q.   Is that your narrative basically on the first page down

12 to where it starts by saying, "Statement of Captain A.E.

13 Woodlief"?

14 A.   Yes.

15 Q.   So you wrote all that narrative?

16 A.   I did.

17 Q.   Have you had a chance to review that report prior to your

18 testimony in court here today?

19 A.   I have.

20 Q.   And can you say that -- is there anything inaccurate or

21 that needs to be corrected based on your recollection of

22 events?

23 A.   No.

24 Q.   It's all accurate?

25 A.   It's all accurate.

1  Q.   I'd like you to look at the top of this exhibit where it

2  has an administrative data about time dispatched and time

3  arrived.  Do you see that?

4  A.   I do.

5  Q.   Can you explain what those times represent?

6  A.   The time dispatched would be the time that I received the

7  call over the radio.  The time arrived would be the time I

8  arrived on scene.  In this case, it would have been lane two

9  of checkpoint two.  And then time completed would have been

10 once Captain Woodlief was done doing his investigation and the

11 scene was cleared.

12 Q.   All right.  So based on these records, it took you

13 approximately six minutes to respond to -- after being called?

14 A.   Yes.

15 Q.   And this time of the day, around 5:30, is that like a --

16 where in the shift of a typical police day does that fall?

17 A.   Our shifts run from 6:00 a.m. to 6:00 p.m., so that would

18 have been right before a shift change.  My responsibility -- I

19 would have arrived at 5:00 in the morning.  My responsibility

20 was to take any calls in order to allow the off-going shift to

21 be able to leave on time.

22 Q.   So at that point in time, since you're kind of the swing

23 guy, are you covering the entire airport?

24 A.   I'm covering the entire airport.

25 Q.   When you received the call, do you remember dillydallying

1  in response to the call?

2  A.   No.

3  Q.   When you arrived on scene there at terminal two, would

4  you have been briefed on the situation at hand?

5  A.   I did.  I spoke to Officer Pegram, who was the initial

6  responding officer on scene.

7  Q.   And what did Mr. Pegram tell you about what was going on?

8  A.   He told me that TSA had found a duffle bag that it looked

9  like had cash that was artfully concealed.

10  Q.   And did you conduct --

11        MR. FESAK:  You can take the exhibit down now.

12  BY MR. FESAK:

13  Q.   Did you conduct at a later point in time your own search

14  of that duffle bag?

15  A.   I did.

16  Q.   And is what was reported to you by Officer Pegram at the

17  outset consistent with what you later saw during that search?

18  A.   Yes, it was.

19  Q.   I'm going to jump forward a little bit out of order to

20  your search of that bag.

21        MR. FESAK:  If you can, please pull up Exhibit 14,

22  but don't play it yet.

23  BY MR. FESAK:

24  Q.   Did you ask for Mr. Lyon's consent to search his bag?

25  A.   I did.

R. Alwang - Direct Examination

1  Q.   Did he give that consent?

2  A.   Yes, he did.

3  Q.   All right.

4        MR. FESAK:  Let me pull the video and play until I

5  tell you to pause, please.

6        (Video played in open court.)

7  BY MR. FESAK:

8  Q.   While we're paused, is that you there on the left?

9  A.   Yeah, that's me.

10 Q.   Holding something in your hands?

11 A.   Yes.

12       (Video played in open court.)

13 BY MR. FESAK:

14 Q.   What is that thing that you were holding in your hand, do

15 you know?

16 A.    It was -- turned out to be cash that was in a

17 vacuum-sealed bag and it was covered with newspaper.

18 Q.   You say "turned out to be cash."  In the video you say --

19 what do you say to Mr. Lyon, did you hear that?

20 A.    At one point I asked him what it was because I couldn't

21 tell.

22 Q.   So you didn't know exactly what it was at that time?

23 A.    Correct.

24 Q.   Have you encountered currency or bulk currency before as

25 an RDU police officer?

1  A.    I have.

2  Q.    Have you ever seen cash packaged like that before?

3  A.    That was my first time.

4  Q.    Would you say that's pretty unique?

5  A.    It's pretty unique, yes.

6  Q.    Have you ever seen other illegal items such as drugs or

7  other things packaged like that?

8  A.    Yes, I have.

9         MR. FESAK:  Can you continue playing the video

10 please.

11     (Video played in open court.)

12 BY MR. FESAK:

13 Q.    Last thing I heard was "this bag reeks of marijuana."

14 Were those your words?

15 A.    Yes.

16 Q.    Was that a faint odor or strong odor of marijuana that

17 you detected?

18 A.    It was a strong odor.

19 Q.    That odor, the odd, unique packaging of the object that

20 you found during your search, were your suspicions aroused at

21 all that something illegal might be going on?

22 A.    Yes.

23 Q.    When you were searching the bag, did you notice a lot of

24 clothing items or personal items?

25 A.    No, I didn't.

R. Alwang - Direct Examination

1  Q.   Did it appear to you that Mr. Lyon was packed for a long

2  trip?

3  A.   No.

4          MR. AXFORD:  Objection.  Speculation.

5          THE COURT:  Well, as to the latter, I'll sustain it.

6  You can ask him what else was in the bag.

7  BY MR. FESAK:

8  Q.   Can you say, like, how many sets of clothes there were in

9  the bag?

10 A.   No, I can't recall.

11 Q.   Let's pull up Exhibit 25, please.  Do you recognize this

12 photograph?

13 A.   I do.

14 Q.   Do you recognize the location where this photo was taken?

15 A.   I believe most of it was underneath the bottom liner of

16 the bag.

17 Q.   I'm sorry.  Let me clarify the question.  The location

18 like the -- that this photo was taken.

19 A.   Yes.  It's in the same room that you showed the video of.

20 It's the back desk, yes.

21 Q.   That's the police office at RDU airport?

22 A.   Correct.

23 Q.   And now I think the question you started to answer, what

24 is depicted there sitting on top of that desk?

25 A.   That is the result of the search of the bag.

R. Alwang - Direct Examination

1  Q.   That's everything y'all pulled out of Mr. Lyon's bag?

2  A.   I believe so, yes.

3  Q.   Nothing has been added to it?

4  A.   (The witness nodded negatively.)

5  Q.   Nothing has been taken away from it?

6  A.   No.  Not that I recall, no.

7  Q.   To clarify, this is all the cash that was seized,

8  eventually seized?

9  A.   That was -- yes.

10 Q.   I want to ask you next about how you got back to that

11 police room where we showed the video of you doing the search.

12     Before you relocated to that room, what options did you

13 provide Mr. Lyon with respect to his involvement in your

14 investigation?

15 A.   I would have told him that he was free to leave.

16 Q.   And which option did Mr. Lyon choose?

17 A.   He chose to stay.

18 Q.   How many police officers were present at the point in

19 time when you gave him that option?

20 A.   It was myself and Officer Pegram.

21 Q.   Okay.  Did you or Officer Pegram threaten Mr. Lyon in any

22 way?

23 A.   No.

24 Q.   Did you use threatening language or gestures?

25 A.   No.

```
 1   Q.   Did you physically restrain him?
 2   A.   No.
 3   Q.   Did you handcuff him?
 4   A.   No.
 5   Q.   Did you touch him or shove him?
 6   A.   No.
 7   Q.   Did you draw your weapons on him?
 8   A.   No.
 9   Q.   Did you take or have possession of Mr. Lyon's driver's
10   license?
11   A.   I did.
12   Q.   And why do you take possession of a passenger's driver's
13   license when you're doing this kind of a preliminary
14   investigation?
15   A.   For purposes of a report.
16   Q.   Do you -- I mean, do you copy it or take a photograph of
17   it?
18   A.   I took a photograph of it, yeah.
19   Q.   And what do you normally do once you've made whatever
20   copy you need for your report?
21   A.   Give it back.
22   Q.   Did you give it back in this case?
23   A.   Not right away, no.
24   Q.   Do you know how Mr. Lyon actually got his license back?
25   A.   It was -- yes.
```

R. Alwang - Direct Examination

```
1   Q.   How did he get his license back?
2   A.   In the office it was laying on the table in front of me
3   and at some point he reached and got it himself.
4   Q.   Did he ask for it?
5   A.   No.
6   Q.   Did he ever ask for it?
7   A.   I don't recall.
8   Q.   If he had asked for it, would you have given it back to
9   him --
10  A.   Yes.
11  Q.   -- after you were done with it?
12  A.   After I took a photograph of it, yes.
13  Q.   You didn't try to stop him when he reached for it to take
14  it back off the desk?
15  A.   No.
16           MR. FESAK:  No further questions, Judge.
17           THE COURT:  Cross-examination.
18           MR. AXFORD:  Your Honor, with the Court's
19  permission, for health reasons, would you allow me a restroom
20  break?
21           THE COURT:  Okay.  Five-minute recess.
22       (The proceedings were recessed at 10:52 a.m. and
23  reconvened at 10:57 a.m.)
24           THE COURT:  You may examine the witness.
25           MR. AXFORD:  Thank you, Judge.
```

1                    CROSS-EXAMINATION

2    BY MR. AXFORD:

3    Q.    Good morning, Officer Alwang.

4    A.    Good morning.

5    Q.    The report that Mr. Fesak referenced to you when he first

6    started asking you questions, do you have a copy of that in

7    front of you?

