IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:20-CV-539-D

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| $115,413.00 IN U.S. CURRENCY, | ) | |
| | ) | |
| Defendant. | ) | |

On June 3, 2020, law enforcement officers at Raleigh-Durham International Airport ("RDU")

seized $115,413.00 in currency that Ramon L. Lyon ("Lyon" or "claimant") attempted to smuggle

onto a plane bound for Los Angeles, California. On October 9, 2020, the United States filed a civil

action in rem under 21 U.S.C. § 881(a)(6) [D.E. 1]. Section 881(a)(6) permits the forfeiture of

currency "furnished or intended to be furnished by any person in exchange for a controlled

substance" in violation of the Controlled Substances Act, proceeds traceable to such an exchange,

or currency used or intended to be used to facilitate a violation of the Controlled Substances Act.

See 21 U.S.C. § 881(a)(6). On November 29, 2021, Lyon answered the government's complaint

[D.E. 36].

On June 24, 2022, Lyon moved to suppress "any and all physical objects, pre-detention and

post-detention statements of Lyon, and any and all other physical evidence" which the government

obtained "as a result the illegal extension of the stop, illegal interrogation, illegal detention of Lyon,

and the illegal search and seizure of certain items by the government, all in violation of the Fourth

and Fifth Amendments to the United States Constitution . . . ." [D.E. 43]; [D.E. 44] 18–30. On July

12, 2022, Lyon moved for an evidentiary hearing on his motion to suppress [D.E. 46]. On September 6, 2022, the government responded in opposition to Lyon's motion to suppress [D.E. 54]. On November 4, 2022, Lyon replied [D.E. 63].

On February 8, 2023, the court held an evidentiary hearing on Lyon's motion to suppress [D.E. 70–74]. The court has reviewed the entire record and assessed the credibility of the witnesses. The court enters these findings of fact and conclusions of law. See Fed. R. Civ. P. 52(a)(1). Lyon was not a credible witness. In contrast, the Transportation Security Administration ("TSA") and law enforcement officials testified credibly. As explained below, the court denies Lyon's motion to suppress.

I.

On June 3, 2020, at approximately 5:29 a.m., Lyon entered a TSA security screening area at RDU. See [D.E. 44] 4; [D.E. 54] 5–6. Lyon had smoked marijuana earlier that morning. See Hearing Tr. [D.E. 73] 85, 102–04. At the security screening area, Transportation Security Officer ("TSO") James Adams ("TSO Adams") x-rayed Lyon's bag. See [D.E. 44] 4; [D.E. 54] 5–6; Adams Tr. [D.E. 74] 3–9. Upon x-raying Lyon's bag, TSO Adams noted large organic masses in Lyon's bag and alerted TSO Renu Singh ("TSO Singh") to open and inspect Lyon's bag. See [D.E. 44] 4; [D.E. 54] 6; Hearing Tr. at 8–10. Within 30 seconds, TSO Singh pulled Lyon's bag to open and inspect it. See [D.E. 44] 4; [D.E. 54] 6; Hearing Tr. at 10–14. The parties agree that TSA agents did not violate the Fourth Amendment when they opened and inspected Lyon's bag because screening passengers and their carry on bags at the airport is a valid administrative search. See Elec. Priv. Info. Ctr. v. Dep't of Homeland Sec., 653 F.3d 1, 10–11 (D.C. Cir. 2011); United States v. Aukai, 497 F.3d 955, 962–63 (9th Cir. 2007) (en banc); United States v. Hartwell, 436 F.3d 174, 177–81 (3d Cir. 2006) (Alito, J.); United States v. DeAngelo, 584 F.2d 46, 47–48 (4th Cir. 1978);

2

United States v. Edwards, 498 F.2d 496, 499–501 (2d Cir. 1974) (Friendly, J.); see also City of Indianapolis v. Edmond, 531 U.S. 32, 47–48 (2000) (recognizing "validity" of warrantless "searches at places like airports and government buildings, where the need for such measures can be particularly acute"); Chandler v. Miller, 520 U.S. 305, 323 (1997) (same); Nat. Treasury Emp. Union v. Van Raab, 489 U.S. 656, 675 n.3 (1989) (same).

In the bag, TSO Singh found some loose currency. Under the bottom lining of Lyon's bag, TSO Singh found several unidentified masses artfully concealed. See [D.E. 44] at 4–5; [D.E. 54] 2, 6; Hearing Tr. at 10–14. TSO Singh could not tell if there was anything in the wrapped objects that could endanger an aircraft, such as sheet explosives.[1] Some of the masses were wrapped in rubber bands, some were wrapped in newspaper or magazine pages, and some were in vacuum sealed bags. See [D.E. 44] 8; [D.E. 54] 2, 6–7; Hearing Tr. at 10–14.

TSO Singh suspected potential criminal activity due to the quantity, packaging, and concealment of the masses. See [D.E. 44] 4; [D.E. 54] 2, 6–7; Hearing Tr. at 14–15. Thus, TSO Singh alerted her supervisor, TSO Ballesteros. See [D.E. 44] 4; [D.E. 54] 2, 6–7; Hearing Tr. at 14–15. After assessing the same artfully concealed masses in Lyon's bag, TSO Ballesteros also suspected criminal activity. See [D.E. 44] 4; [D.E. 54] 2, 6–7; Hearing Tr. at 23–26. TSO Ballesteros asked Lyon what was in the packaging, and Lyon said cash. Hearing Tr. at 23–24. TSO Ballesteros did not open the packaging, could not tell what was inside, suspected criminal activity,

---

[1] Unidentified, large organic masses, such as those that showed up on the x-ray of Lyon's bag, can be many things, including sheet explosives. See Hearing Tr. at 9–13. At the hearing, TSO Singh testified credibly that determining whether the masses in Lyon's bag were sheet explosives was TSA's "first and major concern." Id. at 13. Carrying sheet explosives on an airplane is a crime. If TSA is unable to determine whether something in a bag is an explosive, TSA investigates the matter with the assistance of law enforcement. See id. at 21. TSA transportation security officers are not sworn law enforcement officers. Airport Police Department ("APD") officers have authority to investigate potential crimes committed at the airport. See N.C. Gen. Stat. § 63-53.

