IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:20-CV-539-D

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | **ORDER** |
| $115,413.00 IN U.S. CURRENCY, | ) | |
| Defendant. | ) | |
| RAMON L. LYON, | ) | |
| Claimant. | ) | |

On October 9, 2020, the United States of America ("United States" or "plaintiff") filed an action in rem for $115,413.00 in United States currency [D.E. 1]. On November 30, 2020, Ramon L. Lyon ("Lyon" or "claimant") filed a verified claim of interest contesting the forfeiture of the $115,413.00 [D.E. 5]. On May 13, 2021, Lyon filed a second verified claim of interest [D.E. 23]. On May 21, 2021, Lyon moved to dismiss the United States' amended complaint for forfeiture [D.E. 25]. On November 18, 2021, the court denied Lyon's motion to dismiss [D.E. 35].

On January 11, 2024, the United States moved for leave to amend its complaint to conform to the evidence by alleging two additional alternative theories of forfeiture [D.E. 92] and filed a memorandum in support [D.E. 94]. On February 22, 2024, Lyon opposed the motion to amend [D.E. 99]. On March 7, 2024, the United States replied [D.E. 100]. On March 14, 2024, the court granted the United States' motion for leave to amend its complaint [D.E. 102]. On the same day, the United States filed its amended complaint for forfeiture [D.E. 103, 103-1].

On April 23, 2024, Lyon filed a third verified claim of interest [D.E. 106]. On May 28, 2024, Lyon moved to dismiss the United States' amended complaint for forfeiture [D.E. 113] and filed a memorandum in support [D.E. 114]. On June 11, 2024, the United States responded in opposition [D.E. 115]. On July 22, 2024, the court denied Lyon's motion to dismiss the amended complaint for forfeiture [D.E. 116].

On August 12, 2024, Lyon answered the amended complaint for forfeiture [D.E. 117]. On September 26, 2024, the United States moved for summary judgment and to strike Lyon's claim [D.E. 133], and filed a memorandum [D.E. 134], statement of materials facts [D.E. 135], and appendix in support [D.E. 136]. On October 7, 2024, Lyon amended his answer to the amended complaint for forfeiture [D.E. 140]. On November 1, 2024, Lyon responded to the United States' motion for summary judgment and to strike Lyon's claim [D.E. 144].[1] On December 11, 2024, the United States replied [D.E. 147]. As explained below, the court grants the United States' motion for summary judgment and strikes Lyon's claim of interest.

I.

On June 3, 2020, Lyon entered a security checkpoint at Raleigh-Durham International Airport ("RDU") in Morrisville, North Carolina, to board a flight to Los Angeles. See Pl.'s Statement of Material Facts ("PSMF") [D.E. 135] ¶ 116; [D.E. 103-1] ¶ 9; [D.E. 140] 2.

---

[1] Lyon's response fails to comport with the Local Civil Rule 56.1(a)(2). Lyon fails to offer facts or evidence to controvert the numbered paragraphs in the United States' statement of material facts. See Local Civil Rule 56.1(a)(2), E.D.N.C. Accordingly, the facts contained within each numbered paragraph of the United States' statement of material facts are deemed admitted by Lyon. See id. ("Each numbered paragraph in the movant's statement of material facts will be deemed admitted for purposes of the motion unless it is specifically controverted by a correspondingly numbered paragraph in the opposing statement."); Williamson v. Bridgestone Ams., Inc., 625 F. Supp. 3d 466, 470–71 (E.D.N.C. 2022); Felton v. Moneysworth Linen Serv., Inc., 295 F. Supp. 3d 595, 597 n.1 (E.D.N.C. 2018); Howard v. Coll. of the Albemarle, 262 F. Supp. 3d 322, 329 n.1 (E.D.N.C. 2017), aff'd, 697 F. App'x. 257 (4th Cir. 2017) (per curiam) (unpublished).

A Transportation Security Administration ("TSA") official monitoring the x-ray machine identified one of Lyon's bags for further inspection. See PSMF ¶¶ 116–18; [D.E. 103-1] ¶ 9. After searching Lyon's bag, the United States seized $115,413.00 in United States currency hidden in the bag. See PSMF ¶ 124; [D.E. 103-1] ¶¶ 9–15, 33. Lyon claimed that the currency was from the Phish Lounge, an internet sweepstakes business, which he claimed to operate. See PSMF ¶¶ 125–28; [D.E. 103-1] ¶¶ 9–10; [D.E. 140] 3–4.