8    A.    I do.

9    Q.    You do?

10   A.    Yes.

11   Q.    Would you mind turning to page 2 of 3.

12   A.    Does it start with "On June 3rd, 2020, at 0530"?

13   Q.    Yes, sir.

14   A.    Okay.

15   Q.    Now, you testified on direct that at the time you

16   originally approached -- strike that.

17        Where did you first come in contact with Mr. Lyon?

18   A.    It would have been at lane two at the checkpoint.

19   Q.    Like where the screening table is?

20   A.    Right.

21   Q.    And who all was there?

22   A.    Officer Pegram and TSA.

23   Q.    Do you know which TSA agent?

24   A.    I don't recall.

25   Q.    Okay.  Were you informed by Officer Pegram at that time

 1 that he already procured Mr. Lyon's driver's license?

 2 A.   I don't recall.

 3 Q.   Okay.  Now, you also testified that you have rarely, if

 4 ever, seen the package that you saw that day.  You said you

 5 rarely or had never seen anything like that before, correct?

 6 A.   I never seen money packaged like that before, no.

 7 Q.   Okay.  But by the time that you left the TSA screening

 8 area, you knew it was cash, did you not?

 9 A.   I would say I had a pretty -- that was my suspicion, yes.

10 Q.   Okay.  Do you remember having a conversation with anybody

11 from TSA stating that this could be some type of an explosive

12 material?

13 A.   I don't recall, no.

14 Q.   Okay.  Did anybody from TSA ever show you the x-ray image

15 of this bag?

16 A.   I don't recall seeing that, no.

17         MR. AXFORD:  Your Honor, with the Court's

18 permission, may I approach the witness?

19         THE COURT:  You may.

20 BY MR. AXFORD:

21 Q.   Officer, this appears to be --

22 A.   It appears to be the bag, yes.

23 Q.   And everybody that testified here today said that this

24 money was artfully concealed.  So really what we're talking

25 about here is this liner was zipped and money was somewhere

1  underneath that piece of nylon?

2  A.   Underneath, yes, sir.

3  Q.   And you believe that that's artfully concealed?

4  A.   Yes.

5  Q.   Okay.  And whether that was artful concealment or not, by

6  the time you got to the TSA checking station, that zipper had

7  already been undone and the package was kind of out in the

8  open?

9  A.   I don't recall the condition of the bag when I arrived.

10  Q.   Okay.  And then at some point, yourself and Officer

11  Pegram escort Mr. Lyon to the security office?

12  A.   Correct.

13  Q.   Okay.  Have you reviewed the video from the security

14  office lately?

15  A.   I have.

16  Q.   So it's fair to say that Mr. Lyon walks in first and you

17  kind of motion -- you point at the chair that he ends up

18  sitting in, basically nonverbally telling him to sit there or

19  offering him to sit there?

20  A.   Right.

21  Q.   And then yourself, Officer Pegram, and another TSA agent

22  come in behind him?

23  A.   Correct.

24  Q.   Okay.  And Officer Pegram places this duffle bag at the

25  time with all of his items in it on the desk right in front of

1  you?

2  A.   Precisely --

3  Q.   I'm going to play the video.  Let me ask you a different

4  way.

5       Did you carry any of Mr. Lyon's luggage?

6  A.   I don't recall.  I may have.

7  Q.   Okay.

8           MR. AXFORD:  Just to refresh his memory, Judge, I'm

9  going to play that snippet.

10          THE COURT:  All right.

11      (Video played in open court.)

12  BY MR. AXFORD:

13  Q.   Can you see that image?

14  A.   Yes.

15  Q.   That's the security office we're talking about?

16  A.   That is.

17      (Video played in open court.)

18  BY MR. AXFORD:

19  Q.   So that's Mr. Lyon.  And it appears that he has a

20  different carry-on bag other than the one I just showed you,

21  and he's carrying that one, right?

22  A.   That's what it appears, yes.

23  Q.   Okay.

24      (Video played in open court.)

25  BY MR. AXFORD:

1  Q.   And did you see, you know, the motion -- the gesture that
2  you did to him to offer him that particular chair?
3  A.   Yes.
4  Q.   Okay.
5       (Video played in open court.)
6  BY MR. AXFORD:
7  Q.   All right.  And then at that point, at some point either
8  Mr. -- excuse me -- Officer Pegram had given you his driver's
9  license because you're the one that actually sets it on the
10 table?
11 A.   (The witness nodded affirmatively.)
12 Q.   Okay.
13      (Video played in open court.)
14 BY MR. AXFORD:
15 Q.   And this would be Officer Pegram?
16 A.   That's Officer Pegram.
17 Q.   Pegram.  I'm sorry.  And he brings the duffle bag and
18 sets it on the table?
19 A.   He does.
20      (Video played in open court.)
21 BY MR. AXFORD:
22 Q.   So now you have yourself and Officer Pegram still present
23 in the doorway and another TSA agent, who I don't know if that
24 one is here or not, but that's another TSA agent, kind of by
25 the bin where all of Mr. Lyon's loose property items would be?

1   A.   Right.

2   Q.   Okay.

3        (Video played in open court.)

4   BY MR. AXFORD:

5   Q.   And is it your understanding that the TSA agent is

6   actually still present because the bag had not cleared the

7   administrative search?

8   A.   I don't know why TSA was still there.  I don't know why

9   TSA was in there with me.

10  Q.   Okay.  Do you remember another TSA agent walking in later

11  in this video and stating that bag hasn't been cleared yet?

12  A.   Yes.

13  Q.   So now with that memory being refreshed, it's a true

14  statement that this bag had not been cleared yet?

15  A.   Yeah.  At the time I didn't know, yeah -- yes.

16       (Video played in open court.)

17  BY MR. AXFORD:

18  Q.   Is that the picture that you just took of this particular

19  bag?  Do you remember ever taking any more pictures?

20  A.   I believe I may have taken a photograph of all the -- all

21  the items that were discovered during the search on the table.

22  Q.   The picture that Mr. Fesak put up earlier?

23  A.   I'm not sure if that's from my camera, but I remember

24  taking photographs of that.

25  Q.   Okay.

 1          (Video played in open court.)

 2    BY MR. AXFORD:

 3    Q.   Now, at this point that's Sergeant Evans that enters the

 4    room?

 5    A.   Correct.

 6    Q.   So that's now the third law enforcement officer that has

 7    come into this room with Mr. Lyon?

 8    A.   Yes.

 9    Q.   Do you know who called her?

10    A.   I don't recall.

11          (Video played in open court.)

12    BY MR. AXFORD:

13    Q.   This is you putting on purple gloves?

14    A.   (The witness nodded affirmatively.)

15          (Video played in open court.)

16    BY MR. AXFORD:

17    Q.   And this is you having a conversation with Mr. Lyon

18    trying to get consent to search his bag?

19    A.   Correct.

20          (Video played in open court.)

21    BY MR. AXFORD:

22    Q.   So Sergeant Evans, right there she says, "If you're not

23    consenting, we'll call a detective in," did you hear that?

24    A.   I did.

25          (Video played in open court.)

1  BY MR. AXFORD:

2  Q.   And at this point you have now in your possession the

3  vacuum-sealed package?

4  A.   Yes.

5  Q.   And it's your testimony that -- I mean, that looks fairly

6  small, I guess, for lack of a better word.  I mean, do you

7  remember like the size or weight of that particular package?

8  Since you've never seen it before, I imagine that might stick

9  out in your memory.

10 A.   That particular bag, I don't remember the weight; but no,

11 it wasn't that big, no.

12 Q.   Okay.  So the image that Mr. Fesak showed 20 minutes ago

13 where there's just cash laid straight all the way across the

14 table, it's your testimony that that amount of vacuum-sealed

15 bags is the same of what you're holding in this picture?

16 A.   That is the -- I don't understand the question.  I'm

17 sorry.

18 Q.   Okay.  Do you remember the picture Mr. Fesak showed you

19 earlier?

20 A.   Yes.

21 Q.   Well, wasn't that like six or seven vacuum-sealed bags

22 and some loose cash?

23 A.   It was, yeah.

24 Q.   So is it your testimony that that picture is

25 representative of what you're holding in your hand right

1  there?

2  A.   No.  No, it's not.

3  Q.   Okay.  So was there something other than this right here

4  in his bag?

5  A.   Yeah, I believe there was more vacuum-sealed bags inside

6  underneath the liner.

7       (Video played in open court.)

8  BY MR. AXFORD:

9  Q.   From the time Mr. Lyon entered the security room to the

10 time that, you know, approximately two hours later after he

11 was done speaking with Officer Woodlief, were you present the

12 entire time?

13 A.   I was present in the vicinity the entire time.

14 Q.   Did you ever leave that room?

15 A.   Yeah, I left.  Once Captain Woodlief arrived on scene, I

16 believe I left.

17 Q.   Do you know if that red duffle bag ever left that room?

18 A.   I don't.  I don't recall, no.

19      (Video played in open court.)

20          MR. AXFORD:  Just one more snippet we're trying to

21 find, Judge.