3

and contacted APD Officer John Pegram ("Officer Pegram"), who was ten feet away. See id. at 23–28, 43.

At approximately 5:33 a.m., Officer Pegram arrived at the security screening area. See [D.E. 44] 4; [D.E. 46] 2; [D.E. 54-7] 1–2; Hearing Tr. at 25, 43–44. After inspecting the bag and suspecting criminal activity, Officer Pegram asked Lyon what was in the packaging, and Lyon said $6,000 cash. Hearing Tr. at 43–46. Officer Pegram was not sure what was in the packaging and had never seen money packaged that way, but he had seen drugs packaged that way. Id. at 45–46. Officer Pegram requested assistance with Lyon's bag from another nearby APD officer, Officer Rodney Alwang ("Officer Alwang"). See id. at 47–49; [D.E. 44] 4; [D.E. 46] 2; [D.E. 54-7] 1–2. While waiting for Officer Alwang to arrive, Officer Pegram asked for Lyon's driver's license, and Lyon gave it to him. Hearing Tr. at 49–50. At no time did Officer Pegram tell Lyon that he was being detained or arrested. Id. at 50–51.

At approximately 5:34 a.m., Officer Alwang arrived and spoke with Officer Pegram. Id. at 66–67. Officer Alwang told Lyon that Lyon could either leave the area without the bag or remain with the bag while they investigated. See [D.E. 54] 1–2, 5–17; [D.E. 54-7] 2–3; Hearing Tr. at 71. Lyon chose to stay with his bag. See Hearing Tr. at 71. When Officer Alwang spoke with Lyon, he detected the odor of marijuana on Lyon and emanating from Lyon's bag. See Hearing Tr. at 85, 102–03; Gov. Ex. 39. Officer Alwang, Officer Pegram, TSO Chris John ("TSO John"), and Lyon then walked to a nearby office for security reasons and discretion. See [D.E. 54] 1–2, 5–17; [D.E. 54-7] 2–3; Gov. Ex. 39 at 5:34; Hearing Tr. at 36–37, 62. Officer Alwang credibly testified that for situations involving suspected criminal activity, he takes the item out of public view for the public's safety and discretion. See Hearing Tr. at 62.

4

At approximately 5:34 a.m., Officer Alwang, Officer Pegram, TSO John, and Lyon entered a nearby office. See Gov. Ex. 39; Hearing Tr. at 36–37. Once in the nearby office, Officer Alwang used his cell phone to photograph Lyon's driver's license. Hearing Tr. at 72. Officer Alwang then placed Lyon's driver's license on the table in front of Lyon. Id. at 72–73. Officer Alwang then searched a database for any outstanding wants or warrants. See [D.E. 46] 2; [D.E. 46-2]; [D.E. 54] 17. Officer Alwang discovered no wants or warrants but noticed Lyon's extensive criminal history, including Lyon's multiple drug-trafficking convictions. See [D.E. 46] 2; [D.E. 46-2]; [D.E. 54] 17. While Officer Alwang checked Lyon's information, Lyon sat casually in the office, used his phone, and talked to the other officers. See Gov. Ex. 39. Lyon's driver's license was always in his sight and within arms length on the table in front of him. See id. Lyon used the table for other items, including his wallet and his phone. See id.

At approximately 5:35 a.m., Officer Alwang learned that Lyon was traveling to Los Angeles, California, and he had purchased his airline ticket the day before. See id. At approximately 5:35 a.m., APD officers also learned that Lyon had no return flight from Los Angeles, no hotel reservation or other place to stay upon landing in Los Angeles, and no checked luggage. See [D.E. 46] 3; [D.E. 54] 1–2, 11–14; [D.E. 65] Manually Filed Ex. 13; Hearing Tr. at 107–09.

At approximately 5:36 a.m., Officer Alwang asked for Lyon's consent to search his bag. See Gov. Ex. 39. APD Officer Davis explained to Lyon that if he cooperated and his story checked out, Lyon could keep the currency in addition to his bag but that even if he did not cooperate and his story did not check out, Lyon was still free to go but the officers would keep the currency. See id.; Hearing Tr. at 80–81.

Lyon consented to the search of his bag, and Officer Alwang began the consent search of Lyon's bag at 5:39 a.m. See id.; Hearing Tr. at 85. At the outset of the search at 5:39 a.m., Officer

5

Alwang exclaimed that Lyon's bag "reeked of marijuana." See Gov. Ex. 39; Hearing Tr. at 85, 102–04. In response, Lyon told Officer Alwang that he had smoked marijuana that morning. See Gov. Ex. 39; Hearing Tr. at 85, 102–04. Officer Alwang then retrieved the packaged items in Lyon's bag and asked Lyon what they contained. Lyon responded that the packages contained currency that he earned from gambling and that he always packaged his money that way. See [D.E. 46] 3; [D.E. 46-2]; Manually Filed Ex. 14 [D.E. 65]. The bag did not contain marijuana. See Hearing Tr. at 86.