Following this seizure, RDU police interviewed Lyon. See PSMF ¶¶ 118–23; [D.E. 103-1] ¶ 12; [D.E. 140] 3. During the interview, Lyon misrepresented: (1) the amount of currency he was carrying, (2) the purpose of his travel, and (3) his role with Phish Lounge. See PSMF ¶¶ 118–23; [D.E. 103-1] ¶¶ 12–15; [D.E. 140] 3. Lyon first told police he was traveling to California to purchase land. See PSMF ¶ 123; [D.E. 103-1] ¶ 12; [D.E. 140] 3. He later changed his story and said he was traveling to California to purchase video poker machines. See PSMF ¶ 128; [D.E. 103-1] ¶ 14; [D.E. 140] 3.

Because Lyon had no employment history in North Carolina and an extensive criminal record, including multiple drug trafficking convictions, the Department of Homeland Security ("DHS") concluded that there was probable cause that the $115,413.00 was an intended payment for a controlled substance or the proceeds from a controlled substance sale. See [D.E. 54] 2, 13–14; [D.E. 54-10] 1–8; PSMF ¶ 119; [D.E. 103-1] ¶¶ 16–18, 33; [D.E. 140] 3. Lyon agreed to surrender the bulk currency and signed a DHS Form 4607. See PSMF ¶ 124; [D.E. 103-1] ¶ 15; [D.E. 140] 3. The United States filed a complaint for the seized currency. See [D.E. 1].

Lyon contends that the seized currency is "proceeds from the Phish Lounge located at 1825 Garner Rd., Raleigh NC." [D.E. 140] 3. On January 11, 2024, based on belated discovery responses from Lyon, and deposition testimony from Lyon and his fiancée Denise Williamson

3

("Williamson") concerning the Phish Lounge, the United States moved for leave to amend its complaint to add two additional, alternative theories of forfeiture. See [D.E. 92] 1–2. Specifically, DHS concluded that there was probable cause that the seized currency derived from proceeds traceable to specified unlawful activity, including an illegal gambling business, or was used in the operation of an illegal gambling business. See PSMF ¶¶ 125–28; [D.E. 103-1] ¶¶ 30–33.

Williamson "was the sole owner of the Phish Lounge" located at 1825 Garner Rd., Raleigh NC, and operated the Phish Lounge for a time under the business registration Plush Lounge & Bar LLC. PSMF ¶¶ 10–11; see [D.E. 136-3] 1–2; [D.E. 136-6] 1–2. Originally, Williamson operated the Plush Lounge and Bar as "an actual bar." PSMF ¶ 16; [D.E. 136-3] 1–2. Williamson, however, noticed her patrons were "always talking about . . . phishing," video gaming machines that allow patrons to shoot at sea creatures on a screen after purchasing credits to wager. [D.E. 136-2] 17; see PSMF ¶¶ 49, 51–53. These "fish tables" turn entirely upon luck. PSMF ¶ 48; see PSMF ¶¶ 54–55; [D.E. 103-1] ¶¶ 29, 31; [D.E. 136-2] 56–58, 76–77.

In late 2015 or early 2016, after researching the games, Williamson purchased several fish tables and converted the Plush Lounge and Bar into a gambling business. See [D.E. 103-1] ¶¶ 28–29; [D.E. 134] 6–7; PSMF ¶¶ 16–21; [D.E. 140] 4. After finding success with the fish tables, Williamson purchased additional machines, closed the Plush Lounge and Bar, and opened the Phish Lounge. See [D.E. 103-1] ¶¶ 28–29; [D.E. 134] 6–7; PSMF ¶¶ 11, 16–21; [D.E. 136-2] 8–9, 12, 17–21; [D.E. 140] 4. In addition to fish tables, the Phish Lounge also offered stand-up consoles, large machines that allowed patrons to wager credits in luck-based games. See [D.E. 103-1] ¶ 28–29; [D.E. 134] 9–10; PSMF ¶¶ 43, 48, 54, 58–60; [D.E. 136-2] 20, 58–64, 112–114.

The Phish Lounge operated 24/7 and Williamson hired personnel to work around-the-clock. See [D.E. 103-1] ¶ 28–29; [D.E. 134] 25–28; PSMF ¶¶ 40–47; [D.E. 136-1] 50–52; [D.E.