22      (Video played in open court.)

23 BY MR. AXFORD:

24 Q.   And the TSA agent here, do you know what he's doing here?

25 A.   They've got reports they have to do as well.  I'm

1  assuming he's collecting information for his report.

2  Q.   Okay.  Is it possible he might be actually finishing the

3  administrative search to, quote, unquote, "clear the bag"?

4  A.   It's possible, yeah, I don't know.

5  Q.   Okay.

6       (Video played in open court.)

7  BY MR. AXFORD:

8  Q.   So now you have the vacuum-sealed bags in your hands.  So

9  it's your testimony that there are more vacuum-sealed bags

10 other than what you're holding right here?

11 A.   Inside that bag?

12 Q.   Yes.

13 A.   I don't recall.  I mean, we ended up finding more, but if

14 they all came directly from that bag, I can't -- I can't

15 recall.

16      (Video played in open court.)

17 BY MR. AXFORD:

18 Q.   And this is -- in the video there you saw Sergeant Evans

19 put on gloves?

20 A.   Yes.

21 Q.   Okay.

22      (Video played in open court.)

23 BY MR. AXFORD:

24 Q.   Do you recall what you were taking a picture of there

25 when Mr. Lyon had his phone?

1  A.    Yeah, it looked like it was his boarding pass.

2  Q.    His boarding pass?

3  A.    Correct.

4  Q.    Okay.

5         (Video played in open court.)

6  BY MR. AXFORD:

7  Q.    Officer Alwang, at this point do you know if that bag has

8  been cleared by TSA?  You see another TSA officer.  Do you

9  remember what he was doing?

10  A.    It looks like he was collecting information for his

11  report; but, no, I didn't know whether or not that bag had

12  been cleared.

13  Q.    Okay.

14         MR. AXFORD:  That's all the questions I have at this

15  moment.

16         THE COURT:  Cross-examination.

17         MR. FESAK:  Nothing further, Your Honor.

18         THE COURT:  Run the video from 5:34 -- Government,

19  can you pull that up -- before anybody goes into that room.  I

20  think it's around that mark.  0534.

21      (Video played in open court.)

22         THE COURT:  What exhibit is that?

23         MR. ANDERSON:  That's Government's Exhibit 39.

24  Exhibit 39 is the full video.

25      (Video played in open court.)

1    THE COURT:  All right.  Stop it there.

2    Officer, I know you contemporaneously said at

3 5:39:09 that you expressly stated, quote, "your bag reeks of

4 marijuana."  At 5:34:39, when that bag is open, in your

5 experience as a law enforcement officer, can you smell

6 marijuana at that time?

7    THE WITNESS:  Yeah.  I don't recall, like, exactly

8 when I smelt it, but it probably -- I didn't say anything

9 right away.

10    THE COURT:  Right.  But I'm trying to -- it was --

11 it was before the 5:39:09 mark when you verbalized it, right?

12 When you say, "your bag reeks of marijuana," you're in the --

13 I mean, the bag is open, right, so it's the open bag that's

14 reeking of marijuana?

15    THE WITNESS:  Right.

16    THE COURT:  And that's at the 5:34:39 mark, right?

17    THE WITNESS:  Yes.

18    THE COURT:  All right.  Any follow-up questions?

19    MR. FESAK:  No, Judge.

20    THE COURT:  Any follow-up questions?

21    MR. AXFORD:  Just one, Your Honor.

22                    CROSS-EXAMINATION

23 BY MR. AXFORD:

24 Q.   Throughout the search and interaction with Mr. Lyon, did

25 you ever find any items of contraband, specifically illegal

1 drugs?

2 A.    No, no.

3        MR. AXFORD:  Thank you.

4        THE COURT:  Thank you.  You may step down.

5        THE WITNESS:  Thank you.

6        THE COURT:  The United States may call its next

7 witness.

8        MR. ANDERSON:  Thank you, Your Honor.  The United

9 States calls Ramon Lyon to the stand.

10       THE COURT:  All right.  Mr. Lyon can come up and be

11 sworn.

12                       RAMON LYON,

13      having been duly sworn, testified as follows:

14       THE COURT:  You may examine the witness.

15       MR. ANDERSON:  Thank you, Your Honor.

16                   DIRECT EXAMINATION

17 BY MR. ANDERSON:

18 Q.   Good morning, Mr. Lyon.

19 A.   Good morning.

20 Q.   Mr. Lyon, have you testified before?

21 A.   No.

22 Q.   Just do me a favor, try to keep your voice up as best you

23 can so you and I can hear each other, okay?

24 A.   Okay.

25 Q.   You live here in Raleigh?

1  A.   Yeah.

2  Q.   Off Atlantic Avenue?

3  A.   Yeah.

4  Q.   You've lived there since about 2018?

5  A.   Yeah.

6  Q.   That's about a 10-minute drive or so north of where we

7  are in this courthouse, right?

8  A.   Yeah.

9  Q.   In June of 2020, you owned a business called the Phish

10 Bar and Lounge; is that right?

11 A.   Yeah.

12 Q.   Phish is spelled --

13 A.   It wasn't Bar, though.  It was the Phish Lounge.

14 Q.   It was just called the Phish Lounge?

15 A.   Uhm-uhm.

16 Q.   That was a yes?

17 A.   Say what?

18 Q.   It was called the Phish Lounge?

19 A.   Lounge.

20 Q.   And Phish was spelled --

21 A.   P-H-I-S-H.

22 Q.   That was a gaming business?

23 A.   Yes.

24 Q.   And that was located on Garner Road here in Raleigh?

25 A.   Yes.

1  Q.   About a five-minute drive south of the courthouse where

2  we are now?

3  A.   Yes.

4  Q.   The people who went to Phish Lounge, the patrons, they

5  could play games on something called a fish table?

6  A.   Yes.

7          MR. PRUDEN:  Objection, Your Honor.

8          THE COURT:  Overruled.

9  BY MR. ANDERSON:

10 Q.   A fish table is a video fishing game; is that right?

11 A.   Yeah, yeah.

12 Q.   I'm going to show you what's been previously marked as

13 Government's Exhibit No. 41.  Now, you provided some documents

14 to the Government in this case; is that right?

15 A.   Uhm-uhm.

16 Q.   That was a yes?

17 A.   Yes.

18 Q.   We're going to turn to the last page of Government's

19 Exhibit No. 41.  This is one of the pictures that you've

20 provided to the Government in this case?

21 A.   Yes.

22 Q.   Now, is this a picture of the inside of the Phish Lounge?

23 A.   Yes.

24 Q.   Is this what the Phish Lounge looked like in 2020?

25 A.   Yes.

1  Q.    And in the bottom left-hand corner, that's a fish table?

2  A.    Yes.

3  Q.    I'm going to show you one other image from Government's

4  Exhibit 41, it's the second to last page.

5       Mr. Lyon, give us just one moment while we pull that up.

6       Mr. Lyon, you should see another picture up on your

7  screen again.  Do you see that?

8  A.    Yes.

9  Q.    This is another picture of the inside of the Phish

10  Lounge?

11  A.    Yes.

12  Q.    Again, how it looked in June of 2020?

13  A.    Yes.

14  Q.    And in the sort of middle to bottom right of this

15  picture, that's a fish table, right?

16  A.    Yes.

17  Q.    Now, fish table, the ones you use at the Phish Lounge,

18  they generate a lot of revenue for you, right?

19  A.    Yes.

20  Q.    They generate a lot of cash specifically?

21  A.    Yes.

22  Q.    You kept a lot of cash on hand at the Phish Lounge?

23  A.    Yes.

24  Q.    You handled a lot of cash at the Phish Lounge?

25  A.    Yes.

1  Q.   Hundreds of thousands of dollars?

2  A.   Yes.

3  Q.   And you handle a lot of cash at the Phish Lounge on a

4  daily basis?

5  A.   Some days slower than others.

6  Q.   Some days?

7  A.   Were slower than others.

8  Q.   But, generally speaking, on a regular basis you're

9  handling large amounts of cash at the Phish Lounge?

10 A.   Yes.

11 Q.   Now, those tables brought in a lot of revenue, but

12 sometimes the players would win, right?

13 A.   Yes.

14 Q.   When the players won, did you pay them out in cash?

15 A.   Yes.

16 Q.   Every time?

17 A.   Yes.

18 Q.   Now, there were other games in the Phish Lounge, right?

19 A.   Yes.

20 Q.   When players played those games, sometimes they won,

21 right?

22 A.   Yes.

23 Q.   When they won, did you pay them out in cash?

24 A.   Yes.

25 Q.   Every time?

1  A.   Yes.

2  Q.   Now, let's go to the day before the seizure, okay?

3  A.   Uhm-uhm.

4  Q.   That would be June 2nd of 2020, right?

5  A.   Yes.

6  Q.   That day you went to the Phish Lounge?

7  A.   Uhm-uhm.

8  Q.   Yes?

9  A.   Yes.

10  Q.   You opened up the safe at the Phish Lounge, right?

11  A.   Yes.

12  Q.   And you personally counted out the money that you planned

13  to take to California?