At approximately 5:40 a.m., Lyon showed the officers his boarding pass on his phone. See Gov. Ex. 39. Throughout the encounter, Lyon possessed his phone, boarding pass, and other belongings, including a second carry on bag. See id. Lyon's bag and driver's license remained on the table, within arms length, directly in front of Lyon. See id. At approximately 5:43 a.m., Lyon retrieved his driver's license from the table. See id. At approximately 5:46 a.m., APD officers concluded their search and asked an off-site task force officer ("TFO") with the Department to Homeland Security to come to the airport. See id.; see also [D.E. 44-6] (photograph of currency from Lyon's bag). The off-site task force officer (TFO Woodlief) drove from his residence to RDU.

At approximately 7:10 a.m., TFO Woodlief of the Department of Homeland Security arrived at RDU. See [D.E. 44] 6–10; [D.E. 46] 3; [D.E. 54] 2, 21–22; [D.E. 63] 2. TFO Woodlief noted the strong smell of marijuana upon entering the office where Lyon and his bag were. See Manually Filed Ex. 19 [D.E. 65] (video of TFO Woodlief walking in to speak with Lyon and noting the strong smell of marijuana). TFO Woodlief spoke with Lyon for approximately 20 to 30 minutes. At the end of the conversation, based on the totality of the circumstances, TFO Woodlief told Lyon that he was seizing Lyon's currency under 21 U.S.C. § 881(a)(6). See [D.E. 44] 6–10; [D.E. 46] 3; [D.E. 54] 2, 21–22; [D.E. 63] 2–3.

6

On February 8, 2023, the court held an evidentiary hearing on Lyon's motion to suppress evidence arising from the seizure of Lyon's currency. See [D.E. 70–74]. At the hearing, Lyon testified that in June 2020 he operated the Phish Lounge in Raleigh. See Hearing Tr. at 87. It was a gaming business that generated significant amounts of cash for Lyon. See id. at 87–89. When a player "won" at one of the "fish tables," then Lyon would pay the customer in cash. See id. at 89–90.

According to Lyon, on June 2, 2020, after closing the Phish Lounge, he counted approximately $115,000 in cash that he planned to take to California on June 3, 2020. See id. at 91. Lyon claimed that he intended to take the $115,000 to California to purchase some fish tables from an American Arcade Supply store in Los Angeles. See id. Lyon supposedly decided to make this trip to Los Angeles even though American Arcade Supply had a store in Raleigh and Lyon had purchased some software from that Raleigh store in February 2020. See id. at 92. According to Lyon, fish tables in the store in Los Angeles were priced lower than in the Raleigh store. See id. at 91–92. Lyon's testimony about why he was taking $115,000 in cash to Los Angeles, however, was not credible. Notably, Lyon purchased fish tables in Raleigh in September 2020 for approximately $7,000 and paid for the tables with a check and a debit card. See id. at 93–94.

Lyon also testified that he packaged the $115,000 in currency in vacuum sealed bags on June 2, 2020. See id. at 95–96. Lyon closed the Phish Lounge at approximately 2:00 a.m. on June 3, 2020. See id. at 96–97. Lyon then drove home. See id. at 97. Lyon then packed the cash under the liner in a duffle bag and placed his clothes, some other items, and some loose cash on top of the concealed cash. See id. at 98–99.

At the hearing, Lyon denied smoking marijuana before driving to the airport on June 3, 2020. See id. at 101. However, the United States impeached Lyon with the videos of his interactions with

7

the officers on June 3, 2020, where Lyon admitted to officers that he had smoked marijuana that morning. See id. at 101–03.

At the hearing, Lyon admitted that he repeatedly lied to the officers on June 3, 2020. See id. at 104–05. Initially, Lyon told the officers that he had $6,000 in his bag. See id. at 105–06. A few minutes later, Lyon told a different officer that he had approximately $60,000 in his bag. See id. at 106. A few minutes after that, Lyon lied again and said that he had approximately $100,000. See id. at 105–07. At the hearing, Lyon also admitted that he lied to law enforcement when he told them that he intended to use the cash to buy some land in California. See id. at 107–08. He also admitted that he told law enforcement officers that he did not know how long he would be in California, that he had not booked a return flight, and that he did not know where he planned to stay in Los Angeles. See id. at 108–09.

## II.

The Fourth Amendment protects persons from unreasonable searches and seizures. See U.S. Const. amend. IV. In considering Lyon's motion to suppress, the government must prove by a preponderance of the evidence that the search and seizure did not violate the Fourth Amendment. See United States v. Matlock, 415 U.S. 164, 177–78 & n.14 (1974). The exclusionary rule provides that "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." United States v. Calandra, 414 U.S. 338, 347 (1974). The exclusionary rule "reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" Segura v. United States, 468 U.S. 796, 804 (1984) (citations omitted).

**8**

The Fourth Amendment and the exclusionary rule apply to civil forfeiture cases. See One 1958 Plymouth Sedan v. Pennsylvania, 380 U.S. 693, 702 (1965); United States v. Taylor, 13 F.3d 786, 788 (4th Cir. 1994); United States v. Turner, 933 F.2d 240, 243 (4th Cir. 1991); United States v. $78,850.00 in U.S. Currency, 444 F. Supp. 2d 630, 635 (D.S.C. 2006); cf. 18 U.S.C. § 981(b)(2)(B) ("[A] seizure may be made without a warrant if—(B) there is probable cause to believe that the property is subject to forfeiture and—(i) the seizure is made pursuant to a lawful arrest or search; or (ii) another exception to the Fourth Amendment warrant requirement would apply . . . ."). All currency furnished in exchange for illegal drugs, all proceeds traceable to an exchange for illegal drugs, and all currency used to facilitate illegal drug trafficking are subject to civil forfeiture. See 21 U.S.C. § 881(a)(6). In civil forfeiture actions brought under 18 U.S.C. § 983, the government must establish by a preponderance of the evidence that the property is subject to forfeiture. See 18 U.S.C. § 983(c); United States v. McClellan, 44 F.4th 200, 205 (4th Cir. 2022); United States v. $50,720.00 in U.S. Currency, 589 F. Supp. 2d 582, 583 (E.D.N.C. 2008); United States v. $433,980 in U.S. Currency, 473 F. Supp. 2d 685, 689 (E.D.N.C. 2007).