136-2] 37–38, 45, 82; [D.E. 136-8] 1–2. Lyon identified at least nine employees who worked for Williamson at the Phish Lounge. See PSMF 40–47; [D.E. 136-8] 1–2. Williamson controlled virtually every aspect of the Phish Lounge, including "leasing space for the business; researching and acquiring gambling software and equipment, including fish tables; hiring and firing employees and setting their work schedules; handling bookkeeping and payroll; working as cashier when needed; and removing, counting, and logging cash generated by the gambling machines at the Phish Lounge." PSMF ¶ 28; see [D.E. 136-2] 13–14, 17–23, 25–28, 31, 66–71, 82–83. Williamson referred to the Phish Lounge as "my sweepstakes" and "my business." PSMF ¶ 31; [D.E. 136-2] 59, 61. Likewise, referring to Williamson, Lyon called the Phish Lounge "her business." [D.E. 136-1] 77. According to Lyon, he was "just the manager" at the Phish Lounge. See, e.g., [D.E. 136-1] 16–19, 23–24, 27–31, 33, 36–37, 47, 49, 67, 78. Lyon worked for Williamson and Williamson was the "Boss Lady." [D.E. 136-8] 2; see, e.g., PSMF ¶¶ 37–39.

For Williamson and the Phish Lounge, business boomed. See PSMF ¶¶ 67–68. Williamson tracked the Phish Lounge's daily profits and cash flow on pull sheets: forms recording "how much money was taken out of [each] machine" and counted at a given time. [D.E. 136-1] 44; see PSMF ¶¶ 69–74; [D.E. 136-1] 42–46; [D.E. 136-2] 31–32, 34, 69–70. In 2018, the Phish Lounge regularly generated daily gross revenues in excess of $2,000.00. See PSMF ¶¶ 78–83. For example, on at least 16 days between January and February 2018, the Phish Lounge generated over $10,000.00 in daily gross revenue. See PSMF ¶ 79; [D.E. 136-2] 117, 121–22, 129, 142–47, 152, 161, 172–74, 178–80, 182, 184–85, 188–91. From February 18, 2018, through March 8, 2018, the Phish Lounge grossed at least $25,000.00 a day. See PSMF ¶ 80; [D.E. 136-2] 115–16, 118–23, 125, 125, 140–41, 149–50, 152, 167, 169–71, 181, 183, 192, 198. The Phish Lounge continued to rake in money, grossing over $1.8 million from January to May 2018. See PSMF ¶

5

83; see generally [D.E. 136-2] 115–98. The Phish Lounge's financial success continued into 2020. See PSMF ¶¶ 84–93; see generally [D.E. 136-2] 115–98.[2] In addition to cash-purchased credits, the Phish Lounge also accepted payment via cash app. See PSMF ¶ 93; [D.E. 103-1] ¶ 29.

On June 2, 2020, Williamson opened the Phish Lounge's safe—located in Williamson's office—and allowed Lyon to count out $115,413.00. See PSMF ¶¶ 103–04; [D.E. 136-1] 69–71; [D.E. 136-2] 88; [D.E. 136-9] 9. Williamson tasked Lyon with traveling to California and using the money to purchase more fish tables for the lounge. See PSMF ¶¶ 104; [D.E. 136-1] 69–71; [D.E. 136-2] 88; [D.E. 136-9] 9. Williamson forbade Lyon from using the money for any purpose other than purchasing the fish tables—"not even to buy somebody a drink." [D.E. 136-2] 89. Lyon vacuumed sealed the money, took it home after work, and packed it in his carry-on for his flight to California the next day. See PSMF ¶ 114; [D.E. 72] 12–15; [D.E. 136-1] 75–76; [D.E. 136-9] 9; [D.E. 136-11] 4. On June 3, 2020, the TSA seized the $115,413.00 from Lyon's duffle bag. See PSMF ¶ 1; [D.E. 103-1] ¶¶ 33; [D.E. 140] 3. Neither Williamson nor the Phish Lounge asserted claims to the seized currency.

In its motion for summary judgment, the United States argues Lyon lacks standing to pursue his claim and that Lyon has no legal right to the currency because the currency amounts to the fruits of an illegal enterprise. See [D.E. 134] 15–29. Specifically, the United States argues Lyon lacks both Article III and statutory standing to pursue his claim because the currency belonged to Williamson or the Phish Lounge LLC. See id. at 15–19. Moreover, the United States

---

[2] In its memorandum supporting its motion for summary judgment, the United States details the Phish Lounge's financial success. See PSMF ¶¶ 84–93; see generally [D.E. 136-2] 115–98. The Phish Lounge thrived financially from the day it opened until it closed sometime after June 3, 2020. See PSMF ¶¶ 84–93, 127. The COVID pandemic brought the Phish Lounge its largest daily gross earnings, with some days yielding over $30,000.00. See PSMF ¶ 92; [D.E. 136-2] 52.