14  A.   Yes.

15  Q.   You personally counted out about $115,000?

16  A.   Yes.

17  Q.   Now, your story is that you were planning to take that

18  money to California to purchase some more fish tables, right?

19  A.   Yes.

20  Q.   From a company called American Arcade Supply?

21  A.   Yes.

22  Q.   American Arcade Supply, in 2020, they actually had a

23  location right here in Raleigh, didn't they?

24  A.   Yes.

25  Q.   Up on Old Wake Forest Road?

1   A.   Yes.

2   Q.   Now, you had bought something from that store in February

3   of 2020, right?

4   A.   Yes.

5   Q.   That was about four months before this seizure?

6   A.   Yeah, I had purchased a game.

7   Q.   You purchased a game from the Raleigh location?

8   A.   Yes.  Just the software.

9   Q.   Okay.

10  A.   The tables, they charging too much over here.  I can get

11  a better price if I went out there.

12  Q.   Okay.  Now, you have actually ordered fish tables from

13  American Arcade Supply before; is that right?

14  A.   All of them.

15  Q.   All of them?

16  A.   Uhm-uhm.

17  Q.   Let me show you what's been previously marked as

18  Government's Exhibit No. 42.  And we're going to go to the

19  last page of Government's Exhibit No. 42.

20       Now, Mr. Lyon, you should have a document up on your

21  screen that says "invoice" in the top right corner.

22  A.   Yeah.

23  Q.   This is an invoice from American Arcade dated

24  September 29th, 2020, right?

25  A.   Yes.

1 Q.   Let's go to the next page, please.  All right.  Now, this

2 is the last page of Government's Exhibit No. 42, the one

3 that's up on your screen now.  This is another invoice from

4 United Arcade Supply; do you see that?

5 A.   Uhm-uhm.

6 Q.   That's what American Arcade used to be, right?

7 A.   Excuse me?

8 Q.   That's what American Arcade used to be called, United

9 Arcade Supply?

10 A.   Yeah, I believe so.

11 Q.   And if we look down at the invoice, the first item there

12 is listed as OK2 plus; do you see that?

13 A.   O who?

14 Q.   The very first item on the invoice.  And we can increase

15 it so you can see it a little bit better.

16 A.   I can see it.

17 Q.   That first item is OK2 plus, right?

18 A.   Yeah.

19 Q.   That's a fish table, right?

20 A.   Yeah -- yes, I think so.

21 Q.   And then the third item down says Thunder Dragon 2,

22 right?

23 A.   Yes.

24 Q.   That's also a fish table.

25 A.   Yes.

1    Q.   The address on this invoice is a California address up at

2    the top; do you see that?

3    A.   Yes.

4    Q.   Now, let's look at specifically how you paid for those

5    fish tables.  We're going to pull up the last two lines of

6    this invoice.  You paid partly in cash, right?

7    A.   Yes.

8    Q.   $7,000?

9    A.   Yes.

10   Q.   But you also paid with a credit card, right?

11   A.   Uhm-uhm.

12   Q.   Yes?

13   A.   Either -- it might have been a debit card.  It might not

14   have been a credit card.

15   Q.   Either way, you paid with a card?

16   A.   Yeah.

17   Q.   You also paid for the remainder with a check, right?

18   A.   Yes.

19   Q.   But your story today is that on June 3rd, 2020, you were

20   actually going to fly to California with $115,000 in cash?

21   A.   Right.

22   Q.   To buy fish tables?

23   A.   Right.

24   Q.   Now, again, on June 2nd, 2020, the day before the

25   seizure, you personally counted out about $115,000, right?

1  A.   Right.

2  Q.   What denominations?

3  A.   They were hundreds.

4  Q.   Hundreds?

5  A.   Uhm-uhm.

6  Q.   You also had some ones in there?

7  A.   I don't think so.  I'm not sure, but I don't think it was

8  ones.

9  Q.   You don't think you had any ones?

10  A.   I don't think so.

11  Q.   You had twenties?

12  A.   I'm not sure.  I don't think -- I don't think so.  I

13  think it was all hundreds.  There might have been some

14  twenties, though.

15  Q.   Okay.  We'll look at a couple pictures in a little while.

16  After you counted out about 115,000, you wrapped the cash in

17  newspaper, right?

18  A.   Uhm-uhm.

19  Q.   Yes?

20  A.   Uhm-uhm.

21  Q.   Can you verbalize the "yes" for the court reporter?

22  A.   Yes.

23  Q.   And then you personally packaged the money with a vacuum

24  sealer, right?

25  A.   Right.

1  Q.   When you got done vacuum sealing all of that cash, you

2  had four bundles?

3  A.   I don't know.  I don't think it was four bundles.

4  Q.   How many do you think it was?

5  A.   I think it was two.

6  Q.   You think it was two bundles?

7  A.   Yeah.

8  Q.   Two vacuum-sealed bundles?

9  A.   I think it was two.

10 Q.   And after you finished vacuum sealing, you personally put

11 the money back in the safe at the Phish Lounge, right?

12 A.   Uhm-uhm.

13 Q.   Yes?

14 A.   Yes.

15 Q.   Until you were ready to go home that day?

16 A.   Right.

17 Q.   So you worked your day at the Phish Lounge, right?

18 A.   Right.

19 Q.   You closed up at about 2:00 a.m.?

20 A.   Maybe.  Maybe about 2:00.

21 Q.   2:00 a.m.?

22 A.   Maybe.

23 Q.   That would be about 2:00 a.m. on June 3rd --

24 A.   I can't recall.  I can't recall what time it was.

25 Q.   Let me show you real quick your interrogatory responses

1  in this case, which may help refresh your recollection.  I'm

2  going to show you what's been previously marked as

3  Government's Exhibit No. 41.

4  A.   I see where it says 2:00 o'clock.

5  Q.   Okay.  So having seen that, does that now refresh your

6  recollection about what time you closed?

7  A.   I mean, I said it could have been around 2:00 o'clock.  I

8  just wasn't too for sure.

9  Q.   That's okay.  So around 2:00 o'clock, you close up at the

10  Phish Lounge, right?

11  A.   Uhm-uhm.

12  Q.   Yes?

13  A.   Yes.

14  Q.   That's 2:00 a.m. on June 3rd, 2020, right?

15  A.   Yes.

16  Q.   So now we're to the day of the seizure.

17  A.   Yes.

18  Q.   After you closed the Phish Bar, you took the

19  vacuum-sealed cash and drove home, right?

20  A.   I think that's what I put in there.

21  Q.   And the drive from the Phish Lounge on Garner Road here

22  in Raleigh to your house on Atlantic Avenue in Raleigh, that

23  takes about 15 minutes?

24  A.   Maybe 10, 15.

25  Q.   Okay.  Ten to 15 minutes.

1    After that 10- to 15-minute drive home, you packed your
2  stuff, right?
3  A.   Uhm-uhm.
4  Q.   Right?
5  A.   Yes.
6  Q.   You put the cash into your duffle bag, right?
7  A.   Right.
8  Q.   Red duffle bag specifically?
9  A.   Right.
10 Q.   You placed it specifically underneath the liner in the
11 duffle bag, right?
12 A.   Uhm-uhm.
13 Q.   Yes?
14 A.   Yes.
15 Q.   You then packed your clothes on top?
16 A.   Right.
17 Q.   You then added some other items on top?
18 A.   Other items?
19 Q.   Yes, sir.
20 A.   I think it was just my clothes.
21 Q.   Just your clothes?
22 A.   Yeah.
23 Q.   Can we pull up Government's Exhibit No. 41 again.  Let's
24 flip to the seventh page of this exhibit, which should be the
25 answer to Interrogatory Number 11.

1        Let's look specifically, there's a lot of text on here,
2   so I'm going to pull it out for you.  We're going to pull
3   out lines 14 through 16 from this answer.
4        Can you see that a little bit better?
5   A.   Yeah.
6   Q.   So let's read just from the top line there starting on
7   the far right-hand side, "Once I got off" -- do you see that
8   line?
9   A.   You're referring to the loose cash, the other items?
10  Q.   I don't know.  This is what you wrote in your
11  interrogatory response.
12  A.   Loose cash, yeah.  You said other items.
13  Q.   Let's read your response starting on line two, quote, "I
14  placed it in my carry-on bag and placed my clothes and other
15  items in my bag, along with some loose cash."  Do you see
16  that?
17  A.   Yes.
18  Q.   So you put the money under the liner, right?
19  A.   Yes.
20  Q.   And you put your clothes on top, right?
21  A.   Right.
22  Q.   And then some other items?
23  A.   Right.
24  Q.   And then some loose cash?
25  A.   Right.

1  Q.   About how long did all that take for you to pack that

2  bag?

3  A.   I don't know.  I don't remember.

4  Q.   Maybe 20 minutes?

5  A.   I don't even remember, to be honest with you.

6  Q.   Okay.  Did anyone else put anything in your red duffle

7  bag before you got to the airport on June 3rd, 2020?

8  A.   No.

9  Q.   Did anyone have access to your red duffle bag?

10 A.   No.

11 Q.   And to be clear, that red duffle bag belongs to you,

12 right?