A.

Lyon argues that TSA agents unreasonably extended the TSA's administrative search of his bag and that TSA agents improperly commanded him to remain at the security screening area until APD officers arrived, thereby, exceeding the constitutional bounds of an airport administrative search. See [D.E. 44] 4–8; [D.E. 63] 3–4. To be constitutionally reasonable, an airport administrative search must comport with the administrative need that justified it. See, e.g., United States v. McCarty, 648 F.3d 820, 831 (9th Cir. 2011). However, as long as the airport administrative search is "no more intrusive than necessary to accomplish its purpose," then agents need not ignore evidence of criminal activity merely because such criminal activity does not threaten other travelers.

9

See, e.g., United States v. $557,933.89 in U.S. Funds, 287 F.3d 66, 81–82 (2d Cir. 2002) (Sotomayor, J.); United States v. $145,850.00 U.S. Currency, No. 1:10-CV-71, 2010 WL 3063814, at *3–6 (E.D. Va. July 30, 2010) (unpublished).

TSO Adams conducted a constitutional airport administrative search of Lyon's bag at 5:29 a.m. See Elec. Priv. Info. Ctr., 653 F.3d at 10–11; Aukai, 497 F.3d at 962–63; Hartwell, 436 F.3d at 177–81; DeAngelo, 584 F.2d at 47–48; Edwards, 498 F.2d at 499–501; see also City of Indianapolis, 531 U.S. at 47–48; Chandler, 520 U.S. at 323; Nat. Treasury Emp. Union, 489 U.S. at 675 n.3. As for TSO Adams alerting TSO Singh to pull Lyon's bag and TSO Singh calling TSO Ballesteros, the TSA screening was reasonable and constitutional in light of the undefined masses in Lyon's bag. See Elec. Priv. Info. Ctr., 653 F.3d at 10–11; Aukai, 497 F.3d at 962–63; Hartwell, 436 F.3d at 177–81; DeAngelo, 584 F.2d at 47–48; Edwards, 498 F.2d at 499–501; see also City of Indianapolis, 531 U.S. at 47–48; Chandler, 520 U.S. at 323; Nat. Treasury Emp. Union, 489 U.S. at 675 n.3. The entire TSA screening from Lyon entering the area to TSO Ballesteros calling in law enforcement lasted only four minutes. Taking the encounter minute by minute, at 5:29 a.m., Lyon entered the screening area. See [D.E. 44] 4; [D.E. 54] 5–6; Gov. Ex. 39. TSO Adams x-rayed Lyon's bag, flagged large organic masses in the bag, and alerted TSO Singh to pull Lyon's bag for inspection. See [D.E. 44] 4; [D.E. 54] 6; Hearing Tr. at 8–10. Approximately 30 seconds later, TSO Singh pulled Lyon's bag to open and search it. See [D.E. 44] 4; [D.E. 54] 6; Hearing Tr. at 10–14.

TSO Singh found some loose cash and clothes on top. Under the bottom lining of Lyon's bag, TSO Singh found several unidentified masses artfully concealed. See id. at 4–5; [D.E. 54] 2, 6; Hearing Tr. at 10–14. TSO Singh did not know what the packaging contained but believed that the unidentified masses reflected potential criminal activity due to the quantity, packaging, and concealment of the masses. Thus, TSO Singh, alerted her supervisor, TSO Ballesteros. See [D.E.

10

44] 4; [D.E. 54] 2, 6–7; Hearing Tr. at 14–15. After assessing the same artfully concealed masses in Lyon's bag, TSO Ballesteros suspected criminal activity and promptly alerted law enforcement. See [D.E. 44] 4; [D.E. 54] 2, 6–7; Hearing Tr. at 22–26; [D.E. 44-10] 8 (if evidence of a crime is detected in plain view during the course of a security screening, the TSO shall "refer it to a supervisor or a law enforcement official for appropriate action.").

TSA agents properly conducted an administrative search and notified law enforcement due to suspected criminal activity. See, e.g., McCarty, 648 F.3d at 832–38; Aukai, 497 F.3d at 962–63; Hartwell, 436 F.3d at 177–81; $557,933.89, 287 F.3d at 85–87; United States v. Smith, 643 F.2d 942, 944–45 (2d Cir. 1981); United States v. Clay, 638 F.2d 889, 891–92 (5th Cir. 1981); DeAngelo, 584 F.2d at 47; Edwards, 498 F.2d at 499–501. Moreover, during the brief, four-minute period between TSO Singh alerting TSO Ballesteros and TSO Ballesteros alerting Officer Pegram, no TSA agent told Lyon that he was not free to leave. See Hearing Tr. at 15, 28, 50. Of course, TSA agents still had possession of Lyon's bag, but TSA could not give Lyon's bag back to him because TSA had not cleared the bag. See, e.g., Adams Tr. [D.E. 74] 8–9; Hearing Tr. at 24–25, 36, 39–40; [D.E. 44-10]. TSA still was not sure whether the bag contained sheet explosives. See Hearing Tr. at 24–25, 36, 39–40. Thus, having reviewed the totality of the circumstances, the court concludes that TSA agents did not unreasonably extend TSA's administrative search or improperly command Lyon to remain at the security screening area until APD officers arrived.