6

argues Lyon would not be entitled to the currency even if he were its owner because "the seized currency constitutes proceeds traceable to, and/or money used in, an illegal gambling business, and is forfeitable to the United States." Id. at 19.

In opposition, Lyon argues he "has repeatedly demonstrated his possessory and/or ownership interest in the money" seized from him. [D.E. 144] 3. Moreover, Lyon claims he "and his family" suffered an injury when TSA seized the currency. Id. at 3.[3] Lyon asserts "[o]ther courts have consistently held that simple possession is sufficient, if accompanied by an explanation, and the person from whom the property was taken . . . always has standing." Id. at 3–6 (collecting cases). Alternatively, Lyon argues that ambiguities in North Carolina state law indicate "that sweepstakes operations were not clearly illegal under state law, which is a prerequisite for federal prosecution under 18 U.S.C. 1955." Id. at 7. In support, Lyon cites Hest Technologies, Inc. v. State ex rel. Perdue, 219 N.C. App. 308, 725 S.E.2d 10 (2012), and argues that the legal landscape at the time of the seizure "was characterized by significant ambiguities and inconsistencies . . . regarding sweepstakes operations" and that "conflicting court decisions," coupled with allegedly inconsistent enforcement, "raises doubt about the illegality of sweepstakes" under North Carolina law. Id. at 2–3, 6–7.[4] Lyon also argues that, at the time of the seizure, "there

---

[3] Lyon makes a nonsensical argument that if he and his fiancée, Williamson, had lived in South Carolina, then South Carolina law would vest him with an ownership interest in the seized currency. See id. at 3 n.2. Neither Lyon nor Williamson lived in South Carolina. Accordingly, South Carolina law provides no comfort.

[4] On December 14, 2012, the Supreme Court of North Carolina reversed Hest. See Hest Techs., Inc. v. State ex rel. Perdue, 366 N.C. 298, 303, 749 S.E.2d 429, 439 (2012). Accordingly, Hest provides no comfort.

was a moratorium on prosecuting fish table establishments in North Carolina." Id. at 2.[5] Apart from these legal arguments, Lyon offers no contrary evidence. Cf. Fed. R. Civ. P. 56(c)(1)(A).

The United States argues that because Lyon failed to offer any evidence of a possessory interest in the seized currency, he cannot establish Article III standing to pursue his claim. See [D.E. 147] 3–4. The United States also argues that Lyon's claim fails because "Lyon has never asserted a possessory interest in the seized currency" in accordance with Supplemental Rule G(5)(a). [D.E. 147] 4. Although Lyon now purports to assert an interest, the United States argues that Lyon's "[b]elatedly asserted interests" conflict with his "sworn claim" and cannot confer standing. Id. at 4. Alternatively, the United States argues that Williamson and Lyon, at best, had a bailor-bailee relationship regarding the $115,413.00. See id. at 5–7. Supplement Rule G(5) requires claimants to allege any claims based on a purported bailment, to identify the bailor, and, if filing a claim on behalf of a bailor, to state the bailee's authority to do so. See Fed. Supp. R. G(5)(a)(i)(B), G(5)(a)(iii) & 2006 Committee Notes on Rules, Subdivision (5); United States v. $244,320.00 in U.S. Currency, 295 F. Supp. 2d 1050, 1060–61 & n.7 (S.D. Iowa 2003) (applying Supplemental Rule C(6), which applied to forfeiture proceedings before 2006, when Supplemental Rule G was adopted); United States v. $746,198.00 in U.S. Currency, More or Less, 299 F. Supp. 2d 923, 931–32 (S.D. Iowa 2004) (same). According to the United States, because Lyon failed to comply with the requirements for bailees contesting forfeiture under Supplement Rule G(5), Lyon lacks statutory standing. See [D.E. 147] 7–8. Finally, the United States argues that the Phish Lounge violated North Carolina state law and that the seized currency, as proceeds of illegal gambling, "is, in fact, forfeitable to the United States." Id. at 10.

---

[5] When Lyon made this same argument in his motion to dismiss, the court rejected it. See [D.E. 116] 4–5. The argument has not improved with age. The court once again rejects Lyon's moratorium argument.

8

II.

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Scott v. Harris, 550 U.S. 372, 378, 380 (2007); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment initially must demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. See Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. See Harris, 550 U.S. at 378.

A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. See Anderson, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position [is] insufficient . . . ." Id. at 252; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Only factual disputes that affect the outcome under substantive law properly preclude summary judgment. See Anderson, 477 U.S. at 248.