13 A.   Yes.

14 Q.   Does anybody else live with you?

15 A.   Yes.

16 Q.   Who?

17 A.   My girlfriend, fiancee.

18 Q.   What's her name?

19 A.   Denise.

20 Q.   Denise?

21 A.   Williamson.

22 Q.   Denise Williamson?

23 A.   Uhm-uhm.

24 Q.   Did she put anything in your bag?

25 A.   No.

1  Q.   All right.  So after you packed your bag, then you jumped

2  in the shower, right?

3  A.   Uhm-uhm.

4  Q.   Yes?

5  A.   Yes.

6  Q.   That took another 15 minutes or so?

7  A.   Probably.  I'm not sure.

8  Q.   And then you get to the airport at Raleigh-Durham

9  International Airport June 3rd, 2020, about 5:30 in the

10  morning, right?

11  A.   Right.

12  Q.   In between the time that you got out of the shower, after

13  you drove home, packed your bag, got your shower and got to

14  the airport at 5:30, in that time you smoked marijuana, right?

15  A.   No, I didn't smoke no marijuana.

16  Q.   All right.  Let's pull up Government's Exhibit No. 36.

17  Let's go ahead and play the video.

18      (Video played in open court.)

19  BY MR. ANDERSON:

20  Q.   We're going to pause it right here in Government's

21  Exhibit No. 36.  This is the interview room at Raleigh-Durham

22  International Airport, right?

23  A.   Uhm-uhm.

24  Q.   Yes?

25  A.   Yes.

1   Q.    Just for ease of reference, I'm going to call that RDU,

2   okay?

3   A.    Okay.

4   Q.    The person in the white hat with the blue jacket that has

5   the white stripes down the arm --

6   A.    That's me.

7   Q.    That's you.  Okay.

8       And then the person in the gray shirt, that's a law

9   enforcement officer, right?

10   A.    Yeah.

11   Q.    Looking through your bag?

12   A.    Right.

13   Q.    Okay.  Let's play the video.

14       (Video played in open court.)

15   BY MR. ANDERSON:

16   Q.    All right.  So you heard yourself tell law enforcement

17   you smoked that morning, right?

18   A.    Play it again.  I didn't hear it.  Play it again.

19       (Video played in open court.)

20   BY MR. ANDERSON:

21   Q.    All right.  So your bag reeks of marijuana, right?

22   A.    Yeah.

23   Q.    And you told law enforcement --

24   A.    That's what he says.  That's what he says.  I mean, he

25   said it reeked of marijuana.

```
 1  Q.   And you told law enforcement that you smoked?

 2  A.   I heard that.

 3  Q.   You said that?

 4  A.   I heard that.

 5  Q.   You said that in the video?

 6  A.   I heard it.

 7  Q.   I'm asking you, Mr. Lyon, those words came out of your

 8  mouth?

 9  A.   Yes, I heard it.

10  Q.   You heard your voice on this video saying, "I smoked"?

11  A.   Yeah.

12  Q.   In fact, you had smoked so much that when another law

13  enforcement officer shows up at about 7:00 a.m., the whole

14  room reeks of weed; is that right?

15  A.   I don't know about that.

16            MR. AXFORD:  Objection as to another officer's

17  thought.

18            THE COURT:  Next question.

19            THE COURT REPORTER:  I didn't get the answer.  I'm

20  sorry.

21            THE WITNESS:  I don't know about that.  I smoked so

22  much -- you said I smoked so much that it still reeked of

23  marijuana when another officer came in at 7:00 o'clock?

24  BY MR. ANDERSON:

25  Q.   Yes, sir.
```

1    A.    I can't answer that question.  I don't know.

2    Q.    The officer actually told you that it reeked of

3    marijuana, didn't he, when he walked in?

4    A.    I mean --

5              MR. AXFORD:  Same objection.

6              THE WITNESS:  -- that's just a tool that they use to

7    do what they want to do.

8    BY MR. ANDERSON:

9    Q.    At the time that you walked to the TSA checkpoint at RDU

10   on June 3rd, 2020, had you taken any drugs?

11   A.    Had I taken any drugs?

12   Q.    Yes, sir.

13   A.    Nah, I don't take drugs.

14   Q.    All right.  Let's fast-forward to the TSA checkpoint now

15   at RDU on June 3rd, 2020.  When you put your duffle bag onto

16   the x-ray machine at that checkpoint, did you have any idea

17   how much money you actually had in that bag?

18   A.    Yeah.

19   Q.    As you said before, your story is that you personally

20   counted out 115,000, right?

21   A.    Right.

22   Q.    And put it in your bag?

23   A.    Right.

24   Q.    So you were carrying, as far as you knew, $115,000 into

25   the airport?

R. Lyon - Direct Examination

 1  A.    Yeah.

 2  Q.    Let's move to when your bag was being taken from the

 3  x-ray machine and was being manually screened by TSA.  While

 4  your bag was being screened, an RDU police officer came up to

 5  you, right?

 6  A.    Yeah.

 7  Q.    He asked you how much money you had, right?

 8  A.    I assume so.

 9  Q.    And you told him $6,000?

10  A.    I mean, I probably told him that.

11  Q.    You probably told him $6,000?

12  A.    I could have.

13  Q.    Even though you knew that the amount of money, according

14  to your story, was 115?

15  A.    I just assumed it was none of his business.

16  Q.    It's none of law enforcement's business, so your solution

17  is to tell a false story?

18          MR. AXFORD:  Objection.

19          THE WITNESS:  I just assumed it was none of his

20  business.

21          THE COURT:  But you told him it was 6,000?

22          THE WITNESS:  Yeah.

23          THE COURT:  And you knew that was not true?

24          THE WITNESS:  Yeah.  I just assumed it was none of

25  his business, you know what I'm saying?

1          THE COURT:  Right.  But you knew it was not true,

2   though?

3          THE WITNESS:  Oh, yeah, yeah.

4          THE COURT:  Next question.

5   BY MR. ANDERSON:

6   Q.   And then a few minutes after you enter the interview room

7   at RDU, a second RDU police officer asks you how much money

8   you have, right?

9   A.   Uhm-uhm.

10  Q.   Yes?

11  A.   Yes.

12  Q.   And you told that officer 60,000, right?

13  A.   I was just telling them anything.  It really was none of

14  their business, that I assumed anyway.

15  Q.   So you told them 60,000, right?

16  A.   Yeah, because I assumed I hadn't done nothing wrong, so

17  it really wasn't -- you know, I felt it was no -- if I told

18  them 10,000 or 20,000, like, I didn't think I was doing

19  anything wrong and I assumed it was none of their business.  I

20  hadn't broken any laws.

21  Q.   When you told the officer it was 60,000, you knew that

22  was not true, right?

23  A.   Yes.

24  Q.   Still a little bit later in the interview, you told a

25  third law enforcement officer you were carrying about 100,000,

R. Lyon - Direct Examination

1  right?

2  A.   Uhm-uhm.

3  Q.   Yes?

4  A.   Uhm-uhm.  Yes.  Yes.

5  Q.   And you knew that that wasn't true either, it was

6  actually 115,000?

7  A.   True.

8  Q.   All right.  But you agree now that you did, in fact, have

9  $115,413 in your duffle bag on June 3rd, 2020, right?

10  A.   Right.

11  Q.   Now, once you got to the interview room at RDU, you were

12  interviewed by some law enforcement officers?

13  A.   Yes.

14  Q.   At the beginning of your interview, you told RDU police

15  officers that you planned to use the money to buy some land in

16  California, right?

17  A.   Once again, I assumed that it was none of his business

18  what I was doing, you know, I was just telling him whatever.

19  Q.   So let me just make sure the record is clear.  So at the

20  beginning of your interview, you told RDU police officers that

21  you planned to use that money to buy some land in California,

22  yes?

23  A.   Yes.

24  Q.   Okay.  And then as you kind of alluded to, that also was

25  not true, right?

R. Lyon - Direct Examination

1    A.    I didn't think I was doing nothing wrong.  I didn't think

2    I was breaking no laws, so, once again, I felt like it was

3    none of his business what I had going on.  I didn't break no

4    law, so...

5    Q.    So when you told law enforcement that you planned to use

6    that money to buy land in California, that was untrue, yes?

7    A.    Yes.

8    Q.    Also at the beginning of your interview, you told RDU

9    police officers that you didn't know how long you were going

10   to be in California, right?

11   A.    Yes.

12   Q.    You could stay maybe a couple weeks?

13   A.    I didn't think -- once again, I didn't think it was none

14   of his business, so, you know, I just kind of told him

15   anything.  I didn't think I was breaking the law.

16   Q.    But you told him that you could stay in California maybe

17   a couple weeks?