## B.

Next, Lyon contends that the APD officers violated the Fourth Amendment when they failed to return his bag and driver's license before going to a separate office. See [D.E. 44] 21–30. Lyon also contends that he did not consent to go with APD officers to a separate office and that the

11

officers seized him in violation of the Fourth Amendment. Id. Moreover, Lyon contends that APD officers violated the Fourth Amendment when they searched his bag. See id.; [D.E. 63] 3–10.

As for Lyon's attack on the brief walk from the TSA screening area to the nearby office, when Lyon went with officers to a separate office there was an ongoing administrative search. The circumstances of this administrative search mirror those that then-Judge Alito discussed and approved in Hartwell. See Hartwell, 436 F.3d at 175–76. In Hartwell, a man entered an airport security screening area, and TSA agents stopped him for further inspection when an item in his pocket alerted the screening technology. See id. TSA agents asked the man to empty his pockets, but the man refused. See id. TSA agents took the man to a separate room and searched his pockets. See id. TSA agents found drugs in the man's pocket, alerted airport police, and airport police searched and arrested the man. See id. The Third Circuit held that the search and seizure was a single permissible administrative search and seizure from when the man entered the TSA security screening area to later police involvement and arrest, and the search and seizure comported with the Fourth Amendment. See id. at 177–81.

As in Hartwell, Lyon went to the TSA security screening area, his bag alerted on the x-ray scanner, and TSA agents legally searched his bag. See [D.E. 44] 4; [D.E. 54] 5–6; Adams Tr. 3–9; Hearing Tr. at 8–14, 23–28. Upon discovering the large, organic masses artfully concealed and wrapped in a unique manner indicative of sheet explosives or drug trafficking, TSA agents alerted APD. Shortly thereafter, Officer Pegram arrived, but he could not determine what was in the bag and reasonably suspected criminal activity. See Hearing Tr. at 43–49. Officer Pegram then contacted Officer Alwang. See id. at 36–37, 62, 71. After Officer Alwang arrived, Lyon voluntarily went with the APD officers and a TSO to a separate office. See [D.E. 44] 4; [D.E. 46] 2; [D.E. 54] 2, 6–7; [D.E. 54-7] 1–2; Hearing Tr. at 14–15, 23–26, 36–37, 57–58, 62–63, 71–73, 84. At this

12

point, TSA had not cleared Lyon's bag, and TSA still had a security interest in determining the contents of the large organic masses in Lyon's bag. See Adams Tr. at 8–9; [D.E. 44-10]; Hearing Tr. at 24–25, 36, 39–40. Although Lyon told APD officers and TSA agents that the masses contained currency, neither the APD officers nor TSA agents had cut into the masses to determine if they were currency or if they concealed anything else, such as sheet explosives or other contraband. Accordingly, the search of Lyon's bag at the screening area and later by APD officers in the separate office was justified by the administrative search doctrine. See, e.g., McCarty, 648 F.3d at 832–38; Aukai, 497 F.3d at 962–63; Hartwell, 436 F.3d at 177–81; $557,933.89, 287 F.3d at 85–87; Smith, 643 F.2d at 944–45; Clay, 638 F.2d at 891–92; DeAngelo, 584 F.2d at 47; Edwards, 498 F.2d at 499–501.

Lyon's encounter with APD officers from 5:34 a.m. through when TFO Woodlief confiscated the currency was consensual. A consensual encounter does not trigger Fourth Amendment scrutiny. See Florida v. Bostick, 501 U.S. 429, 434 (1991); Terry v. Ohio, 392 U.S. 11, 19 n.16 (1968); Santos v. Frederick Cnty. Bd. of Com'rs, 725 F.3d 451, 460–61 (4th Cir. 2013); United States v. Clark, 891 F.2d 501, 504 (4th Cir. 1989). Even when officers have no basis for suspecting a particular individual, they generally may ask an individual questions. See Florida v. Rodriguez, 469 U.S. 1, 5–6 (1984) (per curiam). They also may ask to examine identification. INS v. Delgado, 466 U.S. 210, 216 (1984). They may request consent to search luggage, Florida v. Royer, 460 U.S. 491, 501 (1983), so long as they do not convey a message that compliance with their requests is required. A consensual encounter may, but does not necessarily, turn into involuntary seizure when the police take custody of a person's identification or other property. See, e.g., Rodriguez, 469 U.S. at 5–6; Royer, 460 U.S. at 501.