9

Case 5:20-cv-00539-D   Document 149   Filed 03/12/25   Page 9 of 19

This dispute requires the court to interpret North Carolina's gaming regulations and apply North Carolina law. Accordingly, this court must predict how the Supreme Court of North Carolina would rule on any disputed state-law issues. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). In doing so, the court must look first to opinions of the Supreme Court of North Carolina. See id.; Parkway 1046, LLC v. U.S. Home Corp., 961 F.3d 301, 306 (4th Cir. 2020); Stahle v. CTS Corp., 817 F.3d 96, 100 (4th Cir. 2016). If there are no governing opinions from that court, this court may consider the opinions of the North Carolina Court of Appeals, treatises, and "the practices of other states." Twin City Fire Ins. Co., 433 F.3d at 369 (quotation omitted). In predicting how the highest court of a state would address an issue, this court must "follow the decision of an intermediate state appellate court unless there is persuasive data that the highest court would decide differently." Town of Nags Head v. Toloczko, 728 F.3d 391, 398 (4th Cir. 2013) (quotation omitted); see Hicks v. Feiock, 485 U.S. 624, 630 & n.3 (1988). Moreover, in predicting how the highest court of a state would address an issue, this court "should not create or expand a state's public policy." Time Warner Ent.-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (cleaned up); see Day & Zimmermann, Inc. v. Challoner, 423 U.S. 3, 4 (1975) (per curiam); Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999).

A.

In a civil forfeiture case, a claimant must show "a colorable interest in the property to have standing." United States v. Phillips, 883 F.3d 399, 402 (4th Cir. 2018). Merely asserting "an ownership interest in the property" does not suffice. Id. at 403; see United States v. $17,900.00 in U.S. Currency, 859 F.3d 1085, 1089–90 (D.C. Cir. 2017). A claimant must prove both statutory standing and Article III standing by a preponderance of the evidence. See $17,900.00 in U.S.

10

Currency, 859 F.3d at 1089. "[S]tatutory standing relates to a claimant's ability to show that he has satisfied whatever statutory requirements Congress has imposed for contesting a civil forfeiture action in federal court." United States v. 8 Gilcrease Lane, Quincy FL 32351, 641 F. Supp. 2d 1, 5–6 (D.D.C. 2009) (quotation omitted). "Article III standing . . . relates to the claimant's ability to show that he has a sufficient interest in the property to satisfy the case-or-controversy requirement of Article III." Id. at 6 (quotation omitted); see United States v. Real Prop. Located at 229 Potter Rd., N. Kingstown, R.I., 91 F. Supp. 3d 303, 306 (D. Conn. 2015).

A plaintiff establishes Article III standing by showing: (1) that the plaintiff has "suffered an injury in fact—an invasion of a legally-protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) "a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court"; and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision" from the court. Chambers Med. Techs. of S.C., Inc. v. Bryant, 52 F.3d 1252, 1265 (4th Cir. 1995) (cleaned up); see Food & Drug Admin. v. All. for Hippocratic Med., 602 U.S. 367, 380 (2024); Tyler v. Hennepin Cnty., 598 U.S. 631, 636 (2023); TransUnion LLC v. Ramirez, 594 U.S. 413, 423–30 (2021); Frank v. Gaos, 586 U.S. 485, 491 (2019); Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016); Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992); Laufer v. Naranda Hotels, LLC, 60 F.4th 156, 161 (4th Cir. 2023); Nanni v. Aberdeen Marketplace, Inc., 878 F.3d 447, 450 (4th Cir. 2017). These requirements are "the irreducible constitutional minimum of standing." Lujan, 504 U.S. at 560; see Spokeo, Inc., 578 U.S. at 338. If a plaintiff does not have standing, the court does not have subject-matter jurisdiction to hear the plaintiff's claim. See, e.g., Lujan, 504 U.S. at 560–61; White Tail Park, Inc. v. Stroube,

413 F.3d 451, 459 (4th Cir. 2005); Payne v. Sears, Roebuck & Co., No. 5:11-CV-614, 2012 WL 1965389, at *3 (E.D.N.C. May 31, 2012) (unpublished).

Injury-in-fact requires the plaintiff to demonstrate a "concrete and particularized" harm. Krakauer v. Dish Network, L.L.C., 925 F.3d 643, 653 (4th Cir. 2019); see Spokeo, 578 U.S. at 340. Specifically, concreteness means the injury must be "real, and not abstract," even if the harm is intangible. Spokeo, 578 U.S. at 340 (quotation omitted); see Curtis v. Propel Prop. Tax Funding, L.L.C., 915 F.3d 234, 240–41 (4th Cir. 2019). Furthermore, "in determining whether a given injury meets the constitutional threshold, [courts] look to both historic practice and the judgment of Congress." Krakauer, 925 F.3d at 653; see TransUnion, 594 U.S. at 424–26; Spokeo, 578 U.S. at 340–41; Lujan, 504 U.S. at 560; Garey v. James S. Farrin, P.C., 35 F.4th 917, 921–22 (4th Cir. 2022). Tangible or intangible injuries can satisfy the requirement of concreteness. See Spokeo, 578 U.S. at 340–41. If a plaintiff fails to establish Article III standing, the court lacks subject-matter jurisdiction.