18   A.    If I wanted to.

19   Q.    Okay.  That wasn't true either, was it?

20   A.    If I wanted to.  It could have been true.

21   Q.    It could have been.  Was it?

22   A.    I had never made it out there.

23   Q.    Okay.  In fact, you hadn't booked a return flight, right?

24   A.    No.

25   Q.    You also told --

R. Lyon - Direct Examination

1          THE COURT:  Do you mean correct, or had you booked a
2    return flight?
3          THE WITNESS:  I didn't book a return flight.
4    BY MR. ANDERSON:
5    Q.   Also at the beginning of your interview with RDU police
6    officers, you told them that you didn't know where you would
7    be staying in California, right?
8    A.   Right.
9    Q.   That you would probably stay in a hotel?
10   A.   Right.
11   Q.   But that you hadn't made a reservation?
12   A.   Right.
13   Q.   Was that true?
14   A.   Yeah, that was true.
15   Q.   Now, you claimed to be the owner of all $115,413 at issue
16   in this case, right?
17   A.   Right.
18   Q.   And you understand that you've made that claim under
19   oath, right?
20   A.   Right.
21   Q.   Twice, in fact?
22   A.   When?  When?  When I was at the airport?
23   Q.   No, sir.  In this case -- I will give you the dates
24   specifically and if I need to show you, I will.  In fact,
25   Mr. Lyon, I'll just show it to you.

1    MR. ANDERSON:  Your Honor, may I have just a second,

2  please?

3    THE COURT:  You may.

4  BY MR. ANDERSON:

5  Q.   Now, Mr. Lyon, you should see a document up on your

6  screen.  Do you?

7  A.   Yeah.

8  Q.   And it says on the right-hand side, "Claim of Ramon

9  Lyon," right?

10  A.   Yes.

11  Q.   And just for purposes of the record, you see at the

12  bottom it has a case number written out?

13  A.   Yes.

14  Q.   And it says Document 5?

15  A.   Yes.

16  Q.   Filed November 30th, 2020?

17  A.   Yes.

18  Q.   All right.  Now, you see in that first paragraph you

19  claim, at least on information and belief, to be the owner of

20  all of the money involved in the case, right?

21  A.   Yes.

22  Q.   And if we flip to the second page, that verification,

23  you swear under penalty of perjury that that statement is true?

24  A.   Yes.

25  Q.   You own all the money?

1  A.   Yes.

2  Q.   And that's your signature?

3  A.   Yes.

4  Q.   So that was the first time that you made your claim.

5       I'll show you the second time here.

6            MR. AXFORD:  Your Honor, at this point I'm going to

7  object.  It seems like the Government is challenging the

8  claimant's standing, which that argument is long since passed.

9            THE COURT:  Overruled.

10 BY MR. ANDERSON:

11 Q.   Mr. Lyon, you see on the screen another document that

12 says, "Verified Claim" in the top right-hand corner?

13 A.   Yes.

14 Q.   And at the bottom, again, the case number, right?

15 A.   Yeah.

16 Q.   Docket -- Document 23, right?

17 A.   Yeah.

18 Q.   Filed May 13th, 2021, right?

19 A.   Uhm-uhm.

20 Q.   Okay.  And again, in the second paragraph here, which is

21 on your screen, you claim to be the owner of all $115,413 at

22 issue in this case, right?

23 A.   Right.

24 Q.   And if we flip to the third page of the document, that's

25 your signature, right?

1  A.   Right.

2  Q.   And if I scroll it up, you verify that that's true?

3  A.   Right.

4  Q.   Okay.  All right.  So you claim to be the owner of all

5  the money involved in the case, right?

6  A.   Right.

7  Q.   But according to your sworn interrogatory responses, the

8  money -- quote, "the money taken from me is the money removed

9  from my bag in the video," end quote, right?

10  A.   Uhm-uhm.

11  Q.   Yes?

12  A.   Right.  Right.

13  Q.   I just want to make sure we're all on the same page about

14  what cash you're claiming to own, okay?

15  A.   Okay.

16  Q.   So I'm going to show you a video clip, Government's

17  Exhibit 37.  And we're going to watch just a little bit and

18  then we'll pause at 5:48:47.

19       (Video played in open court.)

20  BY MR. ANDERSON:

21  Q.   We've paused it here, Government's Exhibit No. 37, at

22  5:48:47, one of the law enforcement officers is holding some

23  loose cash in her left hand, right?

24  A.   Uhm-uhm.

25  Q.   Yes?

1  A.   Right.

2  Q.   And some vacuumed-sealed cash in her right hand, right?

3  A.   Right.

4  Q.   That's the money that you claim to own, right?

5  A.   You talking about with the paper you just showed me?

6  Q.   Yes, sir.  The money you're claiming in this case is that

7  money right there?

8  A.   Yeah.

9  Q.   So it's your testimony that that money that that officer

10  is holding in total is $115,000 --

11  A.   Not in her hand, no.

12  Q.   Where is the rest of it?

13        MR. PRUDEN:  Objection, Your Honor.  The evidence

14  has been destroyed of this cash.

15        THE COURT:  Well, he can answer.  Was there more

16  money in the bag?

17        THE WITNESS:  I don't see none.

18  BY MR. ANDERSON:

19  Q.   Well, you packed the bag.  Was there more money in the

20  bag than what she's holding?

21  A.   I mean, going -- I don't see it in the video.

22  Q.   I'm not asking you about the video now.  I'm asking you

23  on this day, was there more money in this bag than what she's

24  holding?

25  A.   I don't see it on the video.

1  Q.   Mr. Lyon, that is not my question, sir.

2  A.   I mean, that's the answer because I don't see it on the

3  video.

4  Q.   Mr. Lyon, I'm going to ask you without the video.  How

5  many bundles of cash did you have in your bag?

6  A.   I don't know.  Going off the video, that's just what I

7  see on the video.

8  Q.   Mr. Lyon, I'm asking you to go off your memory.  You

9  packed that bag yourself, sir.

10 A.   I don't remember.  I can't recall.

11 Q.   You can't recall.  You can't recall whether you packed

12 four bundles or 20 bundles or two bundles?

13 A.   I mean, going off the video in which you just showed me,

14 I don't recall.

15 Q.   Okay.  Looking -- can you put the video back up.

16 Actually, I'm sorry.  We'll show Claimant's Exhibit No. 3.

17 Just for the record, Claimant's Exhibit No. 3 is Docket

18 Entry 44-5 in this case.

19      Mr. Lyon, there's another picture up on your screen.

20 Right?

21 A.   It look like the same picture.

22 Q.   Well, if we look at the timestamp, it's basically the

23 same.  It's about one second later than from what we just

24 looked at, right?

25 A.   I guess so, if you say so.

1  Q.   I'll make that representation to you that it's one second

2  later.

3       That cash that that law enforcement agent is holding in

4  her hand, is that all the cash, all $115,413?

5  A.   I mean, that's -- I got to say no, it don't look like it.

6  Q.   It doesn't look like it, right?

7  A.   Uhn-uhn.

8  Q.   I want to show you what's been filed as Claimant's

9  Exhibit No. 4, which should be Docket Entry 44-6.  Let's flip

10 to the second page of this exhibit.

11      Do you see all that cash laid out on the table?

12 A.   Yeah.

13 Q.   So we see the loose cash, right, at the top of the

14 picture, right?

15 A.   Right.

16 Q.   That's yours?

17 A.   I mean, I wasn't there when they did this.

18           MR. PRUDEN:   Objection.

19 BY MR. ANDERSON:

20 Q.   You packed the bag?

21 A.   I wasn't -- I mean, when they did all of this right here,

22 I wasn't there.  So I don't know what they -- you know, I

23 can't say.  I don't know what they did or what anyone did.  I

24 wasn't there when all of this was done.

25 Q.   Regardless of whether you were there when this photo was

1  taken, does this look like the cash that you packed up that

2  day, the day before, I mean?

3        MR. AXFORD:  Objection, Your Honor.  There's no

4  foundation for this picture.

5        THE COURT:  Do you know?

6        THE WITNESS:  I don't know, because I wasn't there.

7        THE COURT:  He says he doesn't know.

8        THE WITNESS:  I wasn't there when this was done.

9        MR. ANDERSON:  Nothing further, Your Honor.

10        THE COURT:  Thank you.

11        Cross-examination.

12                    CROSS-EXAMINATION

13  BY MR. PRUDEN:

14  Q.   Good afternoon, Mr. Lyon.  This money on the table was

15  not taken from -- all from your bag, correct?

16  A.   I didn't -- uhn-uhn.

17        THE COURT:  Just so the record is clear, was that

18  Government's Exhibit 25 you showed?

19        MR. PRUDEN:  Yes, Your Honor.

20        THE COURT:  And then when you say from my bag, you

21  mean the red duffle bag, yes?

22        THE WITNESS:  Yes, sir.

23        THE COURT:  Okay.  Next question.

24     (Video played in open court.)

25  BY MR. PRUDEN:

1  Q.   Mr. Lyon, at this point, how many people had searched

2  your bag, how many officers?

3  A.   Maybe three or four.  One, two -- maybe three.

4       (Video played in open court.)

5  BY MR. PRUDEN:

6  Q.   The officer said "that's it."

7  A.   Excuse me?

8  Q.   The female officer, when she finished searching your bag,

9  said "that's it," referring to the cash?

10 A.   Yeah.  I think she did, yeah.

11 Q.   Mr. Lyon, you and Denise Williamson have a family

12 together, correct?

13 A.   Yes.

14 Q.   And you're business partners, correct?

15 A.   I can't hear you.

16 Q.   You're business partners, correct?

17 A.   Yeah.

18 Q.   I'm going to show you -- Mr. Lyon, can you tell me where

19 this video is being taken?