13

Alternatively, if officers develop reasonable suspicion that a passenger may be carrying contraband in his luggage (including sheet explosives, marijuana, or currency to be used to facilitate a violation of the Controlled Substance Act), authorities may conduct an investigative detention of the person and his property consistent with Terry, in order to confirm or dispel their reasonable suspicion. See, e.g., United States v. Place, 462 U.S. 696, 706 (1983); $557,933.89, 287 F.3d at 85–87. Under Terry, an officer may conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity may be afoot. See United States v. Arvizu, 534 U.S. 266, 273–75 (2002); Illinois v. Wardlow, 528 U.S. 119, 123 (2000); Minnesota v. Dickerson, 508 U.S. 366, 373 (1993); United States v. Sokolow, 490 U.S. 1, 7–11 (1989); Terry, 392 U.S. at 21. "When an officer's observations lead him reasonably to believe that a traveler is carrying luggage that contains [contraband], the principles of Terry and its progeny would permit the officer to detain the luggage briefly to investigate the circumstances that aroused his suspicion, provided that the investigative detention is properly limited in scope." Place, 462 U.S. at 706; see United States v. McFarley, 991 F.2d 1188, 1191 (4th Cir. 1993). "Though the quantum of suspicion necessary for a Terry stop is less demanding than that for probable cause, an officer must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." United States v. Brown, 401 F.3d 588, 596 (4th Cir. 2005) (quotations omitted). "[T]he reasonableness of a lawful Terry stop is evaluated according to the totality of the circumstances, including (1) the seizure's duration; (2) whether the police acted diligently to confirm or dispel their suspicions; (3) whether detention was unnecessarily prolonged; and (4) the importance of the governmental interest alleged to justify the intrusion." United States v. $433,980 in U.S. Currency, 473 F. Supp. 2d 672, 681 (E.D.N.C. 2006); United States v. Alpert, 816 F.2d 958, 964 (4th Cir. 1987). Furthermore, during a Terry stop, an officer may permissibly obtain a person's driver's license to perform a criminal

14

background check. See United States v. Foreman, 369 F.3d 776, 781–82 (4th Cir. 2004); United States v. Avagyan, 164 F. Supp. 3d 864, 888 & n.30 (E.D. Va. 2016).

As for Lyon's bag, Officer Pegram was the first police officer to arrive at the security screening area and did so at 5:33 a.m. See Hearing Tr. at 43–52; [D.E. 44] 4; [D.E. 46] 2; [D.E. 54-7] 1–2. At the security screening area, Officer Pegram noticed the same suspicious circumstances that the TSA agents observed: organic masses wrapped in newspaper, vacuum-sealed, and hidden under the lining of Lyon's bag. See Hearing Tr. at 43–52; [D.E. 44] 4; [D.E. 46] 2; [D.E. 54-7] 1–2. At the evidentiary hearing, Officer Pegram credibly testified that Lyon told TSA agents that the packaging contained currency, but Officer Pegram had never seen currency wrapped in such a manner. See Hearing Tr. at 46–47. Officer Pegram, however, had seen illegal drugs wrapped in a similar manner. See id. at 47. When Officer Pegram asked Lyon about the contents, Lyon initially told Officer Pegram that he was carrying $6,000 in currency. Id. at 46–47. Officer Pegram believed that the large organic masses in Lyon's bag looked like much more currency than $6,000. See id. at 46–47, 51–52, 54–55, 104–05. Based on the suspicious circumstances, Officer Pegram alerted Officer Alwang, who arrived at approximately 5:34 a.m. See [D.E. 44] 4; [D.E. 46] 2; [D.E. 54-7] 1–2.

Officer Alwang immediately noticed the same suspicious circumstances. See [D.E. 54] 1–2, 5–17; [D.E. 54-7] 2–3. At the evidentiary hearing, Officer Alwang credibly testified that at 5:34 a.m. Lyon and his bag smelled like marijuana before they went to the office. See Hearing Tr. at 85, 102–03; Gov. Ex. 39.[2]

---

[2] The video of Officer Alwang's search of Lyon's bag at 5:39 a.m. confirms that Officer Alwang stated that Lyon's bag "reek[ed] of marijuana." Hearing Tr. at 85, 102–03; Gov. Ex. 39.

15

As for any challenge to Officer Alwang noticing the strong marijuana odor when first interacting with Lyon at 5:34 a.m. before going to the office, a passenger's reasonable expectation of privacy does not extend to the airspace surrounding him or his luggage. See United States v. Venema, 563 F.2d 1003, 1005–06 (10th Cir. 1977); United States v. Bronstein, 521 F.2d 459, 461 (2d Cir. 1975) ("If the police officers here had detected the aroma of the drug through their own olfactory sense, there could be no serious contention that their sniffing in the area of the bags would be tantamount to an illegal search."). Therefore, before even consulting Lyon about whether he consented to join officers in a separate office, APD officers had probable cause to seize Lyon's bag and take it to the office. See Place, 462 U.S. at 706; Payton v. New York, 445 U.S. 573, 587 (1980); McFarley, 991 F.2d at 1191; $145,850 U.S. Currency, 2010 WL 3063814, at *2–6; see also United States v. Cyzewski, 484 F.2d 509, 514 (5th Cir. 1973).

Under the "plain view" exception to the Fourth Amendment, authorities may lawfully seize suspected contraband or other items of evidentiary value that are plainly visible to an officer "whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity." Illinois v. Andreas, 463 U.S. 765, 771 (1983). The plain-view doctrine is based on the proposition that "once police are lawfully in a position to observe an item first-hand, its owner's privacy interest in that item is lost; the owner may retain the incidents of title and possession but not privacy." Id.; Payton, 445 U.S. at 587; United States v. Williams, 592 F.3d 511, 521 (4th Cir. 2010); $145,850 U.S. Currency, 2010 WL 3063814, at *2–6 (collecting cases); see also United States v. Currency, U.S. $42,500.00, 283 F.3d 977, 981–83 (9th Cir. 2002); Cyzewski, 484 F.2d at 514; United States v. $48,940 in U.S. Currency, 594 F. Supp. 3d 125, 131–33 (D. Mass. 2022) (once the officer opened the airline passenger's bag and discovered concealed "bundles of cash," the officer had probable cause to seize the bag). "Because

16

probable cause deals with probabilities and depends on the totality of the circumstances, it is a fluid concept that is not readily, or even usefully reduced to a neat set of legal rules." Dist. of Columbia v. Wesby, 138 S. Ct. 577, 586 (2018) (cleaned up). "It requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Id. (cleaned up). "Probable cause is not a high bar." Id. (cleaned up).