Lyon admits that Williamson owned the Phish Lounge, and Lyon was just a manager. See [D.E. 136-1] 16–19, 23–24, 27–31, 33, 36–37, 47, 49, 67, 77, 78; see also [D.E. 103-1] ¶ 28; [D.E. 134] 6–7; PSMF ¶¶ 11, 16–21; [D.E. 136-2] 8–9, 12, 17–21, 90; [D.E. 140] 4. Lyon also admits that Williamson tasked Lyon with traveling to California to purchase more fish tables for the lounge and that Williamson provided the money to Lyon for the fish tables. See PSMF ¶¶ 104; [D.E. 136-1] 69–71; [D.E. 136-2] 88; [D.E. 136-9] 9. Lyon also concedes that Williamson forbade Lyon from using the money for any purpose other than purchasing the fish tables—"not even to buy somebody a drink." [D.E. 136-2] 89. Under Williamson's order, Lyon admits he vacuumed sealed the money, took it home after work, and packed it in his carry-on luggage for the flight to California the next day. See PSMF ¶ 114; [D.E. 72] 12–15; [D.E. 136-1] 75–76; [D.E. 136-9] 9;

12

[D.E. 136-11] 4. Furthermore, Lyon admits the $115,413.00 came from Williamson's safe and originated from the Phish Lounge. See PSMF ¶¶ 103–04; [D.E. 136-1] 69–71; [D.E. 136-2] 88; [D.E. 136-9] 9. Thus, the seized currency belonged either to Williamson or the Phish Lounge LLC. The seized currency has never belonged to Lyon.

Because the United States met its burden to establish the absence of a genuine issue of material fact concerning ownership, Lyon may not rest on the allegations or denials in his pleading. See Anderson, 477 U.S. at 248–49. Rather, Lyon "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co, 475 U.S. at 587 (emphasis and quotation omitted); Phillips, 833 F.3d at 402–03. Lyon, however, offers no such evidence. Thus, no genuine issue or material fact exists about who owned the seized money and who did not own the seized money. Because Lyon did not own the money, he cannot establish that he suffered an injury-in fact—an invasion of a legally-protected interest. Accordingly, Lyon lacks Article III standing to pursue his claim, and the court grants the United States' motion for summary judgment and strikes Lyon's claim. See, e.g., Phillips, 833 F.3d at 402–06.

Alternatively, Lyon lacks statutory standing to pursue his claim. "Statutory standing applies only to legislatively-created causes of action and concerns whether a statute creating a private right of action authorizes a particular plaintiff to avail herself of that right of action." CGM, LLC v. BellSouth Telecommunications, Inc., 664 F.3d 46, 52 (4th Cir. 2011) (quotation omitted). "The question of who can sue under a statutory cause of action turns on whether the party is within the statute's zone of interests." Krakauer, 925 F.3d at 656; see Lexmark Int'l., Inc. v. Static Control Components, Inc., 572 U.S. 118, 129–30 (2014). "If a plaintiff is the sort of person the law intended to protect, he can press his claim." Krakauer, 925 F.3d at 656. Applying statutory standing requires the court to "simply look to the statute itself." Id.

13

The court need not consider any bailor-bailee relationship that may have existed between Williamson and Lyon because Lyon failed to comply with Supplemental Rule G(5)(a). Supplemental Rule G governs <u>in rem</u> forfeiture actions arising from a federal statute. <u>See</u> Fed. Supp. R. G(1). Under Supplemental Rule G(5)(a)(i), "[a] person who asserts an interest in the defendant property may contest the forfeiture by filing a claim in the court where the action is pending." Fed. Supp. R. G(5)(a)(i); <u>see</u> 18 U.S.C. § 983(a)(4)(A). Supplemental Rule G(5) requires a person to "state the claimant's interest in the property." Fed. Supp. R. G(5)(a)(i)(B). Lyon's verified claims, however, merely offer a threadbare assertion that Lyon is the "owner" of the seized currency without providing any factual support. <u>See</u> [D.E. 5]; [D.E. 23]; [D.E. 106]. These threadbare assertions fail to comport with Supplemental Rule G(5)(a)'s requirement that claimants state their "interest in the property." Fed. Supp. R. G(5)(a)(i)(B). Moreover, when viewed against the raft of evidence establishing the ownership of the currency, Lyon's <u>ipse dixit</u> claim of interest disintegrates. <u>See, e.g.</u>, <u>Phillips</u>, 833 F.3d at 402–06. Accordingly, Lyon lacks statutory standing to pursue his claim, and the court grants the United States' motion for summary judgment and strikes Lyon's claim.