20 A.   Where the video is being taken?

21 Q.   Or what day this is and where you are.

22      (Video played in open court.)

23          THE WITNESS:  I'm all the way in the back.

24      (Video played in open court.)

25          THE WITNESS:  Looks like I'm putting my stuff on the

1  screening table.

2        (Video played in open court.)

3            THE WITNESS:  Coming through.  Pat down.

4        (Video played in open court.)

5  BY MR. PRUDEN:

6  Q.   What happened there?

7  A.   I was waiting for my bag and she just took it, she took

8  it right past me.  I grabbed my shoes.  I think she might have

9  told me to grab my stuff and go to the little table where they

10  do, like, I think, like, a little private search or whatever

11  you call it.

12  Q.   You shake your head right at 5:30:07.  Can you explain

13  your interaction with -- who are you speaking with at this

14  time?

15  A.   I probably was talking to the officer that you had up

16  here earlier.  I think I was talking to him because I was

17  asking him like what did I do wrong.  And he was like, like,

18  he didn't really -- you know what I'm saying, he didn't know.

19  He just was just going by what somebody had told him.

20  Q.   Did you ask to leave?

21  A.   Yeah.  I asked him why did I have to go to the back and

22  he told me he -- he told me that I just had to go back there.

23  Q.   Okay.

24        (Video played in open court.)

25  BY MR. PRUDEN:

1  Q.   In the minutes, approximately five or so or more minutes

2  when you're interacting with the TSA prior to the police

3  officer coming and taking your license, did you ask to -- did

4  you say that you needed to leave and you're going to --

5  A.   Yeah.  I told them I was going to miss my flight; I

6  needed to go.

7  Q.   What did they say in response?

8  A.   They told me don't worry about the flight.

9  Q.   Did they tell you, you could not leave?

10 A.   Yeah.  He told me I couldn't leave.  Told me to just

11 stick around for a minute.  It shouldn't take long, it's

12 probably going to be real quick.

13 Q.   How many TSA officers told you that?

14 A.   All of them.

15      (Video played in open court.)

16 BY MR. PRUDEN:

17 Q.   Did you feel like you could leave at any point prior to

18 going into the interrogation room?

19 A.   No.  They had my ID.  I couldn't go nowhere.

20 Q.   Did they have your money too?

21 A.   They had everything, my bag, everything.  Outside of the

22 one carry-on you saw me walk in with, that was all I had.

23 Q.   Were you ever told you were free to leave and you could

24 leave?

25 A.   No, because I would have left.  If I was free to leave, I

1 would have left.

2 Q.   Is it true that the first time that you knew you could

3 leave is when the female officer told you that you could

4 technically leave without your stuff at approximately -- you

5 had been at that point in that interrogation room for -- at

6 6:46 a.m. and that is approximately an hour and 12 minutes

7 into this ordeal when you were not -- that's the first time

8 you were told you could technically leave; is that right?

9 A.   Yes.

10           MR. PRUDEN:  No further questions.

11           THE COURT:  Thank you.

12           Redirect examination.

13           MR. ANDERSON:  Your Honor, the Government doesn't

14 have any further questions.

15           THE COURT:  Thank you, sir.  Please watch your step

16 stepping down.  You may step down.  There's a step up as you

17 come off the witness stand and a step down through the gate.

18           The United States may call its next witness:

19           MR. ANDERSON:  Your Honor, the United States wants

20 to call one of the TSA witnesses to talk about some of the

21 x-rays, but before we do that I think we might need to seal

22 the courtroom given that those are sensitive security

23 information, especially combined with the testimony that he

24 will give about them.

25           THE COURT:  Well, I mean, the claimant is here

1  and -- are those your folks in the back?

2          MR. ANDERSON:  In the back we have two folks from

3  our office, yes, sir.

4          As I understand it, the information can't even be

5  shared with the claimant without a specific authorization from

6  TSA, which we don't have.  We do have an authorization to

7  share it with Mr. Pruden, so he has seen these images before,

8  but I don't think --

9          THE COURT:  What is this witness going to talk

10 about?

11         MR. ANDERSON:  He's going to talk about -- we have

12 two images of the x-rays of Mr. Lyon's bag and the witness is

13 going to talk about what he sees in the bottom of the bag,

14 interpreting the x-ray that will be up on the screen.

15         As I understand it from TSA, that presents a

16 security risk given what it could disclose about the

17 capabilities of the machine and --

18         THE COURT:  Mr. Lyon actually just left.  So the

19 only people in here are the lawyers, the DOJ folks, my law

20 clerks and me, and CSOs, so call your witness.

21         There's just not an issue of -- I'm happy to seal

22 this part of the transcript, but there's no one else in here.

23         MR. ANDERSON:  And we would need to seal those two

24 exhibits, but otherwise --

25         THE COURT:  That's fine.  I mean, the lawyers -- you

1  told me that Mr. Pruden has seen these.

2          MR. ANDERSON:  Right.  He has.

3          THE COURT:  All right.  That's fine.

4    (Sealed proceedings commencing at 12:06 and concluding at

5                          12:22 p.m.)

6          THE COURT:  The United States may call its next

7  witness.

8          MR. ANDERSON:  Your Honor, the United States does

9  not have any further witnesses.

10          THE COURT:  The claimant may call its first witness.

11          MR. PRUDEN:  No, Your Honor.

12          THE COURT:  Okay.  I do have an exhibit book from

13  y'all, and do you want those to be received?

14          MR. PRUDEN:  Yes, Your Honor.

15          THE COURT:  I flipped through them, but I think you

16  just did it for helping me to get organized.  They'll all be

17  received, the claimant exhibits in this book.  I got the book

18  from the Government.

19    (Claimant's Exhibit Nos. 1 through 3 were admitted into

20  evidence.)

21          I have read all the papers.  I'll briefly hear

22  arguments.  I'm going to take it under advisement.  I'm not

23  going to rule today.  I anticipate issuing a written decision,

24  but sometimes I just get everyone back together and announce

25  my findings and conclusions.  It's just a function of how many

```
 1   other things I have to do.  But in this case, I do anticipate
 2   writing, but that could change; and if it does, I'll let you
 3   know.
 4            So I'll hear first from Mr. Fesak, and then I'll
 5   hear from either Mr. Pruden or Mr. Axford, and then I'll give
 6   Mr. Fesak the last word.
 7            MR. FESAK:  Thank you, Your Honor.
 8            I'm going to try not to reiterate things already
 9   written in the brief.  And really just, you know, the reason
10   why we're here and having an evidentiary hearing is because
11   there are two different versions of a story.  One is a version
12   that has been propounded to you by public servants, law
13   enforcement officers who have been doing this a long time; and
14   the other is propounded to you, Your Honor, by an individual
15   who has a lengthy criminal history involving -- felony
16   criminal history involving the sale and trafficking in
17   controlled substances and who in all likelihood was high on
18   the morning that he went through security at TSA and his
19   memory was impaired.  And I think they elicited that.  There's
20   an admission on video where he admits having smoked marijuana
21   that morning.  He reeked of marijuana.  His bag reeked of
22   marijuana.
23            And aside from that, I mean, he just gives, I think,
24   demonstrably his recollection of events that morning is not
25   accurate.  He can't identify how many bundles of currency he
```

packed in his luggage.  That part of his memory is very foggy.
He gave, you know, charitably inconsistent, potentially false,
intentionally deceptive statements repeatedly to law
enforcement concerning the amount of money that he was
carrying.  You know, significantly minimizing the true amount
in the first encounter when he says it's only 6,000, then it
grows to 60,000, and eventually grows to 100,000.  Did he
really know how much money he was carrying?  Frankly, in a lot
of cases we see money couriers in the drug business don't know
and that's part of the MO, right, they don't know how much
they are carrying.  If he did, in fact, know how much he was
carrying, he was intentionally deceptive about it.

You know there was a kind of a decoy stack of loose
money on top, you know, that was, I would submit, intended to
avoid detection of the real mother lode that you heard from
every witness was artfully concealed.  It was -- you know,
extra efforts were taken to, you know, unzip a liner, stick it
underneath the frame, you know, beneath everything else in the
suitcase and not only stick it in that section of the
suitcase, which is not readily accessible, but to further wrap
the cash in newspapers, so you couldn't see what it was, and
further to wrap it in vacuum-sealed plastic material.  Which
every single witness, Your Honor, noted how unique, how
unusual, how strange, how suspicious that was.

And that's, of course, consistent with all the case

law we cite in our brief about the wrapping of currency in
newspaper, vacuum sealing of currency, about hiding and taking
extra efforts to conceal currency in secret compartments.

All of this, Your Honor, is -- goes -- at a very
minimum it ultimately goes to probable cause to seize, but it
goes at a minimum and immediately apparent under the plain
view doctrine to the reasonable suspicion that exists at the
outset, which justifies any, you know, short extension of a
detention, to the extent that the Court even finds that there
was no consent.  And we do submit, Your Honor, that there was
consent and Officer Alwang testified to that.  But even if
there wasn't, we would submit, Your Honor, that under the
principles of *Terry*, reasonable suspicion existed.