As for the alleged seizure of Lyon himself, the APD officers initially did not seize Lyon because the encounter at the TSA screening area and the move into the office were consensual based on the totality of the circumstances. Alternatively, even if the encounter became non-consensual once Officer Pegram obtained Lyon's driver's license, Lyon's seizure was permitted as part of the administrative seizure exception. See, e.g., Aukai, 497 F.3d at 962–63; Hartwell, 436 F.3d at 177–81.

Alternatively, Terry permitted the APD officers' conduct. During a Terry stop, officers may seize a person and permissibly question him with no Miranda warning to dispel any initial reasonable suspicions. See Berkemer v. McCarty, 468 U.S. 420, 439–40 (1984); United States v. Brignoni–Ponce, 422 U.S. 873, 881 (1975); United States v. Manbeck, 744 F.2d 360, 375–80 (4th Cir. 1984). During a Terry stop, officers also may request a person to move if there is a legitimate law enforcement justification for doing so. See Royer, 460 U.S. at 504–05; United States v. Glover, 957 F.2d 1004, 1012 (2d Cir. 1992). Here, officers moved to a nearby office to protect officer safety, to protect the evidence, to permit access to resources that would aid the officers' investigation, and to allow Lyon to maintain some privacy. See United States v. Hensley, 469 U.S. 221, 235 (1985); Royer, 460 U.S. at 504–05; cf. Hearing Tr. at 62. Moreover, the APD officers' limited questioning of Lyon from 5:33 a.m. to 5:43 a.m. comports with officers performing their duty under Terry to confirm or dispel their reasonable suspicions.

As mentioned, at 5:34 a.m., Officer Alwang had probable cause to believe that Lyon' bag contained marijuana based on the odor from the bag. See Wesby, 138 S. Ct. at 586; Maryland v. Pringle, 540 U.S. 366, 371 (2003); Ybarra v. Illinois, 444 U.S. 85, 91 (1979); Brinegar v. United States, 338 U.S. 160, 175 (1949). Determining whether an officer has probable cause involves an inquiry into the totality of the circumstances. See Wesby, 138 S. Ct. at 586; Pringle, 540 U.S. at 371; United States v. Humphries, 372 F.3d 653, 657 (4th Cir. 2004). The "odor of marijuana alone can provide probable cause to believe that marijuana is present in a particular place." Humphries, 372 F.3d at 658; cf. United States v. White, 836 F.3d 437, 441 (4th Cir. 2016); United States v. Lewis, 606 F.3d 193, 198 (4th Cir. 2010); United States v. Carter, 300 F.3d 415, 422 (4th Cir. 2002); United States v. Cephas, 254 F.3d 488, 495 (4th Cir. 2001). In addition, at 5:34 a.m., Officer Alwang had not searched the bag and did not know if it contained sheet explosives, marijuana, or other contraband.

Given the totality of the circumstances, by at least 5:34 a.m., Officer Alwang had probable cause to make a warrantless seizure of the bag. See Place, 462 U.S. at 706; Payton, 445 U.S. at 587; McFarley, 991 F.2d at 1191; $145,800 U.S. Currency, 2010 WL 3063814, at *2–6; see also Cyzewski, 484 F.2d at 514; $48,940 in U.S. Currency, 594 F. Supp. 3d at 131–33. Officer Alwang credibly testified that he noticed the smell of marijuana from the bag at 5:34 a.m. See Hearing Tr. at 85. "Just as evidence in the plain view of officers may be searched without a warrant, Harris v. United States, 390 U.S. 234, 236 (1968) (per curiam), evidence in the plain smell may be detected without a warrant." United States v. Roby, 122 F.3d 1120, 1125 (8th Cir. 1997) (per curiam) (cleaned up); see United States v. Harvey, 961 F.2d 1361, 1363 (8th Cir. 1992) (per curiam); Horton v. Goose Creek Indep. Sch. Dist., 690 F.2d 470, 477 (5th Cir.1982); United States v. Haynie, 637 F.2d 227, 233–34 (4th Cir. 1980); United States v. Hutchinson, 471 F. Supp. 2d 497, 509 (M.D. Pa.

18

2007) (collecting cases). The smell of marijuana alone provided probable cause to seize the bag. See Humphries, 372 F.3d at 658; Lewis, 606 F.3d at 198; Carter, 300 F.3d at 422; Cephas, 254 F.3d at 495; United States v. Taylor, 572 F. Supp. 3d 199, 209 (D.S.C. 2021). Likewise, the bundles of hidden currency provided probable cause to seize the bag. See, e.g., $48,490 in U.S. Currency, 594 F. Supp. 3d at 131–33. Furthermore, once Officer Alwang had probable cause to seize the bag, the Fourth Amendment "brevity" requirement ended. See, e.g., Hensley, 469 U.S. at 235–36; Hartwell, 436 F.3d at 177–81; Manbeck, 744 F.2d at 380; $48,490 in U.S. Currency, 594 F. Supp. 3d at 131–33.