Alternatively, assuming without deciding that Williamson and Lyon shared a bailor-bailee relationship, Supplement Rule G(5) requires claimants to allege any claims based on a purported bailment, to identify the bailor, and, if filing a claim on behalf of a bailor, to state the bailee's authority to do so. <u>See</u> Fed. Supp. R. G(5)(a)(i)(B), G(5)(a)(iii) & 2006 Committee Notes on Rules, Subdivision (5); <u>see</u> <u>$244,320.00 in U.S. Currency</u>, 295 F. Supp. 2d at 1060–61 & n.7 (applying Supplemental Rule C(6), which applied to forfeiture proceedings before 2006, when Supplemental Rule G was adopted); <u>$746,198.00 in U.S. Currency, More or Less</u>, 299 F. Supp. 2d at 932 (same). Lyon failed to comply with any of these requirements. Accordingly, Lyon lacks

14

statutory standing to pursue his claim, and the court grants the United States' motion for summary judgment and strikes Lyon's claim.

B.

Alternatively, the United States seeks civil forfeiture under 18 U.S.C. § 981(a)(1)(C) and 18 U.S.C. § 1955(d). See [D.E. 103] 1–2.[6] Section 1955(d) allows for the forfeiture of "[a]ny property, including money, used in violation of [section 1955]." 18 U.S.C. § 1955(d); see United States v. King, 231 F. Supp. 3d 872, 894 (W.D. Okla. 2017). Section 981(a)(1)(C) allows for the forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . 'specified unlawful activity.'" 18 U.S.C. § 981(a)(1)(C). A violation of 18 U.S.C. 1955 constitutes "specified unlawful activity." 18 U.S.C. §§ 1956(c)(7)(A), 1961(1).

"A conviction for the underlying offense . . . is not a necessary prerequisite to a civil forfeiture proceeding." United States v. Stewart, 21 F.3d 426, 1994 WL 89803, at *1 n.2 (4th Cir. 1994) (per curiam) (unpublished table decision); United States v. One Parcel of Real Estate located at 7715 Betsy Bruce Lane, 906 F.2d 110, 111–12 (4th Cir. 1990). The government, however, must "establish, by a preponderance of the evidence, that the property is subject to forfeiture." 18 U.S.C. § 983(c)(1).

In order to seek forfeiture under section 1955(d) or section 981(a)(1)(C), the government first must show the claimant violated section 1955. Section 1955 makes it a federal crime to "conduct, finance, manage, supervise, direct, or own all or part of an illegal gambling business." United States v. Murray, 928 F.2d 1242, 1245 (1st Cir. 1991); see 18 U.S.C. § 1955(a). An "illegal gambling business" is defined as a gambling business which:

---

[6] The United States asserts other grounds for forfeiture but does not seek summary judgment on those grounds. See [D.E. 134] 6 n.2.

(i) is a violation of the law of a State or political subdivision in which it is conducted;

(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

18 U.S.C. § 1955(b).

As for the five-participant requirement, the statute does not define the required degree of participation. See Murray, 928 F.2d at 1245; United States v. Gresko, 632 F.2d 1128, 1132–33 (4th Cir. 1980). The term "conduct," however, means "any degree of participation in an illegal gambling business except participation as a mere bettor." Sanabria v. United States, 437 U.S. 54, 70 n.26 (1978); see Murray, 928 F.2d at 1245; United States v. Merrell, 701 F.2d 53, 54–55 (6th Cir. 1983); United States v. Jenkins, 649 F.2d 273, 275 (4th Cir. 1981); United States v. Greco, 619 F.2d 635, 638–39 (7th Cir. 1980). For example, in United States v. Merrell, the United States Court of Appeals for the Sixth Circuit held that an individual who served coffee to gambling patrons and performed janitorial services qualified as a participant in the gambling operation because the individual performed a service that was "helpful in operating the enterprise." Merrell, 701 F.2d at 54–55 (emphasis in original); see United States v. Follin, 979 F.2d 369, 372–73 (5th Cir. 1992); United States v. Hammond, 821 F.2d 473, 475–77 (8th Cir. 1987).[7] Furthermore, "the government need not show that the same five participants were involved in the business for all thirty days; however, there must be evidence that the business involved at least five people at all