The officers then acted diligently within that first
15 to 20 minutes to confirm their -- dispel their suspicions
as required under the *Terry* line of cases.

In doing so, you know, again, they ran his criminal
history.  You know, they detected the odor of drugs, all of
those things that are cited in our brief and culminating
before 6:00 o'clock in the morning and what we contend is
probable cause having been developed by that point.

In a conversation with Mr. Pruden yesterday or the
day before in advance of this hearing, we had agreed to limit
essentially the matters in contention to those leading up to
6:00 o'clock in the morning.  Their contention being any

```
 1   Fourth Amendment violation occurred before then; and ours
 2   being, of course, that it did not.
 3              So with that said, I think I will rest for the
 4   moment.
 5              THE COURT:  Okay.  I'll hear from Mr. Pruden or
 6   Mr. Axford.
 7              MR. AXFORD:  Judge, the 6:00 o'clock stipulation
 8   is -- while Mr. Pruden and Mr. Fesak talked about that, even
 9   though it didn't come out in the hearing today, there are a
10   few timestamp discrepancies between the TSA screening room and
11   actual TSA checkpoint.
12              Be that as it may, Your Honor, I would submit to you
13   that the Government has already admitted that Mr. Ramon Lyon
14   in its response was already seized and was not, in fact, free
15   to leave.
16              I would direct Your Honor to the Government's
17   response page 7 of 26 in the middle paragraph, the last
18   sentence begins, "However reinforcing the notion that it's not
19   TSA's place to investigate crimes or make arrests."  The
20   policy provides that passengers are, quote --
21              THE COURT:  What exhibit is that?
22              MR. AXFORD:  This is the Government's response to
23   the motion.
24              THE COURT:  Oh, okay.
25              MR. AXFORD:  Page 7 of 26.
```

         1          THE COURT:  Okay.  So Docket Entry --

         2          MR. AXFORD:  Document 54.

         3          THE COURT:  Okay.

         4          MR. AXFORD:  Again, Judge, what the Government's own

         5    admission says is that the policy, which is the TSA policy,

         6    provides that passengers are free to leave the screening

         7    checkpoint once applicable screening requirements have been

         8    completed successfully.

         9          Every witness up there testified that the applicable

        10    screening requirements were not completed until five or six

        11    minutes into the TSA security office or maybe -- the RDU

        12    office, I'm sorry.  So by the Government's own admission,

        13    Mr. Lyon was not free to leave.

        14          Your Honor, I would cite you to *Florida v. Royer*,

        15    which I believe is more equivalent in this case.  And in a

        16    case like this, Judge, where they're claiming that Mr. Lyon

        17    went along to stay with his money, to answer questions, was

        18    all consensual.  As you know, the Government has the burden of

        19    showing that the necessary consent was freely and voluntarily

        20    given.  And the seizure in a case like this for just an

        21    investigatory detention should last no longer than is

        22    necessary to effectuate the purpose of the stop.

        23          Well, the purpose of this stop is that TSA Officer

        24    Adams noticed an organic mass, which is commonly known to

        25    shield weapons and/or sheet explosives in this particular

1  case.

2        So the most officious way the TSA could have

3  dispelled that particular notion is to do the bomb swab.  You

4  either think it's a bomb or you don't, or you know it's cash.

5        So if the safety concern here was that this was

6  hiding sheet explosives, but nobody ever did a bomb swab,

7  which -- I mean, I've had that done on my bag, it takes about

8  three minutes -- that would have been the most expeditious way

9  to dispel that particular notion that that was a threat item

10 and it was never done.

11       A bomb dog wasn't brought over.  Nothing to dispel

12 the sheet explosive theory.

13       The other thing that was very telling, Judge, as you

14 watched the video, while the officers would intimate that they

15 offered or invited Mr. Lyon to come back to the security

16 office, when you invite somebody to go somewhere, just in

17 everyday life you lead them to where you have invited them.

18 You don't have them go first, carry their bag, you have their

19 driver's license, you've got your gun on your side, two armed

20 officers and a TSA officer who also wears a badge, and

21 Mr. Lyon is the first one in, he gets pointed as to where to

22 sit and then the two armed officers and the TSA officer

23 basically stand guard in that room.

24       As I know Your Honor is aware, the facts in *Royer*

25 are extremely similar and the Supreme Court goes so far as to

say -- and it's almost a pretty apt description of the
situation here.  It said those officers requested the
defendant in that case to accompany them to the police room,
just like here; and that defendant, Royer, went with them,
just like here; and he found himself in a small room,
basically a large closet, equipped with a desk and two chairs,
just like here.

            And the Supreme Court goes on to say that the
officers have Royer's ticket.  Now, of course, that case was
back in the '80s when there still were paper tickets.  So you
have your ticket on your phone.  They had his identification,
just like in Mr. Lyon's case; and they had seized his luggage,
just like in Mr. Lyon's case.  And the Court concluded that
Royer was never informed that he was free to board his plane
if he so chose and he reasonably believed he was being
detained.

            That Court, in fact, further states that those
circumstances surely amount to a show of official authority
such that a reasonable person would not have believed that he
was not free to leave.

            Those facts, Judge, are -- again, other than the
paper ticket being seized, the facts are nearly identical.

            As Mr. Fesak would point out, that the odors of
marijuana and the stories, he was seized long before any of
that came out.  So by the time the officers have taken his

license at the check-in table and seized his bag and told him I'm waiting on somebody else and we're going to go off to the side room, he was already seized by that. They had none of that information.

At least the retired Officer Pegram, he testified at the very end of his testimony, yeah, I pretty much knew it was cash. That's what he said. My recollection anyway.

So, Judge, the fact that the security -- the administrative search of his bag had not been successfully completed prevented Lyon from being free to leave and then the show of authority and bringing him back into the police room with two armed officers and a TSA security guard was further evidence that he was, in fact, not free to leave, and no reasonable person in that situation would be free to leave in their own mind.

Thank you.

THE COURT: Thank you.

Mr. Fesak.

MR. FESAK: Again, Your Honor, I don't think there's a disagreement that there is a search and a seizure that occurs permissibly under the Constitution at an airport security checkpoint.

Where we disagree here is, one, that search never concluded, the bag was never cleared. The reason it was never cleared was because TSA officers found something so out of the

ordinary and so unusual it aroused their suspicion.  It --
yes.  I mean, you heard the witnesses, by the time we get to
the end of the train, it's treated as a bulk cash seizure,
right?  And of course that's hindsight as everybody looking,
this is what it turned out to be.

But when you're looking at the x-ray and when you're
doing the first search and the first TSA officer looking at
it, you don't know what it is.  You heard Ms. Singh testify.
And the right thing for her to do is to call her supervisor
and the supervisor's obligation is to call in a police officer
to investigate and just take over the scene.

The -- real quick, in terms of the _Royer_ case, I
think it's a slightly different set of circumstances because
in this case, we actually knew what was in the bag.  We had,
you know, at least at minimum, highly suspicious, hidden,
artfully concealed packaging, which, of course, is what
predicated the calling and the involvement of the law
enforcement officers.  Justified some level of detention, to
the extent there was a detention.

And a couple things:  One, he was given -- if there
was a detention at the beginning -- and I concede there
probably was -- he was given the option to leave.  He could
have asked for his license back.  They would have given it to
him back.

Again, all the indicators from the _United States v._

1    *Clark* case, which is, you know, the verbal demeanor of the

2    officers, you know, drawing of weapons, all of those things,

3    none of them really show a highly coercive environment, Your

4    Honor.

5         And I guess I will conclude really with just citing

6    the Court another case.  It's a Second Circuit case.  The

7    557,933-dollar case.  I think it's a good day for the

8    Government when we can cite Sonia Sotomayor on a civil

9    procedure question.

10        In that case, Your Honor, the facts are private

11   airport security seized 500-some-thousand dollars of money

12   orders, I think it was, in a bag and they detain him.  That's

13   the stipulated facts.  Private security detained the passenger

14   to await the arrival of police to investigate, and under *Terry*

15   that was upheld as permissible.

16        So I think I'll conclude with that.

17        THE COURT:  All right.  The matter is submitted.

18        I thank counsel for their work.

19        We'll be in recess until tomorrow morning at 9:00.

20                    *    *    *

21        (The proceedings concluded at 12:45 p.m.)

22

23

24

25

1                   UNITED STATE DISTRICT COURT

2              EASTERN DISTRICT OF NORTH CAROLINA

3

4

5              CERTIFICATE OF OFFICIAL REPORTER

6

7          I, Amy M. Condon, CRR, RPR, CSR, Federal Official

8  Court Reporter, in and for the United States District Court

9  for the Eastern District of North Carolina, do hereby certify

10 that pursuant to Section 753, Title 28, United States Code,

11 that the foregoing is a true and correct transcript of the

12 stenographically reported proceedings held in the

13 above-entitled matter and that the transcript page format is

14 in conformance with the regulations of the Judicial Conference

15 of the United States.

16

17

18 Dated this 8th day of March, 2023.

19

20                                   _____

21                                   /s/ Amy M. Condon
                                     Amy M. Condon, CRR, CSR, RPR
22                                   U.S. Official Court Reporter

23

24

25