Alternatively, even if the APD officers did not have reasonable suspicion and then probable cause to seize the bag before going to the office, Lyon consented to joining APD officers in the office and then consented to a search of his bag. Consent is an exception to the warrant requirement. See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). For the consent exception to apply, the government must prove that the consent was freely and voluntary given. See id. at 222. Voluntariness is a question of fact and requires a court to scrutinize the totality of the circumstances. See id. at 226–29. To meet its burden of proving valid consent, the government must show that the consent was in fact freely and voluntarily given, and "not the result of duress or coercion, express or implied," id. at 248, or the "mere submission to a claim of lawful authority." Royer, 460 U.S. at 497. In analyzing the totality of the circumstances, the court may consider the party's age, education, experience, intelligence, and circumstances surrounding the alleged consent, including the time, what was said, and the number of officers present. See, e.g., Schneckloth, 412 U.S. at 229–30, 248–49; United States v. Lattimore, 87 F.3d 647, 650–53 (4th Cir. 1996) (en banc). "[K]nowledge of a right to refuse is a factor to be taken into account," but the lack of such knowledge does not make any consent given per se involuntary. Schneckloth, 412 U.S. at 249.

19

In opposition to this court's finding that Lyon consented moving to the room near the TSA screening station and to the search of his bag, Lyon cites Royer and argues that the seizure of his bag and the fact that Officer Pegram and then Officer Alwang had his driver's license rendered any consent to join officers in the office or to allow officers to search his bag involuntary. See [D.E. 44] 20–24; Hearing Tr. at 127–29. However, unlike in Royer, Officer Alwang expressly told Lyon that he was free to leave before going to the office and no other officer told Lyon that he could not leave. See Hearing Tr. at 15, 28, 50–52, 70–73. Moreover, no TSA agent or APD officer told Lyon that he had to stay with his bag. See id. at 15, 28, 50–52, 70–73. Furthermore, in Royer, law enforcement agents encountered Royer to obtain consent to search his luggage to determine whether his luggage contained contraband. See Royer, 460 U.S. at 492–95. In contrast, TSA agents in this case already discovered the large organic masses in Lyon's bag and already had legal authority under the administrative search and seizure exception to detain and search Lyon's bag. See [D.E. 44] 4; [D.E. 54] 6; Hearing Tr. at 8–14, 23–28; Aukai, 497 F.3d at 962–63; Hartwell, 436 F.3d at 177–81; DeAngelo, 584 F.2d at 47–48.

Even after the TSA agents searched Lyon's bag, they could not determine what was in the bag, did not clear the bag, and asked for APD assistance. Moreover, unlike in Royer, Lyon retained his boarding pass and was able to move through security without one of his two carry on bags and to board the plane. Compare Royer, 460 U.S. at 504 with Gov. Ex. 39 (showing Lyon's possession of his phone, wallet, boarding pass, and his other carry on bag through his encounter with APD officers). Although officers possessed Lyon's license for investigative purposes from 5:33 a.m. when Officer Pegram received it until 5:34 a.m. when Officer Alwang put it on the table in front of Lyon, the brief possession of a license did not prohibit Lyon from leaving. Cf. United States v. Weaver, 282 F.3d 302, 310–12 (4th Cir. 2002) (discussing how an officer's retention of a driver's

20

license during a traffic stop prevents the driver from leaving the traffic stop). Additionally, as evidenced by Lyon taking his license off the table and putting it in his wallet at 5:43 a.m. without consulting the officers, Lyon could have taken the license back at any time after Officer Alwang placed it on the table at 5:34 a.m. See Gov. Ex. 39. Therefore, even if the officers' brief possession of the license made Lyon feel like he could not leave, Lyon was free to leave at any time after 5:34 a.m. Based on the totality of the circumstances, the court finds that Lyon consented to joining officers in a separate office and consented to allowing officers to search his bag. Moreover, once officer Alwang had probable cause to seize the bag (whether that was at 5:34 a.m., 5:39 a.m., or 5:43 a.m.), the Fourth Amendment's "brevity" requirement for an administrative search or a Terry stop ended. See, e.g., Hensley, 469 U.S. at 235–36; Hartwell, 436 F.3d at 177–81; Manbeck, 744 F.2d at 380; $48,490 in U.S. Currency, 594 F. Supp. 3d at 131–33.

## C.

To the extent that Lyon argues that TSA agents and APD officers violated his Miranda rights, the court rejects the argument. The requirement to give Miranda warnings in advance of questioning during a custodial interrogation does not attach to questioning during a consensual encounter with law enforcement or questioning during a valid Terry stop. See Berkemer, 468 U.S. at 440–41; United States v. Sullivan, 138 F.3d 126, 130 (4th Cir. 1998). Moreover, Miranda rights arise from the Fifth Amendment's guarantee against compelled self-incrimination. See Miranda v. Arizona, 384 U.S. 436, 439 (1966). And the Fifth Amendment is expressly limited to criminal cases. See Austin v. United States, 509 U.S. 602, 607–08 & n.4 (1993). Asset forfeiture actions brought under 21 U.S.C. § 881 are civil proceedings. See United States v. Cherry, 330 F.3d 658, 668 n.16 (4th Cir. 2003); United States v. One Piper Aztec F De Lux Model 250 PA 23 Aircraft, 321 F.3d 355, 357 (3d Cir. 2003). Thus, Miranda's prophylactic protection does not apply. See Baxter v. Palmigiano, 425

21

U.S. 308, 315 (1976); United States v. $107,840.00 in U.S. Currency, 784 F. Supp. 2d 1109, 1118–19 (S.D. Iowa 2011). Accordingly, the court rejects Lyon's Miranda argument.

III.

In sum, the court DENIES claimant's motion to suppress [D.E. 43] and DENIES as moot plaintiff's motion to limit testimony [D.E. 69]. The clerk SHALL SEAL plaintiff's Exhibits 43 and 44 and the testimony of James Adams in the hearing transcript.

SO ORDERED. This 28 day of March, 2023.

_~~~~~~~Dever~~~~~~~_
JAMES C. DEVER III
United States District Judge