---

[7] The Tenth Circuit, however, has held that "some function necessary to the gambling operation is required and that activity which may be merely helpful to an illegal gambling business does not make the actor a conductor of the illegal business." United States v. Boss, 671 F.2d 396, 399 (10th Cir. 1982). Other courts have rejected this approach. See Merrell, 701 F.2d at 55 (collecting cases).

times for thirty days." United States v. Parker, 790 F.3d 550, 554 (4th Cir. 2015) (alteration and quotation omitted); see Gresko, 632 F.2d at 1133. Thus, the five-participant requirement is met if any five persons were continuously involved over any thirty-day period, or on any single day in which gross revenues exceed $2,000.00. See Parker, 790 F.3d at 554.

In order for an individual to be counted towards the five-participant requirement, the individual must be subject to a conviction under section 1955, but the participant does not need to be charged or convicted. See, e.g., Boss, 671 F.2d at 400–01. Moreover, a participant need not "know that [his] conduct constitutes illegal gambling under state law." United States v. Lawson, 677 F.3d 629, 652–53 & n.32 (4th Cir. 2012); United States v. O'Brien, 131 F.3d 1428, 1430 (10th Cir. 1997).

As for the predicate state law violation, North Carolina law prohibits "any person or organization that operates any game of chance . . . at which any money, property or other thing of value is bet." N.C. Gen. Stat. § 14-292. This court held that fish tables and stand-up consoles offered at the Phish Lounge "were illegal under North Carolina law during the relevant time period." See [D.E. 116] 4; see also N.C. Gen. Stat. §§ 14-292, 14-295, 14-306, 14-306.1A, 14-306.4. That holding remains true today. The games offered at the Phish Lounge permitted patrons to wager money on games of luck. See [D.E. 103-1] ¶¶ 28–29, 31; PSMF ¶¶ 54–55; [D.E. 136-2] 56–58, 76–77. Williamson and Lyon knew that the Phish Lounge facilitated gambling. See [D.E. 103-1] ¶ 28–29; [D.E. 134] 9–10; PSMF ¶¶ 28, 34–35, 48–60; [D.E. 136-2] 20, 58–64, 112–114; O'Brien, 131 F.3d at 1430; cf. Lawson, 677 F.3d at 652–53 & n.32. Lyon offers no evidence to create a genuine issue of material fact concerning the illegality of the games under North Carolina law. Accordingly, the Phish Lounge operated gaming machines in violation of North Carolina state law. See 18 U.S.C. § 1955(b)(i).

17

As for section 1955's remaining elements, Lyon identified at least nine employees who worked for Williamson at the Phish Lounge. See PSMF ¶¶ 40–47; [D.E. 136-8] 1–2. Moreover, the uncontested evidence establishes that the Phish Lounge continuously operated for more than thirty days and with daily profits often far exceeding $2,000.00. See PSMF ¶¶ 78–83; [D.E. 136-2] 115–98. Thus, no genuine issue of material fact exists concerning whether the seized currency is forfeitable to the United States as proceeds from an illegal gambling operation. Moreover, Lyon has no claim to this currency. Accordingly, no genuine issue of material fact exists concerning whether the $115,413.00 was forfeitable to the United States, and the court grants the United States' motion for summary judgment and strikes Lyon's claim.

In opposition to this conclusion, Lyon cites the North Carolina Court of Appeals opinion in Hest. As the United States notes in its reply, the Supreme Court of North Carolina reversed and remanded in Hest "on December 14, 2012, approximately 3 years before the Phish Lounge opened and approximately 7.5 years before the seizure." [D.E. 147] 8–9; see Hest Techs., Inc. v. State ex rel. Perdue, 366 N.C. 289, 303, 749 S.E.2d 429, 439 (2012). Thus, any ambiguity in the law that the North Carolina Court of Appeals decision in Hest created had long dissipated when Williamson began her illegal gambling business and when the United States seized the currency.

III.

In sum, the court GRANTS the plaintiff's motion for summary judgment [D.E. 133] and STRIKES claimant's third verified claim [D.E. 106]. Plaintiff may file a motion for costs in accordance with the Federal Rules of Civil Procedure and the court's local rules. The clerk SHALL close the case.

18

SO ORDERED. This 12 day of March, 2025.

                                                         *J. Dever*
                                                         JAMES C. DEVER III
                                                         United States District Judge